UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LOCAL ACCESS, LLC,

       Plaintiff,

v.                                     Case No:   6:17-cv-236-Orl-40TBS

PEERLESS NETWORK, INC.,

       Defendant.

_____

## REPORT AND RECOMMENDATIONS

Pending before the Court is Plaintiff Local Access, LLC's Motion to Disqualify and/or Discipline Kelley Drye for Litigation Misconduct (Doc. 230). Defendant Peerless Network, Inc. and law firm Kelly Drye & Warren LLP have filed a response in opposition to the motion (Doc. 264). Local Access has filed a related motion for sanctions against Peerless for litigation misconduct (Doc. 229; Doc. 245-sealed) and Peerless has filed its response (Doc. 265; Doc. 274-sealed). The motions allege that Peerless and its attorneys at Kelley Drye improperly disclosed and used documents Local Access had designated as "Confidential" and "Highly Confidential," in violation of the Protective Order I entered on July 10, 2017 (Doc. 44). Peerless and Kelley Drye acknowledge the inappropriate disclosure and that "certain personnel used information derived from the confidential litigation material for reasons other than their responsibilities in connection with this case" (Doc. 188). But they say the disclosures were inadvertent and caused little harm. Local Access alleges the opposite, and that violation of the Protective Order warrants a panoply of sanctions against Peerless and Kelley Drye.

Due to the seriousness of the allegations, I allowed discovery on these issues and stayed all unrelated litigation in the case (See Doc. 275-sealed, Docs. 276, 281, 298, 299, 371, 389). By sealed Order dated January 3, 2019, I granted the motions to the extent they sought issuance of Orders to Show Cause and the scheduling of evidentiary hearings and denied Local Access' request for the imposition of sanctions and other relief, without prejudice to renewal, if appropriate, following conclusion of the hearings (See Doc. 458 – sealed).[1]

Because Local Access sought to disqualify Peerless' chosen attorneys, I decided it was appropriate to address that issue first and deferred hearing on the motion to impose sanctions against Peerless until the conclusion of the motion to disqualify or discipline Kelley Drye (Id. at 6). Kelley Drye was ordered to show cause why it should not be held in civil and criminal contempt and sanctions should not be imposed for failing to comply with the Protective Order, and an evidentiary hearing was held over the course of several days (Docs. 557-562; 564; 567, 569, 571). I allowed post-hearing briefing and the parties have made their submissions (Docs. 574-578). The matter is now ripe for final resolution.

### Background

This is not the first lawsuit between the parties and, remarkably, not even the first time the parties have accused each other of serious misconduct.[2] As Judge Byron observed, this is but the latest chapter in the conflict-ridden saga between Local Access

---

[1] Because the parties' papers and exhibits contain information filed under seal, description of some of the matters pertinent to the motion is necessarily abbreviated for the public docket.

[2] For a detailed historical account of the relationship and litigation between Local Access and Peerless, see Local Access, LLC and Blitz Telecom Consulting, LLC v. Peerless Network, Inc., Case No. 6:14-cv-00399-40-TBS. Among many other sanction motions, some successful and some not, Local Access sought to hold Peerless in contempt and Peerless sought sanctions for "litigation misconduct." The mud-slinging continues here. By my count over eleven motions seeking sanctions have been filed to date in this case.

and Peerless (Doc. 84 at 1). To say the discovery process has been excruciating is an understatement. I have held an extraordinary number of hearings and status conferences to moderate dozens of pretrial disputes. In order to place the current conflict in context, a brief background of the nature of this case and the parties' relationship is necessary.

Local Access and Peerless are competitive local exchange carriers which provide local telephone services, network connectivity and other related telecommunications products and services (Case No. 6:14-cv-399-Orl-40TBS, Doc. 185 at 4). Blitz Telecom Consulting, LLC is a marketing company which aggregates telephone numbers from various telecommunication carriers and markets and resells those services to its customers (Id.). In 2010, Blitz and Peerless entered into a business arrangement which they agreed to modify when the applicable law changed (Id., at 6- 7). This is why Blitz created Local Access to do business with Peerless (Id.).[3]

Local Access and Peerless entered into a five-year contract ("Contract") in 2012, wherein Peerless agreed to provide Local Access with "Homing Tandem Service" (See Doc. 135, ¶ 12; Doc. 135-1). Under the Contract, the Homing Tandem Service was available to Local Access for use in providing local exchange and exchange access telecommunications services to "[its] ... end users within the Peerless Network or its affiliates['] service areas." (See Doc. 135, ¶ 13; see also Doc. 135-1, ¶ 5.16). The Contract provided that if Local Access received a competitive offer from another carrier for a service it was receiving from Peerless and Local Access furnished Peerless written proof of the competitive offer, then Peerless had the option to match the competitive offer,

---

[3] Blitz filed a joinder in Plaintiff's motions (Doc. 362), but its status as a counterclaim Defendant in the current case is immaterial to the present controversy.

or if Peerless chose not to match the offer, Local Access had the option to reroute traffic to the competitor (Doc. 135, ¶14; 135-1, ¶ 3.3).

Local Access presented Peerless with what it claimed was a competitive offer on February 22, 2014 (Doc. 135, ¶ 15). Peerless refused to match the offer, finding that it was "not a valid competitive offer" and stated that "should Local Access move interexchange carrier homing tandem services to a competitor, Peerless will construe that act as an acknowledgement by Local Access that there is no agreement between the parties, or in the alternative, that Local Access is willing to breach its agreements" (Id. ¶¶ 16, 17). After Local Access received Peerless' response it "neither accepted the competitive offer, nor rerouted any of its traffic to Peerless' competitor …." (Id. ¶ 18). Later, Local Access presented Peerless with a new competitive offer that Peerless agreed to match (Id. ¶¶ 19, 20). The parties amended the Contract to reflect: (1) Peerless' agreement to match the competitive offer; (2) Peerless' agreement to "share seventy-five percent (75%) of Collected Tandem Access revenue [it] received on traffic associated with Local Access;" and (3) the parties agreement to extend the termination date of the Contract from August 5, 2015 to August 4, 2018 (Id., ¶¶ 21, 22).

Local Access alleges that on August 24, 2015, it received another competitive offer, this time from Inteliquent, which Peerless chose not to match. (Id., ¶¶ 24-26). Local Access then began re-routing traffic from Peerless to Inteliquent. Local Access claims that its acceptance of Inteliquent's offer did not void the Contract. It also alleges that due to the lengthy process of moving traffic from Peerless to Inteliquent, some of Local Access' traffic remained on the Peerless' network (Id., ¶¶ 27-30). Local Access maintains that Peerless is obligated to compensate it for that traffic. It also claims that despite repeated demands for payment, Peerless has failed to pay for traffic routed over the

Peerless network on and after August 5, 2015 (Id., ¶¶ 31, 32). Local Access is now suing Peerless for breach of contract and contract implied in law (Doc. 135).

