**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

LOCAL ACCESS, LLC,

        Plaintiff,

v.                              Case No:  6:17-cv-236-Orl-78EJK

PEERLESS NETWORK, INC.,

        Defendant.

_____/

**<u>ORDER</u>**

THIS CAUSE is before the Court on Local Access, LLC's ("**Local Access**" or "**Plaintiff**") Motion to Disqualify and/or Discipline Kelley Drye & Warren LLP ("**Kelley Drye**") for Litigation Misconduct (Doc. 230) and Peerless Network, Inc.'s ("**Peerless**" or "**Defendant**") Response in Opposition (Doc. 264). United States Magistrate Judge Thomas B. Smith submitted his Report and Recommendations ("**R&R**," Doc. 609) recommending the Court grant the Motion in part and deny it in part. Plaintiff objected to the R&R ("**Objections**," Doc. 611), and Defendant responded (Doc. 612), opposing the objections.

## I.    BACKGROUND

Simply put, Plaintiff seeks the imposition of sanctions and a finding of contempt against defense counsel, Kelley Drye, for violating the Protective Order Governing the Production of Discovery Material ("**Protective Order**," Doc. 44) entered on July 10, 2017.[1]

---

[1] The Protective Order identifies categories of persons who may be given access to confidential and highly confidential information. It provides that confidential information may be disclosed to "those directors, officers, and employees of [a] corporate entity [party] who require the Confidential Litigation Material to perform his or her responsibilities in

It is without dispute that Kelley Drye violated the Protective Order by improperly disclosing documents designated by Plaintiff as "Confidential" and "Highly Confidential." It is also undisputed that certain employees of Defendant "used information derived from the confidential litigation material for reasons other than their responsibilities in connection with this case." (Doc. 188 at 1). The issue before the Court is whether the R&R, which proposes an award of attorneys' fees and costs as a sanction, but not a finding of contempt and disqualification, should be adopted.

Plaintiff agrees with most of the Magistrate Judge's findings of fact and concurs with the recommendation to award it attorneys' fees and costs. However, Plaintiff does not believe the recommended relief goes far enough to prevent future violations, and takes exception to the following: (1) the failure to address Kelley Drye's disclosure of the highly confidential April 9, 2018 production of call detail records to Defendant as a continued violation of the Protective Order;[2] (2) a finding that Kelley Drye eventually confessed; (3) concluding that Kelley Drye currently complies with the Protective Order; (4) categorizing the Motion as mudslinging;[3] (5) finding that Kelley Drye is unlikely to repeat its conduct; and (6) concluding that Kelley Drye did not violate the Florida Rules of Professional Conduct. (Doc. 611 at 2–14). Thus, Plaintiff requests that this Court: (1)

---

connection with the Civil Action, and who have executed Attachment A, but only to the extent required to perform his or her responsibilities in connection with the Civil Action." (Doc. 44, ¶ 13(e)). Highly confidential information may be disclosed to outside counsel and retained experts, but not to the parties themselves. (*Id.* ¶ 14(c)–(d)).

[2] Plaintiff failed to mention anything about the April production in its Motion, which is likely why Judge Smith did not address it in his R&R, and why this Court will not discuss the merits of it here.

[3] This is not a finding of fact, but rather a conclusive opinion about the actions between these two parties. It does not affect the outcome of the Motion; in fact, Judge Smith recommends an award of attorneys' fees to Plaintiff. Thus, this Court will not address it.

disqualify Kelley Drye from the case; (2) hold Kelley Drye in civil contempt; and (3) refer Kelley Drye to the United States Attorney's Office to decide whether to file criminal contempt charges. (*Id.* at 14). Kelley Drye does not object to the R&R and argues Plaintiff's Objections constitute "unjustified demands for disproportionate punishment[.]" (Doc. 612 at 2).

## II.   LEGAL STANDARD

When a party objects to a magistrate judge's findings, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In doing so, the court must consider the record and factual issues independent of the magistrate judge's report, as *de novo* review is essential to the constitutionality of § 636. *Ernest S. ex rel. Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512–13 (11th Cir. 1990). The court will not consider "[f]rivolous, conclusive, or general objections[.]" *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988) (citation omitted). It "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III.   DISCUSSION

At the outset, the undersigned recognizes the contentiousness with which this action has been litigated and appreciates the long history the Magistrate Judge shares with the parties. The undersigned does not share the same history, having been newly assigned the case. Thus, it is through this lens, unclouded by prior behavior, that counsels' conduct is judged in this case.

