UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LOCAL ACCESS, LLC,

    Plaintiff,

v.              Case No:   6:17-cv-236-Orl-78EJK

PEERLESS NETWORK, INC.,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter comes before the Court on the Order to Show Cause as to Peerless Network, Inc., as to why it should not be held in civil and criminal contempt, and have sanctions imposed for failing to comply with the Court's July 10, 2017 Protective Order (Doc. 44). (Doc. 458.) Plaintiff, Local Access, LLC ("Local Access"), and Defendant, Peerless Network, Inc. ("Peerless"), each submitted opening and closing briefs on the issues. (*See Local Access's filings at* Docs. 657 (opening brief), 658 (exhibits), 660 (notice of scrivener's error), S-664 (sealed opening brief), S-665 (sealed exhibits), 670 (closing brief); *see Peerless's filings at* Docs. 656 (opening brief), 668 (closing brief), S-675 (sealed closing brief).) The Court heard oral argument on the Order to Show Cause on January 15, 2020. (Doc. 676.)[1] For the reasons set forth below, I respectfully recommend that Peerless be held in civil contempt for violating the Protective Order. As a result of the violation, I find the following sanctions to be appropriate: compensatory damages, injunctive relief, striking of pleadings, and awarding attorneys' fees and costs. However, for the reasons given below, I ultimately recommend only an award of $99,887.00 in costs that

---

[1] Neither party requested an evidentiary hearing on the Order to Show Cause, despite the undersigned giving the parties the opportunity to do so.

Local Access incurred by retaining an expert who opined on the reasonableness of the hours charged by its attorneys.

I.      BACKGROUND

    A.  The Order to Show Cause

The parties have finally reached the terminus of the sanctions phase of this litigation—specifically, the undersigned has been tasked with recommending whether and to what extent Peerless should be sanctioned for its violation of the Court's July 10, 2017, Protective Order (Doc. 44.)

Local Access previously moved to disqualify or discipline Peerless's attorneys, who, at the time, practiced with the law firm Kelley, Drye, & Warren, LLP ("Kelley Drye"). (Doc. 230.) Local Access had also filed a related motion for sanctions against Peerless for litigation misconduct (Doc. 229; Doc. S-245), to which Peerless responded (Doc. 265; Doc. S-274.) The motions alleged that Peerless and Kelley Drye improperly disclosed and used documents Local Access had designated as "Confidential" and "Highly Confidential," in violation of the Protective Order. Due to the gravity of these allegations, the previous presiding Magistrate Judge, the Honorable Thomas B. Smith, allowed discovery on these issues and stayed all unrelated litigation. (*See* Doc. S-275.) By sealed Order dated January 3, 2019, Judge Smith granted the motions to the extent they sought issuance of Orders to Show Cause and the scheduling of evidentiary hearings. (*See* Doc. S-458.)

Because Local Access sought to disqualify Peerless's chosen attorneys, Judge Smith decided it was appropriate to address that issue first and deferred consideration of the motion to impose sanctions against Peerless until the conclusion of the motion to disqualify or discipline Kelley Drye. After extensive briefing, the Court ultimately adopted Judge Smith's Report &

Recommendation (Doc. 609) and determined that disqualification was not a sanction it would impose on Kelley Drye. (Doc. 703.) Rather, the Court awarded the reasonable attorneys' fees and costs Local Access incurred between December 20, 2017, and June 29, 2020, which related to the investigation and discovery of Kelley Drye's violation of the Protective Order and the prosecution of the sanctions motion. (*Id.* at 21.) The Order also stated that the "[a]ttorneys' fees and costs awarded to Local Access . . . [were] to be borne solely by Kelley Drye, and Peerless is prohibited from paying any part of said attorneys' fees and costs." (*Id.*) The Order also assessed fines against Kelley Drye's counsel, Henry T. Kelly, Catherine E. James, and Brittany L. McElmury. (*Id.* at 21–22.)

### B. Previous Factual Findings Relevant to the Order to Show Cause

#### 1. The Protective Order

As previously stated, the present dispute involves the terms of the Protective Order (Doc. 44) and the consequences that should result from Peerless's acknowledged violations of it. Judge Smith previously summarized the pertinent portions of the Protective Order in his R&R regarding sanctions as to Kelley Drye, which the undersigned restates here for context:

> Early in the case, the parties filed a Joint Motion for Protective Order with an attached proposed Protective Order intended to "govern discovery production and the exchange of materials among the parties and third-parties in light of the expected exchange of information that is protected 'Consumer Proprietary Network Information' ("CPNI")." (Doc. 43 at 1). Concerned that discovery "may result in the disclosure of CPNI, **confidential or proprietary information among the parties** and from third-party subpoena respondents that should not be publicly disclosed," the parties prepared the Protective Order and "agreed to the contents thereof." (*Id.*, emphasis added; Doc. 43 at 3; and Doc. 43-1). The Court entered the tendered Protective Order after making certain modifications which are not pertinent to this dispute (Doc. 44). The Protective Order defines two categories of information a party may designate as confidential:

"Confidential" Litigation Material is information that contains, reflects, or reveals:(1) trade secret information (which is a formula pattern device for compilation of information which is used in one's business, and which gives the business an opportunity to obtain an advantage over competitors who do not know or use the trade secret information); (2) proprietary information, such as research and development information, or commercially or competitively sensitive information (as examples); or (3) confidential, non-public personal information concerning individuals.