Peerless denies that Local Access accurately represented the terms of any competitor's offer to it (Doc. 193, ¶ 19). It also denies that Local Access properly performed under the Contract (Id., ¶ 23); denies that Local Access was permitted to route traffic away from the Peerless network at any time prior to December 31, 2017; and claims that any right to route traffic off the Peerless network was limited by Local Access' obligation to route such traffic "pursuant to the terms of the alternative proposal" provided to Peerless, which Local Access allegedly did not do (Id., ¶27). Peerless argues in the alternative that to the extent Local Access permissibly executed an alternative agreement with a Peerless competitor, Peerless was released from its obligations under the Contract (Id.). Peerless admits that its network currently routes some amount of traffic associated with Local Access (Id., ¶30), but denies that it owes Local Access any compensation for that traffic. Peerless has interposed numerous affirmative defenses and counterclaims for declaratory judgment, damages for breach of contract, fraud, and a contract implied in law (Id.).

Peerless is represented by local counsel and Kelley Drye, including (during the time period at issue) attorneys Henry T. Kelly (partner); Catherine E. James (senior associate) and Brittany L. McElmury (junior associate).[4] The current dispute involves the terms of the Protective Order and the consequences which should result from the acknowledged violations of the Order.

---

[4] Ms. McElmury is no longer with the firm.

The Protective Order

Early in the case, the parties filed a Joint Motion for Protective Order with an attached proposed Protective Order intended to "govern discovery production and the exchange of materials among the parties and third-parties in light of the expected exchange of information that is protected 'Consumer Proprietary Network Information' ("CPNI")." (Doc. 43 at 1). Concerned that discovery "may result in the disclosure of CPNI, **confidential or proprietary information among the parties** and from third-party subpoena respondents that should not be publicly disclosed," the parties prepared the Protective Order and "agreed to the contents thereof." (Id., emphasis added; Doc. 43 at 3; and Doc. 43-1). The Court entered the tendered Protective Order after making certain modifications which are not pertinent to this dispute (Doc. 44).

The Protective Order defines two categories of information a party may designate as confidential:

> "Confidential" Litigation Material is information that contains, reflects, or reveals:(1) trade secret information (which is a formula pattern device for compilation of information which is used in one's business, and which gives the business an opportunity to obtain an advantage over competitors who do not know or use the trade secret information); (2) proprietary information, such as research and development information, or commercially or competitively sensitive information (as examples); or (3) confidential, non-public personal information concerning individuals.

> "Highly Confidential" Litigation Material is Confidential Litigation Material that (a) has current applicability to the Disclosing Party's business operations and (b) would more likely than not cause competitive harm to the business operations of the Disclosing Party if made public. Highly Confidential Litigation Material is afforded a higher level of confidentiality than Confidential Litigation Material under this Protective Order. The categories of Confidential Litigation Material that shall be deemed Highly Confidential shall be

> > narrowly limited to: customer names and terms of service, and
> > traffic and revenue information.

(Doc. 44, § 2).

The Protective Order identifies categories of persons who may be given access to Confidential and Highly Confidential information (Doc. 44, §§ 13 & 14). Confidential information may be disclosed to: "those directors, officers, and employees of [a] corporate entity [party] who require the Confidential Litigation Material to perform his or her responsibilities in connection with the Civil Action, and who have executed Attachment A, but only to the extent required to perform his or her responsibilities in connection with the Civil Action." (Doc. 44, § 13.e). Highly Confidential information may only be disclosed to outside counsel and retained experts; it cannot be disclosed to the parties themselves (Doc. 44, §14).

When Confidential or Highly Confidential information is disclosed to authorized persons, the Protective Order mandates that it "shall be used only for the prosecution or defense of the Civil Action. No party or person receiving Confidential or Highly Confidential Litigation Material shall use such material or the contents thereof for any other business, commercial, or competitive purposes." (Doc. 44, §15).

The Protective Order requires that certain categories of recipients (including personnel of the corporate parties) "be shown a copy of this Protective Order, and [they] shall not be provided Confidential or Highly Confidential information, unless agreeing in advance in writing to abide by the terms of this Protective Order, and by acknowledging their responsibilities to maintain the Litigation Material as Confidential or Highly Confidential by executing a copy of an acknowledgement set forth in Attachment A." (Doc. 44, §16.2). Unfortunately, when the parties submitted the proposed Protective

Order to the Court for entry, they did not include Attachment A. As a consequence, when the Protective Order was entered, Attachment A was not included.

The Protective Order also provides:

> In the event that information from Litigation Material designated Confidential or Highly Confidential is disclosed to someone not authorized to receive such information under this Protective Order, or if any person so authorized breaches any of his or her obligations under this Protective Order, counsel of record for the party involved shall (after learning of such disclosure or breach) **immediately** give notice of such unauthorized disclosure or breach, including a reasonable description of all pertinent facts, to counsel of record for the party who initially produced the Confidential or Highly Confidential Litigation Material. Without prejudice to other rights and remedies or the designating party, counsel for the party making the disclosure shall make every reasonable effort to prevent further disclosure by it or by the person who was the recipient of such information.

(Doc. 44, §18 – emphasis added).

<u>The Admitted Violations</u>

On June 1, 2018, Kelley Drye notified the Court in writing that Peerless "had access to information designated by Local Access as Confidential litigation material and certain personnel used information derived from the confidential litigation material for reasons other than their responsibilities in connection with this case." (Doc. 188). Kelley Drye acknowledged two breaches of the Protective Order: (1) disclosure of Call Detail Records ("CDRs") designated "Confidential" by Local Access were transmitted to Peerless employees who used the information for purposes other than litigation; and (2) Local Access CDRs that were designated Highly Confidential were transmitted to Peerless.

<b>Issues and Analysis</b>

Local Access seeks disqualification and sanctions against Kelley Drye based on its

improper disclosure of Confidential and Highly Confidential information to Peerless and its part in causing the misuse of some of that information by Peerless. Local Access claims that Kelley Drye acted with "callous disregard" for the procedures established in the Protective Order to safeguard the information and did not act promptly or appropriately upon becoming aware of the unauthorized disclosures and misuse. Kelley Drye argues that the information it disclosed to Peerless was improperly designated and was in fact, not Confidential or Highly Confidential. It also argues that the disclosures were inadvertent and excusable, it acted appropriately and understandably under the circumstances, and that any resulting harm was insufficient to warrant sanctions. The following facts were developed through the testimony and exhibits at the show cause hearing, and the sworn depositions and declarations.

*Findings of Fact*

On December 20, 2017, Local Access (through counsel) produced to Kelley Drye a set of CDRs identified as "LA_0001865-CONFIDENTIAL.zip." and designated as "Confidential" under the terms of the Protective Order (the "12/20/17 Production"). On January 30, 2018, Local Access supplemented this production by providing additional months of CDRs ("the 1/30/18 Production"). Local Access designated the 1/30/18 Production "Highly Confidential." (See, generally, Doc. 229). In her Declaration, Kelley Drye attorney Catherine E. James states:

> 5. On or about February 5, 2018, I asked Brittany McElmury, an attorney at Kelley Drye, to provide Local Access's 12/20/17 Production and 1/30/18 Production of CDRs to Peerless's engineering management, Scott Kell, Executive Vice President of Operations of Peerless, without realizing that the individual file names within the 1/30/18 Production of CDRs had been designated as Highly Confidential.

6. I also requested that two members of Peerless's engineering team (Mr. Kell and Mr. Sherman, Peerless's V.P. of Information Technology) load Local Access's CDRs into a Structured Query Language ("SQL") database and asked that they run queries for the purpose of prosecuting Peerless's claims and defenses.

7. One of the queries identified a list of entities from the 12/20/17 Confidential Production which Peerless identified under an "Egress Carrier" header.