After an independent de novo review of the record, including the Protective Order, the R&R, Plaintiff's Objections, and Defendant's Response in Opposition, the Court accepts the following factual findings determined by the Magistrate:

On December 20, 2017, Local Access (through counsel) produced to Kelley Drye a set of CDRs identified as "LA_0001865–CONFIDENTIAL.zip." and designated as "Confidential" under the terms of the Protective Order (the "12/20/17 Production"). On January 30, 2018, Local Access supplemented this production by providing additional months of CDRs ("the 1/30/18 Production"). Local Access designated the 1/30/18 Production "Highly Confidential." (See, generally, Doc. 229). In her Declaration, Kelley Drye attorney Catherine E. James states:

5. On or about February 5, 2018, I asked Brittany McElmury, an attorney at Kelley Drye, to provide Local Access's 12/20/17 Production and 1/30/18 Production of CDRs to Peerless's engineering management, Scott Kell, Executive Vice President of Operations of Peerless, without realizing that the individual file names within the 1/30/18 Production of CDRs had been designated as Highly Confidential.

6. I also requested that two members of Peerless's engineering team (Mr. Kell and Mr. Sherman, Peerless's V.P. of Information Technology) load Local Access's CDRs into a Structured Query Language ("SQL") database and asked that they run queries for the purpose of prosecuting Peerless's claims and defenses.

7. One of the queries identified a list of entities from the 12/20/17 Confidential Production which Peerless identified under an "Egress Carrier" header.

8. On or about February 12, 2018, I provided that list of entities from Local Access's 12/20/17 Confidential Production to Rick Knight, Executive President of Sales and Marketing at Peerless for the purpose of, inter alia, investigating Local Access's allegations ….

9. I also communicated with Mr. Knight on or around February 12, 2018, February 14, 2018, February 15, 2018, February 19, 2018, March 8, 2018 and March 12, 2018 to plan for and conduct a review of information derived from the 12/20/17 production. During my conversations with Mr. Knight on or around February 15, 2018, March 8, 2018, and March 12, 2018, I discussed with him the terms of and compliance with the applicable Protective Order.

10. On or around March 5, 2018, I asked Brittany McElmury to resend Local Access's 1/30/18 Production of CDRs to Mr. Kell, without realizing that the individual file names within the 1/30/18 Production of CDRs had been designated as Highly Confidential.

11. On or around March 5, 2018, I again directed Peerless's engineering team to load the 1/30/18 Production into a SQL database to run queries attempting to identify information for the purpose of prosecuting Peerless's claims and defenses.

(Doc. 264-4).

In deposition testimony, Ms. James explained that Mr. Sherman and/or Mr. Kell created a spreadsheet of the unique names of Local Access' customers from the information contained in the CDRs from the 12/20/17 Production. (Deposition of Catherine James, 109:5-110:4). This spreadsheet was named "LA_Confidential." (Id. at 108:17-24). Ms. James printed the column of Local Access customer names from that spreadsheet to a native .pdf document she named "LA Customers.pdf." (Id., 110:5-21; Local Access Exhibits 2 & 3). She did not include the word "Confidential" in the file name and the word "Confidential" does not appear anywhere in the .pdf file itself (Id. at 110:9-111:2). On February 12, 2018, Ms. James sent the "LA Customers.pdf" file to Mr. Knight via email. (Local Access Exhibits 2 & 3). The email transmitting the file did not inform Mr. Knight that the file "LA Customers.pdf" contained Confidential information protected by the Protective Order. Before sending the February 12, 2018 email to Mr. Knight, Ms. James had not sent Mr. Knight a copy of the Protective Order and she had not obtained a written acknowledgment of the Order from him (James, 51:11-15).

From there the information, not protected by a designation of "Confidential" was distributed within Peerless. Mr. Knight shared the Local Access confidential customer information contained in the file "LA Customers.pdf" with Mr. Brabson, Ms. McNerney and Mr. Davis, either by sending them the file or by reading the contents over the telephone. (Deposition of Richard Knight, 56:2-21). Mr. Brabson testified that he was never advised that the list was derived from Confidential Litigation Material (Deposition of Brian Brabson, 34:13-45:4). Ms. McNerney and Mr. Davis were also not told that the list was derived from Confidential Litigation Material (Deposition of Margaret McNerney, 26:20-27:10; Deposition of Jeff Davis, 19:12-20). Mr. Davis created a spreadsheet from the list of Local Access customer names provided to him by Mr. Knight (Davis, 44:6-11). He distributed this spreadsheet to Mr. Walther and several other Peerless employees (Id. at 45:7-10). Mr. Walther testified that nobody within Peerless told him he had been given Confidential information (Deposition of Steven Gregory Walther, 28:23-29:15).

*On April 12, 2018, Kelley Drye attorney Henry T. Kelly received an email from counsel for Local Access asserting that Local Access' customers were being solicited by Peerless and requesting information about Local Access' Highly Confidential information* (Doc. 265-10, ¶ 13). Beginning that day, Mr. Kelly and other lawyers representing Peerless had conversations with Peerless employees to gather information to respond to Local Access' concerns (Id., ¶¶ 14-18). According to Mr. Kelly:

> 14. During the period from April 12, 201[8] through approximately April 20, 201[8], I had communications with John Barnicle, Peerless's Chief Executive Officer, and Rick Knight, Executive President of Sales and Marketing at Peerless to inquire about the issue raised by Local Access's counsel's email.