"Highly Confidential" Litigation Material is Confidential Litigation Material that (a) has current applicability to the Disclosing Party's business operations and (b) would more likely than not cause competitive harm to the business operations of the Disclosing Party if made public. Highly Confidential Litigation Material is afforded a higher level of confidentiality than Confidential Litigation Material under this Protective Order. The categories of Confidential Litigation Material that shall be deemed Highly Confidential shall be narrowly limited to: customer names and terms of service, and traffic and revenue information.

(Doc. 44, § 2).

The Protective Order identifies categories of persons who may be given access to Confidential and Highly Confidential information (Doc. 44, §§ 13 & 14). Confidential information may be disclosed to: "those directors, officers, and employees of [a] corporate entity [party] who require the Confidential Litigation Material to perform his or her responsibilities in connection with the Civil Action, and who have executed Attachment A, but only to the extent required to perform his or her responsibilities in connection with the Civil Action." (Doc. 44, § 13.e). Highly Confidential information may only be disclosed to outside counsel and retained experts; it cannot be disclosed to the parties themselves (Doc. 44, §14).

When Confidential or Highly Confidential information is disclosed to authorized persons, the Protective Order mandates that it "shall be used only for the prosecution or defense of the Civil Action. No party or person receiving Confidential or Highly Confidential Litigation Material shall use such material or the contents thereof for any other business, commercial, or competitive purposes." (Doc. 44, §15).

The Protective Order requires that certain categories of recipients (including personnel of the corporate parties) "be shown a copy of this Protective Order, and [they] shall not be provided Confidential or Highly Confidential information, unless agreeing in advance in writing to abide by the terms of this Protective Order, and by acknowledging their responsibilities to maintain the Litigation Material as Confidential or Highly Confidential by executing a copy of an acknowledgement set forth in Attachment A." (Doc. 44, §16.2). Unfortunately, when the parties submitted the proposed Protective Order to the Court for entry, they did not include Attachment A. As a consequence, when the Protective Order was entered, Attachment A was not included.

The Protective Order also provides:

> In the event that information from Litigation Material designated Confidential or Highly Confidential is disclosed to someone not authorized to receive such information under this Protective Order, or if any person so authorized breaches any of his or her obligations under this Protective Order, counsel of record for the party involved shall (after learning of such disclosure or breach) **immediately** give notice of such unauthorized disclosure or breach, including a reasonable description of all pertinent facts, to counsel of record for the party who initially produced the Confidential or Highly Confidential Litigation Material. Without prejudice to other rights and remedies or the designating party, counsel for the party making the disclosure shall make every reasonable effort to prevent further disclosure by it or by the person who was the recipient of such information.

(Doc. 44, §18 – emphasis added).

(Doc. 609 at 6–8.)

Peerless and Kelley Drye have admitted that violations of the Protective Order occurred. As stated by Judge Smith:

> On June 1, 2018, Kelley Drye notified the Court in writing that Peerless "had access to information designated by Local Access as Confidential litigation material and certain personnel used information derived from the confidential litigation material for reasons other than their responsibilities in connection with this case." (Doc. 188). Kelley Drye acknowledged two breaches of the Protective Order: (1) disclosure of Call Detail Records ("CDRs") designated "Confidential" by Local Access were transmitted to Peerless employees who used the information for

purposes other than litigation; and (2) Local Access CDRs that were designated Highly Confidential were transmitted to Peerless.

(*Id.* at 8.)

### 2.  Previous Findings of Fact

Many of the findings of fact previously adopted by the Court in its Order sanctioning Kelley

Drye apply here as well. For context, they are as follows:

On December 20, 2017, Local Access (through counsel) produced to Kelley Drye a set of CDRs identified as "LA_0001865–CONFIDENTIAL.zip." and designated as "Confidential" under the terms of the Protective Order (the "12/20/17 Production"). On January 30, 2018, Local Access supplemented this production by providing additional months of CDRs ("the 1/30/18 Production"). Local Access designated the 1/30/18 Production "Highly Confidential." (*See*, generally, Doc. 229). In her Declaration, Kelley Drye attorney Catherine E. James states:

5. On or about February 5, 2018, I asked Brittany McElmury, an attorney at Kelley Drye, to provide Local Access's 12/20/17 Production and 1/30/18 Production of CDRs to Peerless's engineering management, Scott Kell, Executive Vice President of Operations of Peerless, without realizing that the individual file names within the 1/30/18 Production of CDRs had been designated as Highly Confidential.