8. On or about February 12, 2018, I provided that list of entities from Local Access's 12/20/17 Confidential Production to Rick Knight, Executive President of Sales and Marketing at Peerless for the purpose of, inter alia, investigating Local Access's allegations ….

9. I also communicated with Mr. Knight on or around February 12, 2018, February 14, 2018, February 15, 2018, February 19, 2018, March 8, 2018 and March 12, 2018 to plan for and conduct a review of information derived from the 12/20/17 production. During my conversations with Mr. Knight on or around February 15, 2018, March 8, 2018, and March 12, 2018, I discussed with him the terms of and compliance with the applicable Protective Order.

10. On or around March 5, 2018, I asked Brittany McElmury to resend Local Access's 1/30/18 Production of CDRs to Mr. Kell, without realizing that the individual file names within the 1/30/18 Production of CDRs had been designated as Highly Confidential.

11. On or around March 5, 2018, I again directed Peerless's engineering team to load the 1/30/18 Production into a SQL database to run queries attempting to identify information for the purpose of prosecuting Peerless's claims and defenses.

(Doc. 264-4).

In deposition testimony, Ms. James explained that Mr. Sherman and/or Mr. Kell created a spreadsheet of the unique names of Local Access' customers from the information contained in the CDRs from the 12/20/17 Production. (Deposition of Catherine James, 109:5-110:4). This spreadsheet was named "LA_Confidential." (Id. at 108:17-24). Ms. James printed the column of Local Access customer names from that

spreadsheet to a native .pdf document she named "LA Customers.pdf." (Id., 110:5-21; Local Access Exhibits 2 & 3). She did not include the word "Confidential" in the file name and the word "Confidential" does not appear anywhere in the .pdf file itself (Id. at 110:9-111:2). On February 12, 2018, Ms. James sent the "LA Customers.pdf" file to Mr. Knight via email. (Local Access Exhibits 2 & 3). The email transmitting the file did not inform Mr. Knight that the file "LA Customers.pdf" contained Confidential information protected by the Protective Order. Before sending the February 12, 2018 email to Mr. Knight, Ms. James had not sent Mr. Knight a copy of the Protective Order and she had not obtained a written acknowledgment of the Order from him (James, 51:11-15).

From there the information, not protected by a designation of "Confidential" was distributed within Peerless. Mr. Knight shared the Local Access confidential customer information contained in the file "LA Customers.pdf" with Mr. Brabson, Ms. McNerney and Mr. Davis, either by sending them the file or by reading the contents over the telephone. (Deposition of Richard Knight, 56:2-21). Mr. Brabson testified that he was never advised that the list was derived from Confidential Litigation Material (Deposition of Brian Brabson, 34:13-45:4). Ms. McNerney and Mr. Davis were also not told that the list was derived from Confidential Litigation Material (Deposition of Margaret McNerney, 26:20-27:10; Deposition of Jeff Davis, 19:12-20). Mr. Davis created a spreadsheet from the list of Local Access customer names provided to him by Mr. Knight (Davis, 44:6-11). He distributed this spreadsheet to Mr. Walther and several other Peerless employees (Id. at 45:7-10). Mr. Walther testified that nobody within Peerless told him he had been given Confidential information (Deposition of Steven Gregory Walther, 28:23-29:15).

On April 12, 2018, Kelley Drye attorney Henry T. Kelly received an email from counsel for Local Access asserting that Local Access' customers were being solicited by

Peerless and requesting information about Local Access' Highly Confidential information

(Doc. 265-10, ¶ 13). Beginning that day, Mr. Kelly and other lawyers representing

Peerless had conversations with Peerless employees to gather information to respond to

Local Access' concerns (Id., ¶¶ 14-18). According to Mr. Kelly:

> 14. During the period from April 12, 201[8] through approximately April 20, 201[8], I had communications with John Barnicle, Peerless's Chief Executive Officer, and Rick Knight, Executive President of Sales and Marketing at Peerless to inquire about the issue raised by Local Access's counsel's email.
>
> 15. On May 7, 2018, after I returned from a vacation, I spoke with John Barnicle regarding Local Access's concerns that Peerless had used information produced in discovery to market to Local Access customers. Mr. Barnicle and I agreed that I would have further discussions with Peerless employees.
>
> 16. At Peerless's direction, I spoke with Richard Knight and Brian Brabson on May 9, 2018, with Margaret McNerny on May 10, 2018, Jeff Davis on May 11, 2018, Julie Oost on May 14, 2018, John Barnicle on May 15, 2018 and May 16, 2018. Thereafter, I also had a subsequent conversation with Mr. Davis on June 29, 2018, Julie Oost and John Barnicle on June 29, 2018, Julie Oost, Greg Walther, Chris McDonald, Frank Trento, and James Cook on July 2, 201[8].
>
> 17. Through these conversations, I came to understand that a subset of the information transmitted to Mr. Knight was communicated to Mr. Brian Brabson (on or about February 14, 2018), Jeff Davis, Greg Walther, Chris McDonald, Frank Trento, James Cook (February 26, 2018), and Margaret McNerny (March 2018).
>
> 18. In addition, at my direction, I requested that Peerless provide a copy of all reports generated by Peerless from Local Access's 12/20/17 and 1/30/18 productions and destroy all copies and records containing or derived from those productions. I also directed the production of those reports to Local Access....

(Id.).

What Mr. Kelly and Ms. James fail to mention in their declarations is that Ms. McElmury was asked to confirm the confidentiality designations for Local Access CDRs in response to Local Access' query and, **on April 12, 2018**, she "informed my team that the January 30, 2018 production, which was sent to Scott Kell, was designated as 'Highly Confidential.'" (Doc. 265-5). Ms. McElmury "immediately" and within "seconds" reported that information to Ms. James and "collectively we reported it to Hank Kelly." (Deposition of Brittany McElmury, 79:2-23, 81:1-23, 89:16-24, 90:1-3).

Although Kelley Drye attorneys knew by April 12, 2018 that they had already disclosed the 1/30/18 Highly Confidential information to Peerless,[5] Ms. McElmury sent an email to an attorney for Local Access on May 7, 2018, which reads in part:

> Local Access has produced several sets of CDRs with the designation of "Highly Confidential": **on January 30, 2018, Local Access produced sets of CDRs, each of which was designated as "Highly Confidential**," and on or about April 10, 2018, Local Access produced additional CDRs that it designated "Highly Confidential." However, **almost all of the information provided in these CDRs is not Highly Confidential**, indeed Local Access regularly transmits much of the information contained in the CDRs to Peerless in the course of its business. If Local Access would identify what information within its CDRs it considers "Highly Confidential," we may be willing to consider stripping that information from the CDRs **prior to transmitting them to Peerless for review;** however, we have not received a response to our April 12, 2018 request to confirm what information is "Highly Confidential," or to confirm the header information for these CDRs**.**

(Doc. 229-11, emphasis added). Although Ms. McElmury sent the email, Mr. Kelly and Ms. James were involved in its drafting (See, e.g., Deposition of Henry T. Kelly; 151:24-

---

[5] See Doc. 188, ¶ 14, noting that Kelley Drye produced the information to Peerless employee Mr. Kell who downloaded and shared these files with Peerless employee Mr. Sherman on Feb. 5, 2018.