> 15. On May 7, 2018, after I returned from a vacation, I spoke with John Barnicle regarding Local Access's concerns that Peerless had used information produced in discovery to market to Local Access customers. Mr. Barnicle and I agreed that I would have further discussions with Peerless employees.

> 16. At Peerless's direction, I spoke with Richard Knight and Brian Brabson on May 9, 2018, with Margaret McNerny on May 10, 2018, Jeff Davis on May 11, 2018, Julie Oost on May 14, 2018, [and] John Barnicle on May 15, 2018 and May 16, 2018. Thereafter, I also had a subsequent conversation with Mr. Davis on June 29, 2018, Julie Oost and John Barnicle on June 29, 2018, Julie Oost, Greg Walther, Chris McDonald, Frank Trento, and James Cook on July 2, 201[8].

> 17. Through these conversations, I came to understand that a subset of the information transmitted to Mr. Knight was communicated to Mr. Brian Brabson (on or about February 14, 2018), Jeff Davis, Greg Walther, Chris McDonald, Frank Trento, James Cook (February 26, 2018), and Margaret McNerny (March 2018).

> 18. In addition, at my direction, I requested that Peerless provide a copy of all reports generated by Peerless from Local Access's 12/20/17 and 1/30/18 productions and destroy all copies and records containing or derived from those productions. I also directed the production of those reports to Local Access....

> (Id.).

What Mr. Kelly and Ms. James fail to mention in their declarations is that Ms. McElmury was asked to confirm the confidentiality designations for Local Access CDRs in response to Local Access' query and, on April 12, 2018, she "informed my team that the January 30, 2018 production, which was sent to Scott Kell, was designated as 'Highly Confidential.'" (Doc. 265-

5). Ms. McElmury "immediately" and within "seconds" reported that information to Ms. James and "collectively we reported it to Hank Kelly." (Deposition of Brittany McElmury, 79:2-23, 81:1-23, 89:16-24, 90:1-3).

*Although Kelley Drye attorneys knew by April 12, 2018 that they had already disclosed the 1/30/18 Highly Confidential information to Peerless, Ms. McElmury sent an email to an attorney for Local Access on May 7, 2018, which reads in part:*

> *Local Access has produced several sets of CDRs with the designation of "Highly Confidential": **on January 30, 2018, Local Access produced sets of CDRs, each of which was designated as "Highly Confidential**," and on or about April 10, 2018, Local Access produced additional CDRs that it designated "Highly Confidential." However, **almost all of the information provided in these CDRs is not Highly Confidential**, indeed Local Access regularly transmits much of the information contained in the CDRs to Peerless in the course of its business. If Local Access would identify what information within its CDRs it considers "Highly Confidential," we may be willing to consider stripping that information from the CDRs **prior to transmitting them to Peerless for review**; however, we have not received a response to our April 12, 2018 request to confirm what information is "Highly Confidential," or to confirm the header information for these CDRs.*

*(Doc. 229-11, emphasis added). Although Ms. McElmury sent the email, Mr. Kelly and Ms. James were involved in its drafting (See, e.g., Deposition of Henry T. Kelly; 151:24-25; 152:1-18). The email did not disclose that Kelley Drye had already transmitted the Highly Confidential CDRs to Peerless.*

On May 10 or 11, 2018, Mr. Kelly was informed that Messrs. Walther, McDonald, Trento, Cook and Ms. McNerny contacted some of the entities named in the 12/20/17 Production to market Peerless' services (Doc. 264-3, ¶¶ 14–21). Mr. Kelly notified Local Access of this on May 25, 2018 (Doc. 188 at ¶10). On May 16, 2018, Local Access was informed that Kelley Drye "inadvertently produced Local Access's CDRs produced on January 30, 2018 to Peerless." (Doc. 229-17). The Court was notified of these violations on June 1, 2018 (Doc. 188 at ¶¶ 5–10). Mr. Kelly testified that the reason for the delay was the need to investigate the extent of the disclosures and gather the necessary facts.

On May 11, 2018, well after the horse had left the barn, Kelley Drye created a document for recipients of confidential information to acknowledge that they have "read and understand the terms of the Protective Order." (Doc. 264-3, ¶ 4). And, although Kelley Drye represented that all improperly disclosed information was returned or destroyed, at least one Peerless

employee continued to maintain copies of Confidential information until just before the contempt hearing (See Doc. 536).

(Doc. 609 at 9–14) (emphasis added).

As Judge Smith noted,

The timeline here shows:

(1) April 12, 2018: Local Access advised Kelley Drye that Local Access' customers were being solicited by Peerless and asked Kelley Drye "to confirm to whom Local Access's Highly Confidential information has been disseminated." (Doc. 229-10). Kelley Drye did not respond to this email.

(2) April 12: Ms. McElmury discovered that the Highly Confidential January 30, 2018 production had been shared with Peerless. She informed Ms. James and Mr. Kelly but no one told Local Access.