6. I also requested that two members of Peerless's engineering team (Mr. Kell and Mr. Sherman, Peerless's V.P. of Information Technology) load Local Access's CDRs into a Structured Query Language ("SQL") database and asked that they run queries for the purpose of prosecuting Peerless's claims and defenses.

7. One of the queries identified a list of entities from the 12/20/17 Confidential Production which Peerless identified under an "Egress Carrier" header.

8. On or about February 12, 2018, I provided that list of entities from Local Access's 12/20/17 Confidential Production to Rick Knight, Executive President of Sales and Marketing at Peerless for the purpose of, inter alia, investigating Local Access's allegations ....

9. I also communicated with Mr. Knight on or around February 12, 2018, February 14, 2018, February 15, 2018, February 19, 2018, March 8, 2018 and March 12, 2018 to plan for and conduct a review of information derived from the 12/20/17 production. During my conversations with Mr. Knight on or around February 15, 2018, March 8, 2018, and March 12, 2018, I discussed with him the terms of and compliance with the applicable Protective Order.

10. On or around March 5, 2018, I asked Brittany McElmury to resend Local Access's 1/30/18 Production of CDRs to Mr. Kell, without realizing that the individual file names within the 1/30/18 Production of CDRs had been designated as Highly Confidential.

11. On or around March 5, 2018, I again directed Peerless's engineering team to load the 1/30/18 Production into a SQL database to run queries attempting to identify information for the purpose of prosecuting Peerless's claims and defenses.

(Doc. 264-4).

In deposition testimony, Ms. James explained that Mr. Sherman and/or Mr. Kell created a spreadsheet of the unique names of Local Access' customers from the information contained in the CDRs from the 12/20/17 Production. (Deposition of Catherine James, 109:5-110:4). This spreadsheet was named "LA_Confidential." (*Id.* at 108:17-24). Ms. James printed the column of Local Access customer names from that spreadsheet to a native .pdf document she named "LA Customers.pdf." (*Id.*, 110:5-21; Local Access Exhibits 2 & 3). She did not include the word "Confidential" in the file name and the word "Confidential" does not appear anywhere in the .pdf file itself (*Id.* at 110:9-111:2). On February 12, 2018, Ms. James sent the "LA Customers.pdf" file to Mr. Knight via email. (Local Access Exhibits 2 & 3). The email transmitting the file did not inform Mr. Knight that the file "LA Customers.pdf" contained Confidential information protected by the Protective Order. Before sending the February 12, 2018 email to Mr. Knight, Ms. James had not sent Mr. Knight a copy of the Protective Order and she had not obtained a written acknowledgment of the Order from him (James, 51:11-15).

From there the information, not protected by a designation of "Confidential" was distributed within Peerless. Mr. Knight shared the Local Access confidential customer information contained in the file "LA Customers.pdf" with Mr. Brabson, Ms. McNerney and Mr. Davis, either by sending them the file or by reading the contents over the telephone. (Deposition of Richard Knight, 56:2-21). Mr. Brabson testified that he was

never advised that the list was derived from Confidential Litigation Material (Deposition of Brian Brabson, 34:13-45:4). Ms. McNerney and Mr. Davis were also not told that the list was derived from Confidential Litigation Material (Deposition of Margaret McNerney, 26:20-27:10; Deposition of Jeff Davis, 19:12-20). Mr. Davis created a spreadsheet from the list of Local Access customer names provided to him by Mr. Knight (Davis, 44:6-11). He distributed this spreadsheet to Mr. Walther and several other Peerless employees (Id. at 45:7-10). Mr. Walther testified that nobody within Peerless told him he had been given Confidential information (Deposition of Steven Gregory Walther, 28:23-29:15).

*On April 12, 2018, Kelley Drye attorney Henry T. Kelly received an email from counsel for Local Access asserting that Local Access' customers were being solicited by Peerless and requesting information about Local Access' Highly Confidential information* (Doc. 265-10, ¶ 13). Beginning that day, Mr. Kelly and other lawyers representing Peerless had conversations with Peerless employees to gather information to respond to Local Access' concerns (*Id.*, ¶¶ 14-18). According to Mr. Kelly:

> 14. During the period from April 12, 201[8] through approximately April 20, 201[8], I had communications with John Barnicle, Peerless's Chief Executive Officer, and Rick Knight, Executive President of Sales and Marketing at Peerless to inquire about the issue raised by Local Access's counsel's email.

> 15. On May 7, 2018, after I returned from a vacation, I spoke with John Barnicle regarding Local Access's concerns that Peerless had used information produced in discovery to market to Local Access customers. Mr. Barnicle and I agreed that I would have further discussions with Peerless employees.