25; 152:1-18).[6]  The email did not disclose that Kelley Drye had already transmitted the Highly Confidential CDRs to Peerless.

On May 10 or 11, 2018, Mr. Kelly was informed that Messrs. Walther, McDonald, Trento, Cook and Ms. McNerny contacted some of the entities named in the 12/20/17 Production to market Peerless' services (Doc. 264-3, ¶¶ 14-21). Mr. Kelly notified Local Access of this on May 25, 2018 (Doc. 188 at ¶10). On May 16, 2018, Local Access was informed that Kelley Drye "inadvertently produced Local Access's CDRs produced on January 30, 2018 to Peerless." (Doc. 229-17). The Court was notified of these violations on June 1, 2018 (Doc. 188 at ¶¶ 5-10). Mr. Kelly testified that the reason for the delay was the need to investigate the extent of the disclosures and gather the necessary facts.

On May 11, 2018, well after the horse had left the barn, Kelley Drye created a document for recipients of confidential information to acknowledge that they have "read and understand the terms of the Protective Order." (Doc. 264-3, ¶ 4). And, although Kelley Drye represented that all improperly disclosed information was returned or destroyed, at least one Peerless employee continued to maintain copies of Confidential information until just before the contempt hearing (See Doc. 536).

*Discussion*

Although Mr. Kelly testified to the lack of any malicious intent on the part of the firm, it is clear from the admitted account that Kelley Drye:

(1) Failed to ensure that all persons authorized to receive Confidential or Highly Confidential Litigation Materials under the Protective Order were first shown a copy of the

---

[6] In deposition, Ms. McElmury expressed her reservations about this email, but stated: "I was a junior associate at this firm. Many times what I had to say didn't matter." (McElmury,129:4-5).

Protective Order and signed written acknowledgements agreeing to abide by its terms before such litigation materials were disclosed.

(2) Delivered Confidential and Highly Confidential litigation material to Peerless, without first reviewing such material to ascertain how the material had been designated.

(3) Delivered Highly Confidential material to persons not authorized to receive it.

(4) Failed to "immediately" disclose the unauthorized disclosures and breaches of the Protective Order.

(5) Failed to make every reasonable effort to prevent further disclosure by Peerless by delaying its response to Local Access' inquiries.

The Court must decide whether these actions, or inactions, constitute civil contempt, criminal contempt, or warrant sanctions including disqualification or other discipline. The parties have presented declarations and deposition testimony, thousands of pages of exhibits, live witnesses, case law and argument. After much thought, I have concluded that while Kelley Drye acted below the standard expected of members of the bar of this Court and its actions are sanctionable, they do not constitute criminal contempt and the sanction of disqualification is not warranted.

*Contempt*

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as--
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.

A party seeking remedies for civil contempt must establish by clear and convincing evidence that the alleged contemnor violated the court's prior order. Chairs v. Burgess, 143 F.3d 1432, 1436 (11th Cir. 1998); see also Ameriprise Fin. Servs., Inc. v. Lawton, No. 2:11-cv-573-FtM-29SPC, 2011WL6412424, at * 1 (M.D. Fla. Dec. 21, 2011) (the evidence must establish that the order was violated). The clear and convincing proof must demonstrate that: "1) the allegedly violated order was valid and lawful; 2) the order was clear and unambiguous; and 3) the alleged violator had the ability to comply with the order." See Georgia Power Co. v. N.L.R.B., 484 F.3d 1288, 1291 (11th Cir. 2007). "Ambiguities should be resolved in favor of the party charged with contempt." United States v. Barnette, 902 F. Supp. 1522, 1532 (M.D. Fla. 1995).

Once a prima facie showing of a violation is made, the burden shifts to the alleged contemnor "to produce evidence explaining his noncompliance" at a "show cause" hearing. Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1301 (11th Cir.1991).

> At the show cause hearing, the contemnor is "allowed to show either that he did not violate the court order or that he was excused from complying." Mercer, 908 F.2d at 768. A contemnor may be excused because of an "inability" to comply with the terms of the order. See Watkins, 943 F.2d at 1301; Roberts, 858 F.2d at 701. To satisfy this burden, a contemnor must "offer proof beyond the mere assertion of an inability." Watkins, 943 F.2d at 1301. Instead, a contemnor "demonstrate[s] an inability to comply only by showing that [he has] made 'in good faith all reasonable efforts to comply.'" Id. (quoting United States v. Ryan, 402 U.S. 530, 534, 91 S.Ct. 1580, 1583, 29 L.Ed.2d 85 (1971)); see also Roberts, 858 F.2d at 701; Newman v. Graddick, 740 F.2d 1513, 1525 (11th Cir.1984) ("[A] person who attempts with reasonable diligence to comply with a court order should not be held in contempt.").

Chairs, 143 F.3d at 1436.

If the alleged contemnor makes a sufficient showing, the burden shifts back to the party seeking to show contempt to prove the ability of the alleged contemnor to comply with the court's prior order. Michael Grecco Prods., Inc. v. Soffersapp, LLC, No. 16-24966-CIV, 2017 WL 5665370, at *3 (S.D. Fla. Sept. 27, 2017), report and recommendation adopted, No. 16-24966-CIV, 2017 WL 5665382 (S.D. Fla. Nov. 8, 2017). Importantly, "[s]ince the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act.... An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently." McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

In addition to a finding of civil contempt, Local Access seeks a referral for prosecution of criminal contempt. The three elements for a finding of criminal contempt are a lawful and reasonably specific order; that the defendant has violated; willfully. Romero v. Drummond Co., 480 F.3d 1234, 1242 (11th Cir. 2007), citing United States v. Bernardine, 237 F.3d 1279, 1282 (11th Cir. 2001); see 18 U.S.C. § 401(2) and (3).

The Protective Order governs "the parties and their respective counsel." (Doc. 44 at 1). Peerless, through Mr. Kelly, has admitted that "the Protective Order was valid and lawful, the Protective Order was clear and unambiguous, and Peerless had the ability to comply with the Protective Order." (Doc. 265 at 13). If Peerless had the ability to comply with the Protective Order, so did its lawyers. At issue then is whether the non-compliance was willful or if it is excusable.

The violations fall into three categories: (1) failure to comply with the pre-disclosure requirements in the Protective Order; (2) failure to adhere to the Order's prohibition against sharing Highly Confidential information with unauthorized persons;

and (3) failure to promptly disclose the violations and take all reasonable steps to mitigate the damage. Each category warrants close analysis.

Without question, Kelley Drye dropped the ball in failing to timely transmit the Protective Order to Peerless employees who were to receive Confidential information, and in failing to obtain a written acknowledgement from those employees prior to delivering Confidential information to them. Kelley Drye's explanations offered to excuse this noncompliance are weak at best. The firm says it gave "Peerless" a copy of the Protective Order and there are vague assertions of discussing the Protective Order with certain employees, but many employees who received Confidential information were not aware of the Protective Order and its applicability to the information they received.[7] Written acknowledgements were not obtained until well after the Confidential information was shared. That said, I see no evidence that this failure was intentional and find instead that it was negligent. Kelley Drye gained nothing by it and has paid dearly for its sloppiness. For reasons that may never be clear, Kelley Drye and specifically Ms. James, simply overlooked this obligation prior to tendering Confidential information to their client. Considering the totality of the evidence, I agree with Kelley Drye that there is no support for a finding that the failure to obtain acknowledgements prior to making the disclosures was an intentional act of contempt.