(3) April 12 through April 20: Mr. Kelly communicated with Peerless CEO John Barnicle and Mr. Knight to inquire about the issue, then *Mr. Kelly went on vacation* (Doc[.] 264-3, ¶¶ 14, 15). There was still no response to Local Access.

(4) May 7, 2018: Mr. Kelly spoke with Mr. Barnicle and determined that he would have further discussions with Peerless employees. That same day, *Mr. Kelly, Ms. James and Ms. McElmury formulated and sent the email objecting to the designation of Highly Confidential given to the CDRs produced on January 30, 2018 and April 10, 2018 and offered to "strip" certain information "prior to transmitting" the CDRs to Peerless for review. No divulgence was made of the disclosure that had already occurred.*

(5) May 9: Local Access responded to the May 7 email and asked for a response to its April 12, 2018 email (Doc. 229-12). Kelley Drye did not provide a substantive response.

(6) May 10 or 11, 2018: Mr. Kelly says he discovered Peerless had used Confidential information for non-litigation purposes.[4]

(7) May 16: Kelley Drye finally informed Local Access that it had inadvertently provided the January 30, 2018 CDRs to Peerless (Doc. 229-17).

---

[4] "This misuse of Confidential information was made possible by the actions of Kelley Drye in stripping the Confidential designation from the information (itself a violation of the Protective Order) and transmitting it to Peerless . . . without assuring adherence to the provisions of the Protective Order designed to safeguard that information." (Doc. 609 at 25).

(8) May 25: Kelley Drye notified Local Access of the improper solicitation of its customers by Peerless.

(9) June 1, 2018: Kelley Drye notified the Court.

(*Id.* at 20–21) (emphasis added). These facts establish Kelley Drye:

(1) Failed to ensure that all persons authorized to receive Confidential or Highly Confidential Litigation Materials under the Protective Order were first shown a copy of the Protective Order and signed written acknowledgements agreeing to abide by its terms before such litigation materials were disclosed.

(2) Delivered Confidential and Highly Confidential litigation material to Peerless, without first reviewing such material to ascertain how the material had been designated.

(3) Delivered Highly Confidential material to persons not authorized to receive it.

(4) Failed to "immediately" disclose the unauthorized disclosures and breaches of the Protective Order.

(5) Failed to make every reasonable effort to prevent further disclosure by Peerless by delaying its response to Local Access' inquiries.

(*Id.* at 14–15).

The Court also accepts the Magistrate Judge's legal conclusion that the facts support a finding of contempt, as well as his conclusion that the conduct is sufficiently redressable by sanctions. (*Id.* at 34). However, for the following reasons, the Court does not believe the recommended sanctions go far enough to curb the offending conduct.

Kelley Drye's attorneys, Ms. McElmury, a junior associate, Mr. Kelly, a partner, and Ms. James, a senior associate, are not members of the Florida Bar, nor are they licensed to practice in the United States District Court for the Middle District of Florida. They appeared in this case after having been admitted *pro hac vice*. (*See* Doc. 20 at 1). As such, they are "deemed to be familiar with and *governed by* the Code of Professional Responsibility and other ethical limitations or requirements then governing the

professional behavior of members of The Florida Bar." (*Id.* at 2) (emphasis added) (citing M.D. Fla. R. 2.02(c)). At a minimum, the failure to adhere to these ethical standards would support a contempt sanction. Although this Court chooses to sanction Kelley Drye—and the offending attorneys—without such a finding, it will nonetheless address Plaintiff's exceptions to the R&R.

### A.    The Confession

The parties do not dispute that Kelley Drye ultimately confessed to its wrongdoing, albeit reluctantly and belatedly. Plaintiff argues, instead, that the confession consisted of "half-truths and carefully worded constructs geared toward . . . 'avoid[ing] the sword entirely.'" (Doc. 611 at 5) (citation omitted). While Plaintiff may be engaging in a game of semantics, the Court does not necessarily disagree with its characterization. Regardless, the confession does not absolve Kelley Drye of the consequences of its misconduct.[5]

The May 7, 2018 e-mail—that no less than three attorneys from Kelley Drye drafted and sent to Plaintiff—was at best, misleading, and at worse, false. The following portion of the e-mail is particularly troubling: "If Local Access would identify what information within its CDRs it considers 'Highly Confidential,' we may be willing to consider stripping that information from the CDRs *prior* to transmitting them to Peerless for review." (Doc. 229-11 at 2) (emphasis added). This assertion is especially concerning, given that counsel was well-aware when it drafted and sent the e-mail that the information had already been transmitted to Peerless. Quite simply, this is dishonest and as Plaintiff aptly asserts, "contains a misrepresentation by omission." (Doc. 611 at 20). This material fact is not lost on the Court. And counsels' failed attempt to cover their proverbial rear-ends

---

[5] However, some showing of contrition would certainly mitigate the consequence.

cannot be countenanced. As the Magistrate Judge found, Kelley Drye sent the e-mail to mitigate, not investigate. (Doc. 609 at 24). Such conduct is unprofessional, unethical, and unbecoming of attorneys practicing not only in federal court, but any court.