> 16. At Peerless's direction, I spoke with Richard Knight and Brian Brabson on May 9, 2018, with Margaret McNerny on May 10, 2018, Jeff Davis on May 11, 2018, Julie Oost on May 14, 2018, [and] John Barnicle on May 15, 2018 and May 16, 2018. Thereafter, I also had a subsequent conversation with Mr. Davis on June 29, 2018, Julie Oost and John Barnicle on June 29, 2018, Julie Oost, Greg Walther, Chris McDonald, Frank Trento, and James Cook on July 2, 201[8].

> 17. Through these conversations, I came to understand that a subset of the information transmitted to Mr. Knight was communicated to Mr. Brian Brabson (on or about February

14, 2018), Jeff Davis, Greg Walther, Chris McDonald, Frank Trento, James Cook (February 26, 2018), and Margaret McNerny (March 2018).

18. In addition, at my direction, I requested that Peerless provide a copy of all reports generated by Peerless from Local Access's 12/20/17 and 1/30/18 productions and destroy all copies and records containing or derived from those productions. I also directed the production of those reports to Local Access....

(*Id.*).

What Mr. Kelly and Ms. James fail to mention in their declarations is that Ms. McElmury was asked to confirm the confidentiality designations for Local Access CDRs in response to Local Access' query and, on April 12, 2018, she "informed my team that the January 30, 2018 production, which was sent to Scott Kell, was designated as 'Highly Confidential.'" (Doc. 265-5). Ms. McElmury "immediately" and within "seconds" reported that information to Ms. James and "collectively we reported it to Hank Kelly." (Deposition of Brittany McElmury, 79:2-23, 81:1-23, 89:16-24, 90:1-3).

*Although Kelley Drye attorneys knew by April 12, 2018 that they had already disclosed the 1/30/18 Highly Confidential information to Peerless, Ms. McElmury sent an email to an attorney for Local Access on May 7, 2018, which reads in part:*

> *Local Access has produced several sets of CDRs with the designation of "Highly Confidential": on January 30, 2018, Local Access produced sets of CDRs, each of which was designated as "Highly Confidential," and on or about April 10, 2018, Local Access produced additional CDRs that it designated "Highly Confidential." However, almost all of the information provided in these CDRs is not Highly Confidential, indeed Local Access regularly transmits much of the information contained in the CDRs to Peerless in the course of its business. If Local Access would identify what information within its CDRs it considers "Highly Confidential," we may be willing to consider stripping that information from the CDRs prior to transmitting them to Peerless for review; however, we have not received a response to our April 12, 2018 request to confirm what information is "Highly Confidential," or to confirm the header information for these CDRs.*

(Doc. 229-11, emphasis added). Although Ms. McElmury sent the email,

> *Mr. Kelly and Ms. James were involved in its drafting (See, e.g., Deposition of Henry T. Kelly; 151:24-25; 152:1-18). The email did not disclose that Kelley Drye had already transmitted the Highly Confidential CDRs to Peerless.*
>
> On May 10 or 11, 2018, Mr. Kelly was informed that Messrs. Walther, McDonald, Trento, Cook, and Ms. McNerny contacted some of the entities named in the 12/20/17 Production to market Peerless' services (Doc. 264-3, ¶¶ 14–21). Mr. Kelly notified Local Access of this on May 25, 2018 (Doc. 188 at ¶10). On May 16, 2018, Local Access was informed that Kelley Drye "inadvertently produced Local Access's CDRs produced on January 30, 2018 to Peerless." (Doc. 229-17). The Court was notified of these violations on June 1, 2018 (Doc. 188 at ¶¶ 5–10). Mr. Kelly testified that the reason for the delay was the need to investigate the extent of the disclosures and gather the necessary facts.
>
> On May 11, 2018, well after the horse had left the barn, Kelley Drye created a document for recipients of confidential information to acknowledge that they have "read and understand the terms of the Protective Order." (Doc. 264-3, ¶ 4). And, although Kelley Drye represented that all improperly disclosed information was returned or destroyed, at least one Peerless employee continued to maintain copies of Confidential information until just before the contempt hearing (See Doc. 536).

(Doc. 703 at 4–8 (internal quotation marks omitted) (emphasis in original).) The Court adopted

Judge Smith's finding that Kelley Drye:

> (1) Failed to ensure that all persons authorized to receive Confidential or Highly Confidential Litigation Materials under the Protective Order were first shown a copy of the Protective Order and signed written acknowledgements agreeing to abide by its terms before such litigation materials were disclosed.
>
> (2) Delivered Confidential and Highly Confidential litigation material to Peerless, without first reviewing such material to ascertain how the material had been designated.
>
> (3) Delivered Highly Confidential material to persons not authorized to receive it.
>
> (4) Failed to "immediately" disclose the unauthorized disclosures and breaches of the Protective Order.

(5) Failed to make every reasonable effort to prevent further disclosure by Peerless by delaying its response to Local Access' inquiries.

(*Id.* at 9 (internal quotation marks omitted).)