Category two is more problematic. Sharing Highly Confidential information with Peerless is prohibited in clear terms and Kelley Drye did just that. In its defense, it argues

---

[7] I am not impressed with the argument that the Protective Order itself was lacking or ambiguous because it did not include the acknowledgement form as an attachment. I remind Kelley Drye that I entered the Protective Order drafted by the parties and they are no strangers to such orders and attachments. See Attachment A to Protective Order, Doc. 67 at 14 in the 6:14-cv-399 case. Indeed, Attachment A to the Protective Order eventually executed in this case uses the *exact same language* as the Attachment A used in the 399 case. *Compare* Local Access Exhibit 84.

that the wrongful disclosure was Local Access' fault because CDRs are inherently not highly confidential, the parties never intended them to be so, and Local Access wrongly designated them as such. Kelley Drye claims that it "reasonably relied" on its belief and experience that such records were, in fact, not Highly Confidential and, as Local Access claims no harm from the disclosure, sanctions are inappropriate. This argument would have more teeth if Kelley Drye had bothered to open and review the information produced before transmitting it to Peerless.[8] I don't know how the lawyers at Kelley Drye could form a reasonable belief that information was mis-designated when they were unaware of the designation in the first place. One of two things happened. Either the lawyers neglected to review the productions to ascertain their designations when they were received and before they were transmitted to Peerless, or the lawyers did review the productions on receipt, saw the designations and disagreed, but failed to abide by the Protective Order's requirement to "**first** provide the Disclosing Party with written notice of its objections" and treat the document as Highly Confidential "until the Court issues a ruling on the dispute...." (Doc. 44 at 8, 9). Either way, Kelley Drye's actions violated the Protective Order.

As Mr. Kelly argued in a prior related case: "Playing fast and loose might have worked well for William Shakespeare, but in this Court, it should not be tolerated." Case 6:14cv399-PGB-TBS; Doc. 343 at 17.[9] Whether the information was properly designated

---

[8] Mr. Kelly testified that he did not look at the file names or the files prior to directing Ms. James and Ms. McElmury to send them to Mr. Kell. (Hearing transcript, Doc. 567, 112:1-15). Ms. James did not look into any of the .zip folders to view the contents of the January 30 production prior to producing them to Peerless. (James, 87:18-88:8; Hearing transcript, Doc. 571, 35:4-20). Ms. McElmury did not look at the file names before sending the January 30 production to Peerless (McElmury, 54:2-9).

[9] Although Mr. Kelly did not provide an appropriate citation, the Court is familiar with his reference, which appears in Shakespeare's King John: "Play fast and loose with faith? so jest with heaven, Make such unconstant children of ourselves." -King John (Act 3, Scene 1).

in the first place is irrelevant.  It does not give Kelley Drye leave to ignore the protections

afforded documents so designated.  Therefore, I find Kelley Drye's failure to fulfill its

obligations as a recipient of protected information violated the clear terms of the

Protective Order. However, I am not persuaded that Kelley Drye acted willfully, sufficient

to implicate criminal contempt. This brings me to the third and most troubling violation.

The Protective Order anticipates that unauthorized disclosures may occur, and

provides:

> 18. In the event that information from Litigation Material designated Confidential or Highly Confidential is disclosed to someone not authorized to receive such information under this Protective Order, or if any person so authorized breaches any or his or her obligations under this Protective Order, **counsel of record for the party involved shall (after learning of such disclosure or breach) immediately give notice of such unauthorized disclosure or breach, including a reasonable description of all pertinent facts, to counsel of record for the party who initially produced the Confidential or Highly Confidential Litigation Material**. Without prejudice to other rights and remedies of the designating party, **counsel for the party making the disclosure shall make every reasonable effort to prevent further disclosure by it or by the person who was the recipient of such information**.

(Doc. 44, ¶ 18, emphasis added). The timeline here shows:

(1) April 12, 2018: Local Access advised Kelley Drye that Local Access' customers

were being solicited by Peerless and asked Kelley Drye "to confirm to whom Local

Access's Highly Confidential information has been disseminated." (Doc. 229-10). Kelley

Drye did not respond to this email.

(2) April 12: Ms. McElmury discovered that the Highly Confidential January 30,

2018 production had been shared with Peerless. She informed Ms. James and Mr. Kelly

but no one told Local Access.

(3) April 12 through April 20: Mr. Kelly communicated with Peerless CEO John Barnicle and Mr. Knight to inquire about the issue, then Mr. Kelly went on vacation (Doc 264-3, ¶¶ 14, 15). There was still no response to Local Access.

(4) May 7, 2018: Mr. Kelly spoke with Mr. Barnicle and determined that he would have further discussions with Peerless employees. That same day, Mr. Kelly, Ms. James and Ms. McElmury formulated and sent the email objecting to the designation of Highly Confidential given to the CDRs produced on January 30, 2018 and April 10, 2018 and offered to "strip" certain information "prior to transmitting" the CDRs to Peerless for review. No divulgence was made of the disclosure that had already occurred.

(5) May 9: Local Access responded to the May 7 email and asked for a response to its April 12, 2018 email (Doc. 229-12). Kelley Drye did not provide a substantive response.

(6) May 10 or 11, 2018: Mr. Kelly says he discovered Peerless had used Confidential information for non-litigation purposes.

(7) May 16: Kelley Drye finally informed Local Access that it had inadvertently provided the January 30, 2018 CDRs to Peerless (Doc. 229-17).

(8) May 25: Kelley Drye notified Local Access of the improper solicitation of its customers by Peerless.

(9) June 1, 2018: Kelley Drye notified the Court.

When faced with an accusation that the Protective Order was likely being violated and after having been asked for a list of persons who had received protected information, Kelley Drye did not react with the level of concern and promptness the accusation

warranted.[10] I might be inclined to understand this initial lack of zealousness were it not for the firm's actions upon discovering the violations. The Protective Order required an "immediate" disclosure. That did not happen. Instead, under the guise of gathering the facts, Kelley Drye took an inordinate amount of time to disclose the violations it discovered. Its failure to take sufficiently prompt measures amounted to a failure to make all reasonable efforts to secure the information from further misuse.

To be clear, I am mindful of the difficult situation Kelley Drye was facing upon discovery of its own noncompliance and that of its client. I expect any competent lawyer, upon finding that the firm or client had acted inappropriately, would be concerned about possible personal and professional peril. Given this legitimate concern, it would not be unreasonable for a lawyer to take a few days to determine just how big the sword is before falling on it. Nor would it be beyond the pale for a firm to first seek professional advice in ways to mitigate the expected injury. What a lawyer cannot do is delay indeterminately or seek to minimize or cover up the wrongdoing in an effort to avoid the sword entirely. The obligation of candor owed to the court, other counsel, and the profession itself is paramount and trumps any business interest in non-disclosure. This is true even if the wrongdoing was unintentional, unanticipated, or harmless. Disclosing an error - fully, freely and in a timely fashion - is a hallmark of integrity, both personal and professional. The Court expects this from lawyers and lawyers should expect this from themselves.