The Court does not suffer fools lightly. Kelley Drye's attempt to minimize its actions by shifting the blame onto Plaintiff for improperly designating litigation material[6] is unavailing, lacks penitence, and smacks of desperation. (*See* Doc. 264 at 5–9, 14–15). To the point, the process to determine confidentiality disputes was agreed to by the parties and painstakingly detailed in the Protective Order. (*See* Doc. 44, ¶ 11). If Kelley Drye had an issue with the designations, there was a time to bring that matter to the Court's attention. That time has long since lapsed.

### B.    Compliance with the Protective Order

The Court now turns to issues involving Kelley Drye's compliance with the Protective Order.

As it relates to Confidential Litigation Material, the Protective Order directs:

Litigation Material designated as Confidential, including any copies, notes, abstracts, or summaries thereof, shall be maintained in confidence by the Recipient, and shall not be disclosed to any person except:

. . . .

e.    If the party is a corporate entity, only those directors, officers, and employees of the corporate entity who require the Confidential Litigation Material to perform his or her responsibilities in connection with the Civil Action, and who have executed Attachment A, but only

---

[6] In its Response in Opposition to the Motion, Kelley Drye accuses Plaintiff of, among other things, engaging in "scorched earth litigation tactics[,]" "personally harassing [Kelley Drye] in a calculated effort to undermine Peerless" "employ[ing] underhanded tactics to shore up sanctions motions, baselessly accus[ing] Kelley Drye attorneys of lying," "harass[ment,] and discriminat[ion.]" (*See* Doc. 264 at 2, 15–16, 20). These allegations do nothing to diminish Kelley Drye's wrongdoing in the matter now before the Court.

> to the extent required to perform his or her responsibilities in
> connection with the Civil Action.

(*Id.* ¶ 13). And when discussing the treatment of Highly Confidential Litigation Material,

the Protective Order mandates:

> All persons authorized to receive Confidential or Highly Confidential
> Litigation Material under this Protective Order . . . shall be shown a copy of
> this Protective Order, and shall not be provided Confidential or Highly
> Confidential information, unless agreeing in advance in writing to abide by
> the terms of this Protective Order, and by acknowledging their
> responsibilities to maintain the Litigation Material as Confidential or Highly
> Confidential by executing a copy of an acknowledgement set forth in
> Attachment A. A file shall be maintained by outside counsel of record for a
> party of all written agreements signed by persons who will receive
> Confidential or Highly Confidential Litigation Materials from that party or
> persons affiliated with that party.

(*Id.* ¶ 16).

The parties do not dispute that the Protective Order is valid and lawful. (*See* Doc.

230 at 9; Doc. 265 at 13). Kelley Drye also admits the Protective Order is clear and

unambiguous about the parties' duties when disclosing Confidential and Highly

Confidential Litigation Material. (Doc. 265 at 13). In addition, Kelley Drye concedes

Defendant used Confidential Litigation Material improperly for commercial uses, violating

the Protective Order. The only remaining question is whether Kelley Drye could comply

with the Protective Order, and to this question Kelley Drye answers in the affirmative.

(*Id.*).

The Magistrate Judge concluded that Kelley Drye is currently in compliance with

the Protective Order. However, this Court is not satisfied that every person authorized to

receive Confidential or Highly Confidential Litigation Materials under the Protective Order

has: (1) seen the Protective Order; and (2) signed written acknowledgements to abide by

its terms. Indeed, it remains unclear whether Kelley Drye made all reasonable efforts to

comply, as the record is devoid of any evidence that a single Peerless employee signed an acknowledgment of the Protective Order. (*See* Doc. 567 at 162:4–164:4). And while this Court agrees with the Magistrate Judge that failing to do so may only constitute negligence by Kelley Drye, it still violates the Protective Order.

On the other hand, Kelley Drye's failure to immediately notify Local Access of the unauthorized disclosure was not the result of negligence, but rather constituted willful misconduct. When an unauthorized disclosure of Confidential or Highly Confidential litigation material occurs, the Protective Order directs:

> In the event that information from Litigation Material designated Confidential or Highly Confidential is disclosed to someone not authorized to receive such information under this Protective Order, or if any person so authorized breaches any of his or her obligations under this Protective Order, counsel of record for the party involved *shall (after learning of such disclosure or breach) immediately give notice of such unauthorized disclosure or breach*, including a reasonable description of all pertinent facts, to counsel of record for the party who initially produced the Confidential or Highly Confidential Litigation Material. Without prejudice to other rights and remedies of the designating party, counsel for the party making the disclosure shall make every reasonable effort to prevent further disclosure by it or by the person who was the recipient of such information.