### 3.   Additional Findings of Fact

The undersigned makes the following additional findings of fact relevant to the issue of sanctions against Peerless. Regarding the dissemination of the Protective Order within Peerless, in July 2017, Kelley Drye provided the Protective Order to Peerless through Mr. Barnicle, Peerless's CEO, and Ms. Julie Oost, who is a Peerless compliance officer. (Doc. 562-5, LA 5, Interrogatory 7 at 12–13.) Neither Mr. Barnicle nor Ms. Oost distributed the Protective Order to anyone else within Peerless at that time. In fact, no one else at Peerless was given the Protective Order until, at the earliest, May 2018. (*Id.*)

However, Ms. James informed Mr. Knight of the Protective Order on February 15, 2018. (Doc. 265-6 ¶ 9.) By that time, Mr. Knight already possessed the list of Local Access's customer names that Mr. Kell and Mr. Sherman derived from the Confidential 12/20/2017 Production and the Highly Confidential 1/30/18 Production. (*See* Doc. 588-1, Sherman Depo. at 98:20–24.) Ms. James had emailed the customer list to Mr. Knight on February 12, 2018, with no designation of confidentiality, in order to compare the list to Peerless's customers. (Doc. 265-6 ¶ 8; Doc. 582-1, James Depo. at 110:5–112:6; Docs. 562-2, -3; Doc. 609 at 25.) But on February 15, 2018, when Ms. James informed Mr. Knight of the Protective Order, Ms. James also testified that she told Mr. Knight that the customer list she had sent him was Confidential and that it could not be used for any type of marketing purpose. (Doc. 582-1, James Depo. at 126:13–20; Doc. 665-3, Knight Depo. (10/22/19), at 87:4–88:18.)

On February 14, 2018, the day before Ms. James said she spoke to Mr. Knight about the customer list's confidentiality designation, Mr. Knight read at least a portion of the customer list to Mr. Brian Brabson, Peerless's Vice President of Customer Support. (Doc. 665-3, Knight Depo. (10/22/19) 69:22–25; Doc. 265-10, ¶¶16–17.) Mr. Knight did so, according to Mr. Brabson, to find out whether the customers on the list were existing Peerless customers or whether they had been before. (Doc. 580-1, Brabson Depo. at 29:3–7.) While Mr. Knight's testimony has not been entirely consistent regarding where he was when he read the list to Mr. Brabson (London or elsewhere), he recognized in deposition testimony that he knew the customer list was confidential. (Doc. 665-3, Knight Depo. 10/22/19 at 54:25–55:11.)

From his conversation with Mr. Knight, Mr. Brabson transcribed a list that included 70 of the 89 original customer names. (Doc. 665-4 at 8–10, Knight Depo. (10/22/19) Ex. 15.) On February 14 or 15, Mr. Brabson sent Mr. Knight his notes regarding which of the 70 Local Access customers were customers of Peerless. (Doc. 665-3, Knight Depo. (10/22/19), 96:21–97:4.) Then, on February 16, 2018, when Mr. Knight undoubtedly knew of the Confidential nature of the customer list, Mr. Knight gave Peerless's Vice President of Sales for the Eastern Region, Jeff Davis, a list of 50 Local Access customers from this list, over the phone, which Mr. Davis transcribed into a spreadsheet. (Doc. 581-1, Davis Depo. 17:9–13; Doc. 665-6 at 18–20, Davis Depo. Ex. 3.) Then, Mr. Knight told Mr. Davis to market to them. (Doc. 581-1, Davis Depo. 17:16–24.) Mr. Davis subsequently assigned salespersons to each of the entities and the sales team proceeded to contact the customers. (*Id.* at 30:19–22.)

One month later, on March 12, 2018, Mr. Knight sent a text to Mr. Davis asking him to text him a picture of the spreadsheet Mr. Davis was maintaining regarding Peerless's progress in marketing to the 50 Local Access customers from the list, and Mr. Davis did so. (Doc. 665-7 at

12–14, Davis Depo. Ex. 10.) On this same date,[2] Mr. Knight spoke with Ms. James regarding the spreadsheet. Ms. James's notes from this conversation mirror, in many ways, the information that was contained in Peerless's version of the spreadsheet. (Docs. 665, 665-1.)

## II.   DISCUSSION

Local Access asks the Court to hold Peerless in civil and criminal contempt, and, if it does so, to issue the following sanctions against Peerless for its misuse of Confidential and Highly Confidential information: (1) the striking of Peerless's pleadings; (2) an injunction to prevent further violations of the Protective Order; (3) attorneys' fees, (4) disqualification of Kelley Drye, and (5) referral to the U.S. Attorney's Office for a determinations regarding criminal contempt. (*See generally* Doc. 657.)

### A.   Civil Contempt

#### 1.   Standard

District courts have the inherent power to enforce compliance with their orders through civil contempt. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980). "A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (per curiam). Clear and convincing evidence must demonstrate that: "1) the allegedly violated order was valid and lawful; 2) the order was *clear and unambiguous*; and 3) the alleged violator had the ability to comply with the order." *Ga. Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007). "Ambiguities should be resolved in favor of the party charged with contempt." *United States v. Barnette*, 902 F. Supp.