---

[10] I am cognizant of the history of crying wolf displayed by counsel in this and related cases and would normally assume that the initial delay and non-response by Kelley Drye was due to a misguided belief that Local Access was just posturing. This does not explain why the firm did not timely react to Ms. McElmury's confirmation that an improper disclosure had, in fact, occurred.

Local Access raised its concerns on April 12, 2018. That very day, Ms. McElmury confirmed to her team that indeed, an unauthorized disclosure had occurred. Mr. Kelley poked around a bit and then went on vacation. No substantive response was tendered to the April 12 email until well over a month later and even then, only after Local Access had repeated its concerns. Given the gravity of the accusations and the readily discoverable nature of the disclosure of Highly Confidential information to Peerless, this delay was unreasonable and inexcusable.

The Protective Order provides that "counsel of record for the party involved **shall** (after learning of such disclosure or breach) **immediately** give notice of such unauthorized disclosure or breach, including a **reasonable description** of all pertinent facts, to counsel of record for the party who initially produced the Confidential or Highly Confidential Litigation Material." (Doc. 44, ¶ 18 – emphasis supplied). Kelley Drye maintains that it complied with this provision, as the firm was under an obligation to include a description of the facts in its notice and this necessarily anticipates a delay for investigation. I am not persuaded. Allowance of an open-ended delay is belied by the inclusion of the word "immediately." To the extent the provision requires that this immediate notice include a description of all pertinent facts, the description is modified by the word "reasonable," making it clear that disclosure should occur upon learning of the noncompliance, and the disclosure should include all pertinent facts reasonably known at that time. A delay until such time as a party determines, in its own judgment, that *all* facts are discovered is not "immediate" notice and does not comply with the Protective Order. Indeed, the firm knew this and had taken a similar position in this very lawsuit. In a motion brought by Peerless for issuance of an order to show cause against Local Access, Kelley Drye argued that Local Access violated the same provision of the Protective Order in failing to

"'immediately' advise Peerless of the breach and all the pertinent facts" regarding an inappropriate disclosure made by Local Access just *one day prior*. (See Doc. 400 at 3, and 4-5; Doc. 412).

Even if the Court were to find that "immediately" includes a period of time for investigation of the facts, there is no showing that the delay here was due to an investigation concerning the disclosure of Highly Confidential material. Even if the Court allows a few days for the lawyers to collect themselves and (perhaps) seek independent advice, the delay was excessive. No later than April 12, 2018, Kelley Drye knew it had provided the January 30, 2018 Highly Confidential CDRs to Peerless.[11] Yet, rather than disclose this to Local Access, and with full knowledge that it had already made the inappropriate disclosure, Kelley Drye sent an email asking Local Access to identify what information it considered Highly Confidential in the CDRs so that Kelley Drye could "consider stripping that information from the CDRs prior to transmitting them to Peerless."[12] This email was not sent to investigate; it was sent to mitigate. Kelley Drye had an affirmative duty to promptly disclose what it knew to Local Access and the Court and its failure to do so until well over a month had passed from discovery of the violation is an intentional violation of the Protective Order.

Kelley Drye also acted unreasonably in failing to mitigate the effect of the violations, which led directly to its client's misuse of Confidential information. While I find that the initial failure to obtain written acknowledgements of the receipt of the Protective

---

[11] The Court credits Mr. Kelly's testimony that he did not know the information was designated as Highly Confidential when he initially directed that it be given to Peerless.

[12] Although Kelley Drye has taken the position that this phrase was meant to apply to the April 10th production, I don't buy it. The email specifically references both the January 30 CDRs and the April 10th CDRs and refers to "all of the information provided in **these** CDRs ...." Moreover, the involvement of three attorneys, including Mr. Kelly, in formulating this email, in the wake of an accusation that confidential material was being inappropriately disclosed and used, belies such a convenient explanation.

Order prior to the disclosure was not intentional, this was a significant oversight and led to additional disclosures within Peerless which were not without consequence. The evidence shows that Ms. James gave Confidential information to Mr. Knight on February 12, after she had removed the "Confidential" designation. Although the record contains various statements regarding the particulars of when the Protective Order was discussed and given to Mr. Knight,[13] he testified that when he received the Confidential information he had not yet received, reviewed and signed the Protective Order (Knight, 125:12-21). Knight transmitted Local Access' customer list within his organization and his salespeople went to work. This misuse of Confidential information was made possible by the actions of Kelley Drye in stripping the Confidential designation from the information (itself a violation of the Protective Order) and transmitting it to Peerless' Executive President of Sales and Marketing without assuring adherence to the provisions of the Protective Order designed to safeguard that information.

The firm argues that "the evidence is undisputed that Kelley Drye sent the Protective Order to Peerless upon its entry." (Doc. 574 at 23). But the document cited shows only that the Protective Order was transmitted to Mr. Barnicle and Ms. Oost.

---

[13] Ms. James says in her declaration that she provided Knight with the list of entities on or about February 12, 2018, and during communications with him "on or around February 15, 2018, March 8, 2018, and March 12, 2018" she discussed the terms of and compliance with the applicable Protective Order. (Doc. 264-4, ¶¶ 8-9). In her deposition, she stated that before she sent the list to Mr. Knight, she had not sent him a copy of the Protective Order (James, 51:11-15). She testified:

Q. Before sending that list of names to Mr. Knight, had you inquired as to whether or not Mr. Knight had received the protective order?

A. Not specifically, but I was again under the impression that he had or at least knew its terms because we did discuss where the information was coming from and it was clear that that was for litigation only. (James, 51:16-22).

(Kelley Drye Exhibit 1). There is no showing that the Protective Order was transmitted to Mr. Knight or anyone else within Peerless.[14]

Kelley Drye's post hoc argument that the information contained in the Confidential and Highly Confidential records was not truly confidential because Peerless could have gleaned the same information from its own records also does not persuade. Even if the Court were to credit the contention that Peerless, if so motivated, could have gathered its records and eventually figured out the identities of Local Access' customers, that does not change the fact that Peerless did not do so, but instead impermissibly used Local Access' information in an effort to solicit business - a task clearly not a proper litigation purpose. The Court can find that the customer list was useful to Peerless because it was, in fact, *used*. While Peerless' actions are the subject of another motion that will be heard shortly and I make no conclusions regarding Peerless' culpability at this time, the fact remains that it would not have had the information if Kelley Drye had not supplied it.

Although Local Access does not claim monetary losses due to the improper customer solicitation, Kelley Drye's violations and less than forthright disclosure of the violations was not harmless as even a cursory look at the docket shows. Because of the nature of the violations and the lack of trust between the parties and their lawyers, the litigation on the merits came to a halt while the attorneys conducted an all-hands-on-deck approach to discover the extent of the non-compliance and its aftermath. Discovery of the particulars of the misfeasance was further complicated by Peerless' assertion of attorney

---

[14] Kelley Drye's brief states that Mr. Kelly personally discussed the terms and obligations of the Protective Order with Knight, Barnicle and Kell before the January 30 production, but fails to cite any evidentiary support for this assertion (Doc. 574 at 23). The depositions and documents are rife with redactions or assertions of attorney client or work product privilege. While the Court acknowledges the use of the privilege as a shield, it leaves a factual vacuum in which certain assertions cannot be proven or rebutted.

client privilege and Kelley Drye's assertion of work product privilege.  Countless hours have been spent by the parties and the Court in an effort to unravel what happened and how to go forward from here. While not easy to calculate in dollar figures, the cost to the orderly progression of this suit has been significant and the violations have escalated pre-existing tensions between opposing counsel.[15]

Whether the initial failures to assure compliance prior to tendering Confidential information to Peerless employees and the disclosures of Highly Confidential information to Peerless were due to mere oversight (as claimed by the firm) or recklessness (as claimed by Local Access), the firm's actions upon and after discovering the violations and delaying compliance with the remedial provisions of the Protective Order were taken with knowledge of the violations and were not in compliance with the terms of the Protective Order.