(Doc. 44, ¶ 18) (emphasis added).

At the very latest, on April 12, 2018, Kelley Drye knew it had violated the Protective Order when it received an inquiry from Local Access. Yet, inexplicably, Kelley Drye failed to immediately disclose the unauthorized breach, and instead waited over a month to disclose its actions to Local Access. In doing so, Kelley Drye failed to make every reasonable effort to prevent further disclosure of the Confidential and Highly Confidential material by Peerless. As Judge Smith remarked:

> I expect any competent lawyer, upon finding that the firm or client had acted inappropriately, would be concerned about possible personal and professional peril. Given this legitimate concern, it would not be unreasonable for a lawyer to take a few days to determine just how big the

sword is before falling on it. Nor would it be beyond the pale for a firm to first seek professional advice in ways to mitigate the expected injury. What a lawyer cannot do is delay indeterminately or seek to minimize or cover up the wrongdoing in an effort to avoid the sword entirely. The obligation of candor owed to the court, other counsel, and the profession itself is paramount and trumps any business interest in non-disclosure. This is true even if the wrongdoing was unintentional, unanticipated, or harmless. Disclosing an error - fully, freely and in a timely fashion - is a hallmark of integrity, both personal and professional. The Court expects this from lawyers and lawyers should expect this from themselves.

(Doc. 609 at 22).

### C.      Likelihood of Repetitive Conduct

Plaintiff objects to the Magistrate Judge's conclusion that Kelley Drye is unlikely to repeat its conduct. This objection is premised on Plaintiff's belief that requiring Kelley Drye to pay attorneys' fees and costs as its only sanction for violating the Protective Order will do little to deter the offending conduct. (*See* Doc. 611 at 13–14). While this Court agrees that the recommended sanction falls short, it cannot conclude that Judge Smith was wrong when he stated, "given the uncomfortable gauntlet it just ran, I trust [Kelley Drye] has no wish to violate the Protective Order again." (Doc. 609 at 30).

### D.      Florida Rules of Professional Conduct

"A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice." R. Regulating Fla. Bar 4. Local Rule 2.02(c) requires all attorneys practicing in the Middle District of Florida to follow the ethical limitations and requirements governing the behavior of members of The Florida Bar. This means attorneys practicing before the Court are bound by the Florida Rules of Professional Conduct.

Plaintiff argues that Kelley Drye violated the following Rules Regulating the Florida Bar: (1) Rule 4-3.3, requiring all attorneys, at all times, to demonstrate candor toward the

tribunal; (2) Rule 4-3.4, requiring attorneys to demonstrate fairness to the opposing party and counsel, and in particular Rule 4-3.4(c), prohibiting a lawyer from "knowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists"; (3) Rule 4-8.4(d), prohibiting a lawyer from "engag[ing] in conduct in connection with the practice of law that is prejudicial to the administration of justice"; and (4) Rule 4-4.1, prohibiting a lawyer, while representing a client, from knowingly "(a) mak[ing] a false statement of material fact or law to a third person; or (b) fail[ing] to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 4-1.6." The Magistrate Judge concluded there was insufficient proof to establish a violation of the Rules:

> After an exhausting discovery process, a flurry of motions and filings (many under seal), hundreds of pages of deposition excerpts and exhibits and two days of testimony, Local Access succeeded in proving that Kelley Drye did not fully adhere to the terms of the Protective Order and, when that failure became clear, the firm compounded its error by failing to immediately confess. What Local Access does not appreciate is that the initial violation was an error and Kelley Drye *did* eventually (albeit belatedly) confess.

(Doc. 609 at 34). While the Magistrate Judge was understandably reluctant to find a violation of the rules for professional conduct he concluded was negligent, he failed to consider Kelley Drye's intentional conduct. In particular, the Magistrate Judge failed to determine whether Kelley Drye's willful conduct, namely, drafting and sending the May 7, 2018 e-mail to "cover up" its own wrongdoing, violated the Rules of Professional Conduct. There can be little question that it did. As the Magistrate Judge pointed out:

> No later than April 12, 2018, Kelley Drye knew it had provided the January 30, 2018 Highly Confidential CDRs to Peerless. Yet, rather than disclose this to Local Access, and *with full knowledge that it had already made the inappropriate disclosure*, Kelley Drye sent an email asking Local Access to identify what information it considered Highly Confidential in the CDRs so

that Kelley Drye could 'consider stripping that information from the CDRs prior to transmitting them to Peerless.' *This email was not sent to investigate, it was sent to mitigate.* Kelley Drye had an affirmative duty to promptly disclose what it knew to Local Access and the Court[,] and its failure to do so until well over a month had passed from discovery of the violation is *an intentional violation* of the Protective Order.

(*Id.* at 24) (emphasis added).

Accordingly, the Court finds that Kelley Drye violated the Rules by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. *See generally* R. Regulating Fla. Bar 4-3.4, 4-4.1, 4-4.4, and 4-8.4. Further, the conduct was prejudicial to the administration of justice, given the several months long delay required to investigate and litigate this issue.