---

[2] In addition to Ms. James's conversation with Mr. Knight about the Protective Order on February 15, 2018, Ms. James also testified that she discussed its terms and compliance with Mr. Knight again on March 8, 2018, and March 12, 2018. (Doc. 265-6, ¶ 9.)

1522, 1532 (M.D. Fla. 1995).

Once a *prima facie* showing of a violation is made, the burden shifts to the alleged contemnor "to produce evidence explaining his noncompliance" at a show cause hearing. *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991). At such a hearing, the alleged contemnor is "allowed to show either that he did not violate the court order or that he was excused from complying." *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990). "Parties subject to a court's order demonstrate an inability to comply only by showing that they have made in good faith all reasonable efforts to comply." *Watkins*, 943 F.2d at 1301 (internal quotation marks omitted).

### 2. The Undersigned Recommends a Finding of Civil Contempt Against Peerless.

Peerless implicitly (Doc. 656) and explicitly (Doc. 677 at 24:10–22) does not contest that the Protective Order at issue is valid and lawful, that it was clear and unambiguous, and that Peerless had the ability to comply with it. (*See also* Doc. 265 at 12.) Thus, Peerless has the burden to explain its noncompliance with the Protective Order.

Peerless argues in its opening brief that it was excused from complying with the Protective Order in this instance because it reasonably relied on and followed the advice (or lack thereof) of its counsel, Kelley Drye, in how to transmit the information subject to the Protective Order. To assess this argument, it is important to understand who within Peerless had been given the Protective Order prior to the violation of it.

First, Mr. Barnicle and Ms. Oost possessed the Protective Order as early as July 2017. As CEO and compliance officer, respectively, they presumably were responsible for disseminating the Protective Order within their company to the appropriate personnel. The evidence reveals they did not do so until it was far too late. For a party as sophisticated as Peerless, which is undoubtedly

highly familiar with common litigation practices, such as the use of protective orders, this failure is highly troubling. Peerless cannot be absolved of its responsibility to comply with the Protective Order when its officers actually possessed it.

Second, Kelley Drye sent information derived from Confidential and Highly Confidential information to various employees within Peerless without providing those employees a copy of the Protective Order. Specifically, Ms. James asked Ms. McElmury to provide Local Access's Confidential 12/20/17 Production and Highly Confidential 1/30/18 Production of CDRs to Mr. Kell. Ms. James also requested that Mr. Kell and Mr. Sherman load Local Access's CDRs into the SQL database and run queries. Of course, as previously stated, from those queries, a list of entities from the 12/20/17 Confidential Production was generated. Specifically, Mr. Sherman or Mr. Kell created a spreadsheet, named "LA_Confidential," which contained the unique names of Local Access's customers from the information contained in the CDRs from the 12/20/17 Production. On February 12, 2018, Ms. James sent this "LA Customers.pdf" file to Mr. Knight via email. The email transmitting the file did not inform Mr. Knight that the file "LA Customers.pdf" contained Confidential information protected by the Protective Order.

Ms. James testified that prior to sending the February 12, 2018, email to Mr. Knight, she had not sent Mr. Knight a copy of the Protective Order. However, she also testified that she communicated with Mr. Knight on or around February 15, 2018, March 8, 2018, and March 12, 2018, about the terms of and compliance with the Protective Order. Therefore, it appears that as of February 15, 2018, Mr. Knight was on notice of the terms of the Protective Order, even if he was not provided a copy of it.

Once the information was in Mr. Knight's possession, he distributed it to Mr. Brabson, Ms. McNerney, and Mr. Davis. While accepting the testimony of the latter set of individuals that they were never advised that the list was derived from Confidential Litigation Material, there is sufficient evidence in the record to demonstrate that Mr. Knight was aware of this fact. There is also sufficient evidence in the record to conclude that he told at least Mr. Davis to market to the customers on the list, in direct violation of the Protective Order. But even if Mr. Knight did not tell Mr. Davis to market to the customers on the list, Mr. Knight knew about the Protective Order and should have taken affirmative steps to ensure that his team did *not* market to these customers. By April 12, 2018, Local Access's customers were being solicited by Peerless. On this record, Peerless cannot excuse its noncompliance with the Protective Order by relying on Kelley Drye's failures.

## B. Criminal Contempt

### 1. Standard for Criminal Contempt

As the Court has previously stated:

> A party can establish criminal contempt when it puts forth evidence the alleged contemnor "is aware of a clear and definite court order and willfully disobeys the order." *United States v. Baldwin*, 770 F.2d 1550, 1557 (11th Cir. 1985) (citation omitted). "An essential element of [criminal contempt] is an intent, either specific or general, to commit it. By definition, contempt is a willful disregard or disobedience of a public authority." *Id.* at 1558 (citations and internal quotation marks omitted). The party alleging contempt must prove "a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *Id.* (citation omitted). Reckless disregard will also suffice. *United States v. KS & W Offshore Eng'g, Inc.*, 932 F.2d 906, 909 (11th Cir. 1991) (per curiam) (citation omitted).