On this record, the Court could find that Local Access has established by clear and convincing evidence that Kelley Drye violated the Protective Order by failing to immediately notify Local Access of the misuse of its Confidential information and the sharing of its Highly Confidential information in violation of the provisions cited above. While a finding of civil contempt is supportable, the Court need not resort to such a damning finding, as other avenues of sanction are available to redress the violations.[16]

Remedies

Kelley Drye argues that the Court is without authority to make a finding of civil

---

[15] While I appreciate Kelley Drye's discomfort in Local Access' aggressive call to arms in the prosecution of this motion, I also acknowledge that Local Access was without incentive to be anything but zealous in its efforts to hoist Kelley Drye on a petard. I have no doubt that if the situation had been reversed, Peerless and Kelley Drye would be just as zealous.

[16] The evidence does not support, and I do not recommend referral for criminal contempt proceedings.

contempt or impose any sanction, as civil contempt powers may only be exercised to coerce or to compensate and a party cannot be held in civil contempt simply to memorialize a past violation. See Langford v. Magnolia Advanced Materials, Inc., No. 1:15-CV-01115-AT-JFK, 2016 WL 10652005, at *4 (N.D. Ga. Apr. 22, 2016), report and recommendation adopted, No. 1:15-CV-1115-AT-JFK, 2016 WL 10654072 (N.D. Ga. May 13, 2016) (quoting United States v. McCorkle, 321 F.3d 1292, 1299 (11th Cir. 2003) ("We are at loss as to how a party can be adjudged in civil contempt when the underlying basis for the contempt citation is moot."). Kelley Drye also argues that civil contempt cannot be used to sanction mere technical or de minimus violations. Schainberg v. Urological Consultants of S. Fla., P.A, No. 12-21721, 2013 WL 12086839, at *11 (S.D. Fla. Apr. 18, 2013), report and recommendation adopted sub nom. Schainberg v. Urological Consultants of S. Fla., P.A., No. 12-21721-CIV, 2013 WL 12086272 (S.D. Fla. Apr. 19, 2013) (citing 7 Moore's Federal Practice § 37.51[7][b] (Matthew Bender 3d Ed.)). The firm notes that Local Access makes no damage claim (such as lost customers) leaving nothing to compensate, and the firm has since come into compliance with the Protective Order, leaving nothing to coerce. Thus, according to Kelley Drye, no harm, no foul. I do not find it quite as tidy.

As Magistrate Judge McCoun observed:

> The court may impose two types of remedial sanctions in a civil contempt proceeding, each of which is guided by its purpose: (1) to coerce the defendant into compliance with the court's order; and (2) to compensate the complainant for losses sustained. FTC v. Leshin, 719 F.3d 1227, 1231 (11th Cir. 2013) (hereinafter "Leshin II") (quoting Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 443 (1986)), cert. denied, _ U.S. _, 134 S.Ct. 901 (2014). "A coercive contempt sanction comes with some limitations; for instance, once a contemnor's contumacious conduct has ceased or the contempt has been purged, no further sanctions

are permissible." Id. (citing Leshin I, 618 F.3d at 1239). "On the other hand ... 'the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory.'" Id. (quoting Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1521 (11th Cir. 1990)). "Indeed, the Supreme Court has observed that district courts possess particularly expansive and flexible powers in these circumstances: 'The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.'" Id. (quoting McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949)).

Where the purpose of the contempt sanction is to coerce or secure compliance, the court should consider "the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." EEOC v. Guardian Pools, Inc., 828 F.2d 1507, 1515 (11th Cir. 1987) (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 304 (1947)). Sanctions of this type may include a coercive fine or coercive incarceration. Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1304 (11th Cir. 1991) (citations omitted). However, coercive contempt sanctions may not be used to impose what amounts to a punitive or criminal contempt sanction. Id.

Where the purpose of the contempt sanction is to compensate for losses or damages sustained by reason of noncompliance, the court may impose a monetary fine. United Mine Workers of Am., 330 U.S. at 304. To determine the amount of the remedial fine, the court must consider the extent of the complainant's actual loss and the outcome of the basic controversy. Id. The complainant bears the burden of providing the court "with the basic evidentiary facts to formulate a realistic sanction to which the defendants could respond." In re Chase & Sanborn, Corp., 872 F.2d 397, 401 (11th Cir. 1989) (bankruptcy context). Attorney's fees may be compensable as well because the costs of bringing a violation to the court's attention are also part of the damages resulting from noncompliance. Cook v. Oschner Found. Hosp., 559 F.2d 270, 272 (5th Cir. 1977).

Oxebridge Quality Res. Int'l, LLC v. Smith, 8:15-CV-11-T-17TBM, 2016 WL 11491577, at

*13 (M.D. Fla. July 28, 2016).[17]

---

[17] Judge Kovachevich adopted this Report in unpublished Order. Oxebridge Quality Res. Int'l, LLC

A sanction to coerce Kelley Drye into compliance is not needed. Despite the saber rattling by Local Access, I see no evidence that the firm is not currently in compliance and, given the uncomfortable gauntlet it just ran, I trust it has no wish to violate the Protective Order again. That said, I disagree with Kelley Drye's assertions that the violation here was de minimis and there is no factual or legal basis to award a sanction of any kind.

It must be remembered that, at the time of filing the motion for sanctions, the extent of the resulting harm was unknown. And although Kelley Drye took steps to corral the errant Confidential and Highly Confidential information it was only partially successful, in that at least one Peerless employee continued to have Confidential information until right before the show cause hearing. Because Kelley Drye did not promptly disclose with specificity exactly what information was improperly disclosed, who received it, and what was done with it, the parties were required to engage in robust discovery in preparation for the evidentiary hearing. Just as a court may award sanctions under Rule 37 if compliance is obtained after the filing of a motion to compel, Local Access' motion for sanctions must be viewed through the lens of history and context, and in view of the situation that existed at the time of filing.

The nature of the violations belies any contention that these disclosures were technical or de minimis. The parties have gone to great lengths to protect their confidential information, as evidenced by the *dozens* of filings under seal and motions to strike or withdraw documents improperly filed in the public docket. Indeed, the

_____

v. Smith, 8:15-CV-11-T-17TBM (Order dated Sept. 14, 2016, Doc. 105 in that docket).

requirement of confidentiality was deemed acute enough to warrant moving for entry of the Protective Order in the first place.