### E.    Appropriate Sanctions

Having addressed Local Access's objections to the Magistrate Judge's specific factual findings, the Court will now turn its attention to the issue of sanctions. Courts have the authority to protect the administration of justice and to "impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (citations omitted). "Disobedience of a court order unequivocally merits punishment save in instances in which compliance would necessarily result in an irrevocable and permanent surrender of a constitutional right." *Id.* at 1208 (citations and internal quotation marks omitted).

Local Access seeks these sanctions against Kelley Drye: (1) a finding of civil contempt; (2) referral to the United States Attorney's Office for criminal contempt; (3) and disqualification. Each will be addressed in turn.

### 1.   Civil Contempt

Courts possess the inherent power to hold a party in contempt if it violates court orders. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). To prove civil contempt, the evidence must show: "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002) (citation omitted). The violation must be clear and convincing, as it is a "willful disregard of the authority of the court[.]" *Id.* (citation omitted). A civil contempt sanction is "remedial, and for the benefit of the complainant. But if it is for criminal contempt[,] the sentence is punitive, to vindicate the authority of the court." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–28 (1994) (citation omitted). Civil sanctions ensure parties abide by court orders and provide the opportunity to purge contempt by simply complying with the order. *Id.* at 829.

The party seeking contempt bears the burden of proof, but once proven, the burden shifts to the alleged contemnor. *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 984 (11th Cir. 1986) (citation omitted). The alleged contemnor must show it made "in good faith all reasonable efforts to comply." *Id.* (citation omitted). Even if the alleged contemnor made "substantial, diligent or [ ] good faith" efforts, "the fact that [it] did not make all reasonable efforts establishes that [it] did not sufficiently rebut the . . . prima facie showing of contempt." *Id.* (citations and internal quotation marks omitted). This is a strict standard. The Supreme Court has clearly stated "the absence of willfulness is not a defense to a charge of civil contempt." *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). So, too, the Eleventh

Circuit has determined "that substantial, diligent, or good faith efforts are not enough; the only issue is compliance." *Id.* (citations omitted).

The Magistrate Judge acknowledges that "a finding of civil contempt is supportable[.]" (Doc. 609 at 27). This Court agrees. However, a court "should exercise its discretion to hold a party in contempt only when doing so would vindicate the purpose of the underlying order." *Mercer v. Mitchell*, 908 F.2d 763, 770 (11th Cir. 1990). And while, arguably, that purpose is met here, this Court nonetheless chooses to exercise its discretion through sanctions, instead of civil contempt.

2.     *Criminal Contempt*

Criminal contempt, rightfully so, sets the bar much higher. A party can establish criminal contempt when it puts forth evidence the alleged contemnor "is aware of a clear and definite court order and willfully disobeys the order." *United States v. Baldwin*, 770 F.2d 1550, 1557 (11th Cir. 1985) (citation omitted). "An essential element of [criminal contempt] is an intent, either specific or general, to commit it. By definition, contempt is a *willful* disregard or disobedience of a public authority." *Id.* at 1558 (citations and internal quotation marks omitted). The party alleging contempt must prove "a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *Id.* (citation omitted). Reckless disregard will also suffice. *United States v. KS & W Offshore Eng'g, Inc.*, 932 F.2d 906, 909 (11th Cir. 1991) (per curiam) (citation omitted). Kelley Drye's intentional violation of the requirement to "immediately" report violations of the Protective Order, arguably, support a finding of criminal contempt. However, given the totality of the circumstances, and the fact that Kelley Drye did

eventually report the violation, the Court concludes that a finding of criminal contempt is not absolute. Therefore, it will not take such drastic measures.

### 3.    Disqualification

The Eleventh Circuit has formulated a two-part test for the disqualification of counsel. *Kleiner*, 751 F.2d at 1210. First, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *United States v. Hobson*, 672 F.2d 825, 828 (11th Cir. 1982) (per curiam) (citation omitted). Kelley Drye's violation of the Protective Order satisfies this requirement. But since Local Access's Motion to disqualify is based on an ethical violation and not merely the violation of the Protective Order, the Court must clearly identify the rule and find that counsel violated the rule in order to disqualify the attorney. *See Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). As stated previously, by drafting and sending the May 7, 2018 e-mail, Kelley Drye violated the rules of professional conduct by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. *See* R. Regulating Fla. Bar 4-3.4, 4-4.1, 4-4.4, and 4-8.4. This finding alone, however, is not enough to warrant disqualification. The second part of the test requires the court to "find that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." *Hobson*, 672 F.2d at 828 (citation omitted). In evaluating this factor, the Court must weigh the degree to which retaining Kelley Drye as counsel erodes public trust in the judiciary against Peerless's interest in retaining Kelley Drye as its counsel of choice. *See Kleiner*, 751 F.2d at 1210.