(Doc. 703 at 18.)

- 16 -

**2. The Undersigned Does Not Recommend that the Court Refer Peerless to the United States Attorney for a Prosecutorial Decision Regarding Criminal Contempt.**

Local Access seeks a referral of this matter to the United States Attorney for evaluation of whether Peerless should be prosecuted for criminal contempt. Relevant to the undersigned's consideration of this issue, the Court found in its Order sanctioning Kelley Drye that its "intentional violation of the requirement to 'immediately' report violations of the Protective Order, arguably, support[ed] a finding of criminal contempt." (*Id.*) However, given the totality of the circumstances, and the fact that Kelley Drye did eventually report the violation, the Court concluded that a finding of criminal contempt against Kelley Drye was not warranted and declined to issue such sanctions. (*Id.* at 18–19.)

The undersigned finds that the violations above likewise could support the referral of Peerless for criminal contempt proceedings. Specifically, Mr. Knight violated the Protective Order when he failed to ensure that the Local Access customer list would not be used for purposes outside of the ongoing litigation, but instead specifically directed that the list be used for marketing. It is difficult to see how Mr. Knight's actions could be viewed as anything other than intentional or deliberate. They were certainly not accidental or inadvertent, and any claim of negligence strains credulity. However, as with Kelley Drye, the undersigned believes that sanctions short of criminal contempt, as outlined below, provide a more appropriate remedy.

**C. Sanctions for Civil Contempt**

If the Court concludes that a finding of civil contempt against Peerless is warranted, the Court has wide discretion in fashioning an appropriate remedy to address the contempt. *United States v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999). "These sanctions may serve one of two broad purposes: (1) coercing the contemnor to comply with a court order, or (2) compensating

a party for losses suffered as a result of the contemptuous act." *Id.*

"A coercive contempt sanction comes with some limitations; for instance, once a contemnor's contumacious conduct has ceased or the contempt has been purged, no further sanctions are permissible." *F.T.C. v. Leshin*, 719 F.3d 1227, 1231 (11th Cir. 2013) (*Leshin II*). On the other hand, the Eleventh Circuit has stressed that "the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory." *Id.* (quoting *Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1521 (11th Cir. 1990)).

It is important to note at the outset that Local Access has decided not to seek damages in connection with its claims that Peerless or Kelly Drye violated the Protective Order in this lawsuit.[3] (*See* Doc. 469.) That would be the most direct and straightforward way to compensate Local Access for any harm caused by the violation, and on this record, an award of damages would be an appropriate sanction. Since that route has been foreclosed, there are only a handful of other types of requested relief available for the Court's consideration.

## A.  Injunction

Local Access requests that the Court enter an injunction that would prohibit Peerless from contacting any Local Access clients disclosed to Peerless that did not have a preexisting relationship with Peerless. (Doc. 657 at 29.) As to the customers that the injunction would cover, Local Access refers to a list of 81 clients provided to Peerless on February 12, 2018. (*Id.*) Specifically, Local Access requests an injunction:

---

[3] On December 18, 2020, Local Access filed a separate action against Kelley Drye, Henry Kelly, Catherine James, Peerless, and Richard Knight seeking damages for alleged trade secrets violations arising out of the violations of the Protective Order. *See* Complaint (Doc. 1), Case No. 6:20-cv-2315-Orl-40GJK.

- 18 -

> (1) for any entity on the list with whom Peerless did not have an active contract on February 12, 2008, order that Peerless be prohibited from contacting any such entity for any marketing purpose whatsoever for a period of five (5) years; and (2) for any entity on the list with whom Peerless did have an active contract on February 12, 2018, order that Peerless be prohibited for five (5) years from providing any additional facilities, discounts, incentives or other services beyond that which Peerless's contract with the customer provided on February 12, 2018.

(*Id.* at 29–30.)

However, the undersigned does not recommend the issuance of an injunction of this nature. As Peerless has noted, after months of litigation involving this very issue, Local Access ultimately abandoned its request for an injunction along the lines it now seeks. (Doc. 668 at 1–11.) Instead, as memorialized by Judge Smith, Local Access's injunctive relief would be limited to "an injunction to prevent any further violation of the Protective Order." (Doc. 469.) It appears that Local Access no longer seeks such an injunction, but would rather revert to its more expansive, *ex ante* position. It has been over two years since Local Access abandoned its position, and the time has long passed to pursue this sanction. Since Local Access does not request any other form of injunctive relief, the undersigned recommends that the Court not issue an injunction.

### B.  Attorneys' Fees

The Court previously awarded attorneys' fees and costs to Local Access and directed that Kelley Drye, and not Peerless, be responsible for their payment. (Doc. 703 at 21) ("Attorneys' fees and costs awarded to Local Access in connection with this matter are to be borne solely by Kelley Drye, and Peerless is prohibited from paying any part of said attorneys' fees and costs."). The undersigned has separately submitted a Report & Recommendation regarding the amount of fees and costs to be awarded to Local Access. (Doc. 722.)