More importantly, "[d]isobedience of a court order unequivocally merits punishment save in instances in which compliance would necessarily result in an irrevocable and permanent surrender of a constitutional right." Kleiner v. First Nat. Bank of Atlanta, 751 F.2d 1193, 1208 (11th Cir. 1985) (internal citation and quotation omitted). As the Eleventh Circuit has explained:

> Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal. Roadway Express, Inc. v. Piper, 447 U.S. 752, 764–65, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980). "The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." Flaksa v. Little River Construction Co., 389 F.2d 885, 888 (5th Cir.1968); see Miranda v. Southern Pacific Transportation Co., 710 F.2d 516 (9th Cir.1983); Note, Civil Procedure–Power of Federal Courts to Discipline Attorneys for Delay in Pre-trial Procedure, 38 NOTRE DAME L. 158, 161-66 (1963). **A trial judge possesses the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt.** [fn omitted] Flaksa, 389 F.2d at 888 n. 10. The court's power to impose appropriate sanctions on attorneys practicing before it "springs from a different source than does the power to punish for criminal contempt." Pope & Talbot, Inc., 307 F.2d at 735-36 (Biggs, C.J., dissenting); See also Ex parte Robinson, 86 U.S. (19 Wall.) 505, 512, 22 L.Ed. 205 (1873) (discussing the source and scope of a court's power to cite for contempt or disbar attorneys).
>
> The authority of a court over officers of its bar is at least as great as its power over litigants. Roadway Express, 447 U.S. at 766, 100 S.Ct. at 2464 (citing Flaksa ). Since misconduct by a party courts the risk of outright dismissal, lesser sanctions undoubtedly attend the court's inherent power to discipline intentional attorney misconduct of the sort involved in this case. See id. **Such sanctions include assessment of attorneys' fees and costs,** id.; **disqualification of counsel,** Flaksa, 389 F.2d at 887; **and monetary penalties payable to the clerk of**

> **the court**, <u>Burden v. Yates</u>, 644 F.2d 503, 505 (5th Cir. Unit B
> 1981); <u>Woodham v. American Cystoscope Co</u>., 335 F.2d 551,
> 557 & n. 15 (5th Cir.1964).

<u>Kleiner</u>, 751 F.2d at 1209 (11th Cir. 1985) (emphasis added). Now, I find the Court has ample inherent power to address and redress the conduct of Kelley Drye short of imposing a finding of contempt.[18]

Although Local Access has not attempted to show that it suffered any compensatory damages from the non-compliance, it has adequately shown that it incurred expenses in bringing this matter to the attention of the Court which would not have been incurred had Kelley Drye complied with the Protective Order. I conclude therefore, that an award of attorneys' fees and costs for the investigation of these matters and the prosecution of this motion is warranted. <u>See</u>, <u>generally</u>, <u>Stahl v. Mastec, Inc</u>., 8:05-CV-1265-T-27TGW, 2008 WL 2127970, at *4 (M.D. Fla. May 20, 2008) (sanctions including motion fees and expenses imposed where counsel found to have acted without authority in taking an overly broad interpretation of an agreement and order, but counsel's conduct was not egregious).

Disqualification

As a remedy for violating the Protective Order, Local Access also seeks disqualification of Kelley Drye on the ground that its lawyers violated certain ethical rules. There are two sources for a court's authority when it considers a motion to disqualify an attorney. First, attorneys are bound by the rules of the court in which they appear. Under this Court's local rules, the professional conduct of all members of the

---

[18] In its motion, Local Access argued the Court's power to impose sanctions under the Court's inherent authority and specifically asked for (among other things) an award of fees and costs associated with exposing the violations and the prosecution of the motions. (<u>See</u> Doc. 230, pp. 10-12). In later filings, Local Access revised the relief it sought, but continued to seek an award of attorney's fees and costs as well as the disqualification of the firm and criminal contempt fines. (<u>See</u> Doc. 469).

bar, admitted generally or specially, is governed by the Model Rules of Professional Conduct of the American Bar Association as modified and adopted by the Supreme Court of Florida. L.R. 2.04(d). Second, their professional conduct is governed by federal common law, "because motions to disqualify are substantive motions affecting the rights of the parties." Herrmann v. Gutterguard, Inc., 199 F. App'x. 745, 752 (11th Cir. 2006).

In deciding whether to grant a motion to disqualify, the court must first "identify a specific rule of professional conduct applicable to that court and determine whether the attorney violated that rule." S. Visions, LLP v. Red Diamond, Inc., 2:18-CV-02039-RDP, 2019 WL 936666, at *5 (N.D. Ala. Feb. 26, 2019), quoting Herrmann, 199 F. App'x at 755; see also Schlumberger Techs., Inc. v. Wiley, 113 F.3d 1553, 1561 (11th Cir. 1997) (noting an alternate basis for disqualification if the conduct threatens the operations of the court or the judicial process as a whole, as the district court may regulate that conduct under its broad inherent power to conduct the general business of the court.).

The party bringing the motion for disqualification "bears the burden of showing the grounds for disqualification." In re BellSouth Corp., 334 F.3d 941, 961 (11th Cir. 2003) (citations omitted). "'Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist.'" (Id.) (citations omitted). Disqualification is a harsh sanction, often working substantial hardship on the client, especially in cases where extensive discovery and trial preparation have been completed. As such, "disqualification should be resorted to sparingly." Norton v. Tallahassee Mem'l Hosp., 689 F.2d 938, 941 (11th Cir. 1982).

Mr. Kelly, Ms. James and Ms. McElmury are accused of violating R. Regulating Fla. Bar 4-3.3, which requires all attorneys to, at all times, demonstrate "Candor Toward the Tribunal" and R. Regulating Fla. Bar 4-3.4, which requires attorneys to demonstrate

"Fairness to Opposing Party and Counsel". Local Access also claims "spoliation" and possible violations of other rules, but in subsequent briefing, it focused on Rule 4-3.4(c): a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;" Rule 4-8.4(d): a lawyer shall not "engage in conduct in connection with the practice of law that is prejudicial to the administration of justice ..."; and Rule 4-41: "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 4-1.6."

I do not find sufficient proof to establish a violation of these rules. After an exhausting discovery process, a flurry of motions and filings (many under seal), hundreds of pages of deposition excerpts and exhibits and two days of testimony, Local Access succeeded in proving that Kelley Drye did not fully adhere to the terms of the Protective Order and, when that failure became clear, the firm compounded its error by failing to immediately confess. What Local Access does not appreciate is that the initial violation *was* an error and Kelley Drye *did* eventually (albeit belatedly) confess. While these actions are not acceptable, and will support a finding of contempt, I find that is unnecessary. Despite the verbose protestations of Local Access, there is no monster under the bed. The totality of the record shows that Kelley Drye attorneys made bad decisions, but their conduct is sufficiently redressable by sanctions (which I am recommending) and not by the extreme remedy of disqualification. Kelley Drye's conduct, while disappointing, does not amount to actions that are so prejudicial to the administration of justice that they warrant disqualification.

## Recommendation

Upon consideration of the foregoing, I respectfully recommend the Court award Local Access its reasonable attorney's fees and other legal expenses incurred between December 21, 2017 and the present which relate to the investigation and discovery of Kelley Drye's violation of the Protective Order and the prosecution of this sanctions motion. I also recommend that Peerless be prohibited from paying any part of the attorney's fees and other legal expenses awarded to Local Access in connection with this matter. As Local Access' request for the imposition of sanctions against Peerless remains outstanding, I further recommend that any motion for attorney's fees and legal expenses pursuant to this recommendation (if adopted) be deferred until the conclusion of those proceedings.

## Notice to Parties

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on June 21, 2019.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding United States District Judge
Counsel of Record