"[A] party is presumptively entitled to counsel of [its] choice[.]" *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003) (citations omitted). Thus, the right to chosen

counsel may only be overridden "if 'compelling reasons' exist." *Id.* (citations omitted). Depending on the circumstances, ethical violations and conduct impeding the orderly administration of justice may be compelling enough to justify disqualification. *See generally Schlumberger*, 113 F.3d at 1560–61; *Kleiner*, 751 F.2d at 1209–11. However, as the Magistrate Judge aptly noted, "[d]isqualification is a harsh sanction, often working substantial hardship on the client, especially in cases where extensive discovery and trial preparation have been completed." (Doc. 609 at 33). Therefore, even where, as here, Kelley Drye's conduct violated ethical rules and impeded the orderly administration of justice, other sanctions should be considered before disqualification is employed. Such sanctions include the assessment of attorneys' fees and costs or monetary penalties paid to the clerk of court. *See Kleiner*, 751 F.2d at 1209.

Given the Magistrate Judge's history with the parties, the Court accords great weight to his determination that Kelley Drye's conduct is redressable by sanctions other than disqualification. And after considering the totality of the record, this Court agrees. However, this Court is not satisfied that assessing attorneys' fees and costs is sufficient to address Kelley Drye's conduct. The recommended sanction is weak, and much like requiring a middle schooler to write "I will not talk in class" one hundred times on the chalkboard, it serves as merely an irritant rather than a deterrent to future bad behavior. Accordingly, for the reasons set forth in this Order, the Court concludes that the actions of Kelley Drye warrant the imposition of sanctions beyond those outlined in the R&R.

Therefore, it is **ORDERED** and **ADJUDGED** as follows:

1. The Report and Recommendation (Doc. 609) is **ADOPTED** and **CONFIRMED** and made a part of this Order.

2. Plaintiff's Motion to Disqualify and/or Discipline Kelley Drye for Litigation Misconduct (Doc. 230) is **GRANTED in part** and **DENIED in part**.

3. Local Access is hereby awarded its reasonable attorneys' fees and costs incurred between December 20, 2017, and the date of this Order, which relate to the investigation and discovery of Kelley Drye's violation of the Protective Order and the prosecution of this sanctions Motion.

4. Counsel for the parties shall confer in a good faith effort to resolve the reasonable expenses, including reasonable attorneys' fees, to be awarded. If the parties are unable to reach agreement on the amount, then Plaintiff shall file a motion for assessment of these expenses, including reasonable attorneys' fees, **on or before July 31, 2020**. The motion for assessment of costs and fees shall be supported by evidence of the reasonable hourly rate of each professional for whom fees are sought, the reasonable number of hours worked, and the actual expenses incurred.

5. Attorneys' fees and costs awarded to Local Access in connection with this matter are to be borne solely by Kelley Drye, and Peerless is prohibited from paying any part of said attorneys' fees and costs.

6. Within sixty days, the following Kelley Drye counsel shall pay a fine of $30,000.00, to the Clerk of Court, United States District Court, Middle District of Florida,[7] with each attorney named below personally responsible for the following amounts:

---

[7] Such payment must be paid to the Clerk by a certified bank check, cashier's check, money order, or cash. Personal checks are not accepted. Checks or money orders must be made payable to "Clerk, United States District Court." If paying with cash, the

      a.  Henry T. Kelly – $12,500.00

      b.  Catherine E. James – $12,500.00

      c.  Brittany L. McElmury[8] – $5,000.00

7.  The Clerk of Court is directed to provide a copy of this Order to Brittany L. McElmury, Samsung Electronics America, Inc., 6625 Excellence Way, Plano, Texas 75023-1201.

8.  Pursuant to Rule 4-8.3(a) of the Rules Regulating the Florida Bar, the Clerk of Court is directed to provide a copy of this Order to:

      a.  Northern District of Illinois
         Eastern Division
         Everett McKinley Dirksen United States Courthouse
         219 S. Dearborn St.
         Chicago, IL 60604

      b.  Attorney Registration and Disciplinary Commission
         130 E. Randolph Dr., Ste. 1500
         Chicago, IL 60601-6219

      c.  Office of Disciplinary Counsel
         Board on Professional Responsibility
         District of Columbia Court of Appeals
         515 5th Street NW
         Building A, Suite 117
         Washington, DC 20001

**DONE AND ORDERED** in Orlando, Florida on June 29, 2020.

---

exact amount must be tendered. The Clerk accepts neither credit nor debit cards nor electronic billing nor debit accounts.

    [8] Although Kelley Drye has not employed Ms. McElmury since September 14, 2018, (Doc. 353, ¶ 2), and she has been terminated from this case, (Doc. 354), she is still responsible for her actions while appearing before this tribunal.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE


Copies furnished to:

Counsel of Record
Northern District of Illinois, Eastern Division
Attorney Registration and Disciplinary Commission
Office of Disciplinary Counsel
Brittany L. McElmury