In the Report & Recommendation, the undersigned recommended that the Court disallow $99,887.00 in costs that Local Access incurred by retaining Mr. Robert Thielhelm, Jr., a partner with the law firm of Baker & Hostetler LLP in Orlando, Florida, to provide an opinion regarding the reasonableness of the hours charged by Local Access's counsel. The rationale for disallowing those fees was that they were incurred after June 29, 2020—the date through which the Court awarded Local Access its fees as a sanction against Kelley Drye. However, the undersigned believes that it would be reasonable, and consistent with the Court's prior Order, to award Local Access these additional costs as a sanction against Peerless.

### C.  Disqualification of Kelley Drye

The issue of disqualification of Kelley Drye as counsel for Peerless has previously been addressed by the Court, and the Court has declined to issue such a sanction. (Doc. 703 at 20.) Therefore, this issue is moot.

### D.  Striking of Pleadings

Local Access requests that Peerless's Answer, Affirmative Defenses, and Counterclaims be stricken. The "drastic sanctions of dismissal or default are warranted only on a clear record of delay or willful contempt." *Cent. Fla. Council Boy Scouts of Am., Inc. v. Rasmussen*, No. 6:07-cv-1901-Orl-19GJK, 2009 WL 2781540, at *5 (M.D. Fla. Aug. 28, 2009). But the Court must first make a finding that lesser sanctions will not suffice. *Collins v. Lake Helen*, 249 F. App'x 116, 120–21 (11th Cir. 2007); *Cohen v. Carnival Cruise Lines, Inc.*, 782 F.2d 923, 925 (11th Cir. 1986).

As has been established, Peerless has engaged in contumacious conduct by violating the Protective Order and distributing Confidential and Highly Confidential information to members of Peerless who then used that information for purposes other than litigation. While the Eleventh Circuit has expressed concern at the idea of punishing a client for its attorneys' mistakes, Peerless

is not an innocent client in this situation.

First, as far back as May 25, 2017 at a status conference, Mr. Kelly advised the Court that Peerless would be seeking the entry of a protective order and not just a confidentiality agreement. (Doc. 51 at 12:4–18.) Then, on July 7, 2017, the parties submitted a Joint Motion for Protective Order (Doc. 43), which the Court entered (Doc. 44). Thus, Peerless sought the entry of a Protective Order in this case, and it must own the fact that it failed to disseminate the Protective Order within its organization.

More significantly, Ms. James directly informed Mr. Knight of the existence of the Protective Order when transmitting the client list to him. Although Mr. Knight was not provided with a copy of the Protective Order, Ms. James gave Mr. Knight enough information for him to know that the customer list he possessed should not have been used to market to Local Access's clients.

In light of the foregoing, striking certain of Peerless's pleadings would be appropriate, and Local Access requests as much. But its request fails for lack of specificity. "To comply with the Due Process Clause, a court must impose sanctions that are both 'just' and 'specifically related to the particular 'claim' which was at issue in the order to provide discovery.'" *Serra Chevrolet, Inc. v. GMC*, 446 F.3d 1137, 1151 (11th Cir. 2006) (quoting *Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 707, 102 S. Ct. 2099, 2107 (1982)). In *Serra*, the Eleventh Circuit made clear that the striking of pleadings must be related to the discovery violation. *Id.* at 1152 ("Here, the district court struck three defenses regarding the preclusive effect of the earlier litigation in the state courts, but those defenses had no apparent relationship with the discovery abuse.").

Local Access has suggested that the Court strike Peerless's Answer, Affirmative Defenses, and Counterclaims, but provides no explanation as to how those pleadings are related to the discovery abuses in which Peerless engaged. Peerless argues that there is no connection (Doc. 668 at 30); likewise, the undersigned can discern none. Because Local Access failed to connect the discovery violation to any of Peerless's pleadings, the undersigned cannot recommend that the Court strike any of those pleadings.

## III.   RECOMMEDATION

Ultimately, Peerless tied its own hands with regard to the most logical sanction, compensatory damages; previously abandoned its argument for the injunctive relief that it now seeks; and failed to demonstrate which pleadings are related to the underlying discovery violation such that striking those pleadings would be an appropriate sanction. Of the remaining options available to the Court, including a finding of criminal contempt, the undersigned believes that awarding additional costs is the most appropriate sanction.

Upon consideration of the foregoing, I **RESPECTFULLY RECOMMEND** that the Court hold Peerless in civil contempt for violating the Protective Order, award Local Access $99,887.00 in costs as the sanction for the violation, and **DISCHARGE** the Order to Show Cause (Doc. 458).

<u>**NOTICE TO PARTIES**</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on January 6, 2021.

_____
EMBRY J. KIDD
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record