**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

LOCAL ACCESS, LLC,

          Plaintiff,

v.                                Case No.: 6:17-cv-236-WWB-EJK

PEERLESS NETWORK, INC.,

          Defendant.

_____/

**<u>ORDER</u>**

THIS CAUSE is before the Court on Plaintiff's Motion for Summary Final Judgment (Doc. Nos. 1060, 1075), Defendant's Motion for Summary Judgment (Doc. Nos. 1057, 1092) and the Responses (Doc. Nos. 1128, 1130)[1] and Replies (Doc. Nos. 1129, 1137) thereto.[2]  For the reasons set forth below, both Motions will be granted in part.

**I.    BACKGROUND**

This case is the latest in a series of disputes between these two telecommunications companies.[3] It is centered around the Master Service Agreement

---

[1] Despite previous warnings, Defendant's Response attempts to incorporate by reference several pages of argument from its summary judgment motion in violation of Local Rule 3.01.  In the interest of expediency, the Court will not strike the filing but the Court will not consider any argument that has not been properly briefed.  The parties are cautioned that future failures to comply with all applicable rules and orders of the Court may result in the striking or denial of filings without notice or leave to refile.

[2] With the Court's permission, the parties have submitted several filings under seal. However, recognizing that proceedings in the United States District Court are public and court filings are matters of public record, this Order has been filed publicly.

[3] *See, e.g.*, *Local Access, LLC v. Peerless Network, Inc.*, No. 6:14-cv-399-PGB-TBS (M.D. Fla.) ("**Case 399**").

("**Contract**," Doc. 135-1 at 2–12), a 2012 agreement wherein Defendant, Peerless Network, Inc. ("**Peerless**"), agreed to provide Plaintiff, Local Access, LLC ("**Local Access**"), with Homing Tandem Service.   Although the Contract is replete with typographical errors and fails to define several key terms, including "Homing Tandem Service," at a minimum the parties understood the Contract to obligate Local Access to populate the Local Exchange Routing Guide ("**LERG**") with routing instructions designating Peerless as the default tandem provider for all traffic directed to Local Access within the Peerless footprint.  (Doc. 1075-1 at 134:6–23; Doc. 1075-4 at 58:14–19; 1075-16 at 17:12–17).

This dispute emerges from § 3.3 of the Contract which provides as follows:

> [I]n the event that: (1) [Local Access] provides written proof of a competitive offer from another carrier for the specific service being provided under this agreement; and (2) Peerless does not match the competitive price being offered for this specific service, [Local Access] will then be entitled to reroute traffic pursuant to the alternative proposal[.]

("**Peerless Price Guarantee**," Doc. 135-1 at 4).   On July 31, 2015, Inteliquent, Inc. ("**Inteliquent**"), a non-party telecommunications company that competes with Peerless and with whom Local Access had prior dealings, sent Local Access a competitive offer. ("**July 31 Offer**," Doc. 1075-17 at 345).  In the July 31 Offer, Inteliquent agreed to "share 75% of Collected Tandem Access Revenue" with Local Access.  (*Id.*).  Peerless agreed to match the July 31 Offer, which became the First Amendment to Master Service Agreement between Local Access and Peerless.  ("**First Amendment**," Doc. 135-1 at 14–15).  The Contract remained in full force and effect except as modified by the First Amendment.  (*Id.* at 14).

Four days after the First Amendment was executed, Inteliquent made Local Access another competitive offer.  ("**August 24 Offer**," Doc. 1075-6 490–492).  Peerless

elected not to match the August 24 Offer and told Local Access that "Peerless deems that as of August 24, 2015, it no longer has the exclusive right to provide Homing Tandem Service to Local Access." (*Id.* at 489).   Unbeknownst to Peerless, Local Access and Inteliquent continued to negotiate the terms of the August 24 Offer, which ultimately became the Third Amendment to Master Services Agreement between Local Access and Inteliquent ("**Inteliquent Agreement**") some weeks later.   (Doc. 1075-17 at 365–366). After executing the Inteliquent Agreement, Local Access shifted the majority of its traffic away from Peerless to Inteliquent, but a substantial amount of Local Access traffic remained with Peerless.   (Doc. 1075-3 at 269–270).   Peerless has never paid Local Access any percentage of the collected tandem access revenue it obtained from Local Access traffic.  (Doc. 1075-4 at 242:6–243:19).

Over a year later, the parties settled Case 399.   *See Local Access*, No. 6:14-cv-399, Docket 334, at *1 (M.D. Fla. Mar. 31, 2017).   As part of the settlement, Local Access and Peerless agreed to amend the Contract for a second time.   ("**Settlement Amendment**," Doc. 1075-6 at 352–355).   The Settlement Amendment extended the expiration date of the Contract by five years and established pricing for "all traffic that Local Access places on Peerless's Network." (*Id.* at 354).   At the time of the Settlement Amendment, Peerless had only ever provided "inbound" services to Local Access—meaning, it routed traffic received from third party interexchange carriers to Local Access for termination.  (Doc. 1075-5 at 2–3).  This is in contrast to "outbound" traffic, which Local Access would originate and send through Peerless to be delivered elsewhere.   (Doc. 1075-6 at 23–24).  But with the pricing for "all" traffic set by the Settlement Agreement,

Local Access turned to Peerless to provide commercial outbound traffic services for the first time.  (Doc. 1075-3 at 112-113).

In the months after the Settlement Amendment, Local Access executed contracts with five third-party companies wherein Local Access agreed it would route outbound traffic for them.   (Doc. 1075-6 at 204).  Local Access then demanded Peerless route this outbound traffic under the pricing set by the Settlement Amendment.  (1075-3 at 102–103).  Peerless declined, maintaining that the Contract and Settlement Amendment was for inbound traffic only.  (Doc. 1075-1 at 97:4–10).  Local Access claims that this refusal caused the five outbound contracts to be cancelled.  (*See, e.g.*, Doc. 1075-6 at 196).

In late 2017, Peerless notified Local Access that it was unilaterally canceling the Contract due to Local Access's purported breaches.  (Doc. 1137-5 at 4).  In doing so, Peerless accused Local Access of breaching the Contract by routing traffic to Inteliquent prior to August 2015 and not giving it the opportunity to match the Inteliquent Agreement under § 3.3.  Peerless further alleged it had been fraudulently induced into executing the First Amendment.  (*Id.* at 5–11).  This lawsuit followed.

The parties have filed cross-motions for summary judgment on six issues: (1) Peerless's obligation to provide "outbound" traffic for Local Access and the availability of damages for Peerless's refusal to do so; (2) Local Access's obligation to route its traffic exclusively through Peerless under the Contract; (3) whether the First Amendment was procured by fraudulent inducement; (4) Peerless's obligations to Local Access for collected tandem access revenue; (5) whether Local Access committed fraud with regard to the August 24 Offer and the Inteliquent Agreement; and (6) whether Peerless

wrongfully delivered traffic in violation of Local Access's routing instructions.  Each will be addressed in turn my o.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*  "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007).  Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quotation omitted).  The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Nevertheless, "[i]f there is a conflict between the parties 'allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable

inferences must be drawn in the non-moving party's favor." *Allen*, 495 F.3d at 1314 (citing *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003)).

## III.   DISCUSSION

The Contract is governed by Illinois law, (Doc. 135-1 at 7), and therefore, the Court will first give a brief overview of the relevant law.  To establish a breach of contract under Illinois law, a plaintiff must establish: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages."  *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004).  "Only a duty imposed by the terms of a contract can give rise to a breach."  *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (quoting *W.W. Vincent*, 814 N.E.2d at 967).

Under traditional Illinois contract interpretation principles, the language "speaks for itself, and the intention with which it was executed must be determined from the language used."  *W. Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 290 (Ill. 1962).  "If the language of a contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence."  *Air Safety, Inc. v. Tchrs. Realty Corp.*, 706 N.E.2d 882, 884–85 (Ill. 1999).  But "when the language used is susceptible to more than one meaning [ ] or is obscure in meaning through indefiniteness of expression [ ], a contract is properly considered ambiguous."  *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 767 N.E.2d 945, 949 (Ill. App. Ct. 2002) (quotation omitted).  "If a contract is ambiguous, a court may then (and only then) consider extrinsic evidence to ascertain the parties 'intent."  *Pamado, Inc. v. Hedinger Brands, LLC*, 785 F. Supp. 2d 698, 706 (N.D. Ill. Mar. 28, 2011).  The contract's interpretation "'is a question of law for the court as long

as the extrinsic evidence bearing on the interpretation is undisputed, 'and summary judgment is therefore appropriate in such cases." *Id.* (quoting *Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005)).  With this background, the Court turns to the parties 'contract disputes.

### A.    Outbound Traffic

The parties both move for summary judgment on Count IV wherein Local Access claims that Peerless breached an obligation to "provide services for Local Access to route outbound traffic[.]" (Doc. 154, ¶¶ 84–90).  After review, the Court agrees that the Contract unambiguously requires the provision of outbound services.  For example, § 5.7 states that "[a]ll facilities installed for provisioning Homing Tandem Service are bi-directional," and in § 5.8 the parties agreed "to augment their networks to maximize the flow of traffic between them to minimize any blockages either in-bound or outbound between them." (Doc. 135-1 at 5).  These provisions explicitly contemplate that the services offered under the "Homing Tandem Service" umbrella include outbound services.  This understanding is reinforced elsewhere throughout the Contract.  Section 5.9 required Local Access to be "authorized to send traffic to third party common carriers prior to delivering traffic to such carriers using the Homing Tandem Service." (*Id.*).  And addendum provision A1 posits that Local Access "will be charged a Minutes-of-Use (MOU) charge for all traffic delivered to Peerless from [Local Access]." (*Id.* at 11).  Thereafter, in the First Amendment the parties explicitly agreed that Peerless would be "the sole provider of Homing Tandem Services (including local transit services) for all traffic delivered in and out of Local Access for all markets covered by this offer." (*Id.* at 14).  These provisions

plainly show that the parties intended that Local Access would be permitted to originate traffic and route it through Peerless for delivery elsewhere under their agreements.

Despite the numerous references to outbound traffic, Peerless argues that § 5.10 assumes that the terminating carrier and Peerless would be separate entitles and that § 5.15 designated Peerless as "the tandem provider only." (Doc. 135-1 at 5). But the provisions cited by Peerless must be construed in light of the contract as a whole and are ultimately unavailing when considered in this broader context. *See Mayfair Const. Co. v. Waveland Assocs. Phase I Ltd. P ship*, 619 N.E.2d 144, 152 (Ill. App. Ct. 1993) (holding that under Illinois contract law, "it is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions"). The term "tandem" is undefined in the Contract, and Peerless points to nothing which suggests that the term connotes any sort of directionality. And Peerless does not provide an alternative reasonable explanation for the myriad of provisions that expressly refer to outbound services. The plain language compels a finding that the Contract contemplates outbound services.

Having determined that the parties agreed to the provision of outbound services, the Court turns to Local Access's ability to recover damages. Local Access seeks to recover its lost profits and business opportunities on the five outbound contracts. However, § 8.2 contains a broad limitation of liability clause:

> LIMITATION OF LIABILITY – IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE, RELIANCE, OR COVER DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA, OR USE, INCURRED BY EITHER PARTY OR ANY THIRD PARTY, EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(Doc. 135-1 at 7).  The question, therefore, is whether the damages Local Access seeks to recover are direct damages or consequential damages.

Direct damages are "[d]amages that the law presumes follow from the type of wrong complained of.[]"  *Damages*, Black's Law Dictionary (11th ed. 2019).  In contract cases, they are those damages which "result naturally and usually from the breach.  11 Corbin on Contracts § 56.6 (2023).  Illinois further defines direct contractual damages as "utterly foreseeable, indeed certain to stem from a breach of the contract."  *See Tate & Lyle Ams. LLC v. Glatt Air Techs., Inc.*, No. 13-2037, 2016 WL 7422289, at *4 (C.D. Ill. May 20, 2016) (quotation omitted).

Consequential damages, on the other hand, "are losses or injuries that do not flow directly and immediately from a party's wrongful act but rather result indirectly from the act."  *Aculocity, LLC v. Force Mktg. Holdings, LLC*, No. 17-CV-2868, 2019 WL 764040, at *2 (N.D. Ill. Feb. 21, 2019).  The difference between direct and consequential damages in breach of contract claims lies "in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach."  *Rexnord Corp. v. DeWolff Boberg & Assocs., Inc.*, 286 F.3d 1001, 1004 (7th Cir. 2002).  Unlike direct damages, "[c]onsequential damages require proof of an additional link in the causal chain in order to connect the damages to the contract."  *Endless River Techs. LLC v. Trans Union LLC*, No. 1:18 CV 936, 2023 WL 24101, at *4 (N.D. Ohio Jan. 3, 2023) (quotation omitted).

Lost profits and lost business opportunities are generally considered consequential damages under Illinois law.  *See, e.g.*, *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 913 F.2d 1194, 1202 (7th Cir. 1990) ("[C]onsequential damages would include the lost opportunity cost [the plaintiff] incurred because the profits were delayed."); *Afram Exp.*

*Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir. 1985).  This is especially true where the lost profits "arise out of a collateral transaction[.]."  *Assaf v. Trinity Med. Ctr.*, No. 10-4021, 2015 WL 4036318, at *2 (C.D. Ill. July 1, 2015) (quotation omitted), *aff d*, 821 F.3d 847 (7th Cir. 2016).  But "lost profits can be labeled as direct damages in some circumstances."  *Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166, 1175 (Ill. App. Ct. 2015).

In support of the proposition that its lost profits and business opportunities are direct damages in this case, Local Access relies on Case 399.  *Local Access, LLC v. Peerless Network, Inc.*, No. 6:14-cv-399-Orl, 2016 WL 5373326, at *8 (M.D. Fla. Sept. 26, 2016).  That case involved § 7.1 of the Contract, which obligated Peerless to "assign or refer all Prepaid Calling Card clients" to Local Access.  *Id.* at *2.  Peerless failed to do so and the court, applying Illinois law, determined that Local Access's lost profits constituted direct damages for which recovery was available.  *Id.* at *8.

Unlike Case 399, Local Access's collateral contracts with third parties is an additional link in the causal chain between the Contract and Local Access's lost profits and business opportunities, which the Contract never contemplates.  *Endless River Techs.*, 2023 WL 24101, at *5.  Local Access's damages do not flow immediately from Peerless's refusal to provide outbound services, rather these damages arise from subsequent agreements Local Access made with third parties that were not utterly foreseeable at the time of contracting.  Accordingly, Local Access's lost profits and business opportunities stemming from the five outbound contracts are consequential damages and recovery of such damages is barred by § 8.2.

Furthermore, even if these damages were not barred by § 8.2, Local Access's lost profits and business opportunities are too speculative to warrant recovery.  Under Illinois law, "[l]ost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the lost profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into." *Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1235 (Ill. App. Ct. 1992).  Under the applicable "new business rule," the reasonable certainty requirement for the recovery of lost profits damages may be satisfied by evidence of comparable "past profits in an established business, but that the lost profits of a new business would be too speculative" on which to base recovery." *Malatesta v. Leichter*, 542 N.E.2d 768, 781–82 (Ill. App. Ct. 1989).  Indeed, "[t]he general rule under Illinois law is that a new business has no right to recover lost profits." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 634 (7th Cir. 2007).  The "rule applies with equal force to new products which create potential new business for the entity." *Id.*

Local Access cannot show its lost profits with reasonable certainty because it is undisputed that selling outbound termination services was a new initiative for Local Access.  (Doc. 1075-6 at 202–203).  Thus, Local Access can only speculate that its new venture would have gone according to plan both with respect to the five existing outbound contracts and its anticipated success in procuring more outbound contracts in the future.  Thus, summary Judgment will be granted in favor of Peerless as to any lost profits and business opportunities Local Access seeks to recover with respect to Count IV.

**B.      Exclusivity**

Local Access moves for summary judgment on Count III wherein it argues that Peerless did not have the exclusive right to provide Homing Tandem Services under the parties 'agreement.  Peerless unilaterally terminated the Contract in large part because it believed Local Access had violated its exclusivity rights.  Several of Peerless's affirmative defenses and counterclaims are informed by Peerless's belief that it had such rights.

Section A3 of the First Amendment provides that "consistent with the Current [Contract], Peerless will be the sole provider of Homing Tandem Services (including local transit services) for all traffic delivered in and out of Local Access[.]"  (Doc. 135-1 at 14).  Local Access argues that this is the only provision that gave Peerless complete exclusivity over its traffic.  It posits that Peerless's exclusivity rights lasted only for the four days after the execution of the First Amendment, ending when Inteliquent returned with the August 24 Offer.  Local Access's reading of the provision is strained to say the least.  The provision can only be reasonably read as an affirmation of exclusivity already provided for by the Contract, not as an independent grant of a new exclusivity right.

The source of complete exclusivity within the Contract itself is rather elusive, but it may be implied by the existence of several provisions.  For instance, § 5.3 requires Peerless's tandem information to be designated as "the 'Actual Switch 'in LERG," making it the default route for traffic to Local Access within the Peerless footprint (*id.* at 5).  Though Local Access was capable of populating the LERG with instructions designating more than one carrier to receive traffic to support redundancy.  (Doc. 1075-18 at 209:4–210:4).

Next, § 3.3, which permitted Local Access to reroute traffic in the event Peerless did not match a competitive offer, implies some degree of complete exclusivity over the traffic already on Peerless's network as long as it did not fail to match any competitive offer.   But the provision, standing alone, does not necessarily require Local Access to route any traffic to Peerless in the first place.   It functions only a mechanism by which traffic already placed on the Peerless network can be rerouted elsewhere.

Complicating matters further is § 7.2 of the Contract.   Under the header "NON-COMPETITION," the section obligates Local Access to place all traffic from Prepaid Calling Card clients on the Peerless network.   (Doc. 135-1 at 6).   Local Access was further obligated to refer all clients seeking transit services to Peerless, and Peerless was to be the "sole and exclusive provider" of transit services in its footprint.   (*Id.*).   On the one hand, this section is a grant of exclusivity to Peerless over traffic from Prepaid Calling Card clients as well as transit services in its footprint, which could support Peerless's argument that it enjoyed complete exclusivity.   But, as Local Access points out, if the Contract otherwise provides for complete exclusivity over all traffic, then a separate provision granting complete exclusivity over a specific subset of traffic would be redundant.   *See Mayfair Const. Co.*, 619 N.E.2d at 152.[4]

Taken as a whole, the terms of the Contract and First Amendment are reasonably susceptible to more than one meaning or are obscure in meaning through indefiniteness of expression.   Thus, the Contract is ambiguous on the issue of complete exclusivity, and

---

[4] Local Access also argues that, to the extent § 7.2 could be construed as a grant of complete exclusivity, Peerless is barred from invoking it by the Settlement Amendment. (*See* Doc. 1075-6 at 352–355).   In response, Peerless notes that it is not bringing a claim against Local Access for a violation of § 7.2 and maintains that its rights to complete exclusivity are primarily traceable to sections 3.3, 5.1, 5.2, and 5.3.

interpretation is a question of fact.  *See Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, 727 F. App'x 562, 568 (11th Cir. 2018) (citing *Shields Pork Plus*, 767 N.E.2d 945, 949).   Therefore, Local Access has not provided sufficient justification to grant summary judgment on the issue of exclusivity.

Next, Local Access argues that Peerless is estopped from asserting its potential exclusivity rights because Peerless opted to extend the parties 'agreement for five years as part of the Settlement Amendment despite acknowledging that it knew Local Access violated these purported rights at least as far back as January 2015 and again in March 2017.  Under Illinois law, a party must prove six separate elements to succeed on an equitable estoppel affirmative defense:

> (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.

*Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001).  Local Access has not set forth its estoppel defense with the requisite elements as required by Illinois law and thus summary judgment will be denied.

### C.    Fraudulent Inducement of the First Amendment

The parties cross move for summary judgment on the issue of fraudulent inducement.  Peerless seeks summary judgment on Counts I through III and Count V, which seek payment for collected tandem access revenue due under the First Amendment.  In its Motion, Peerless explains it was not aware that the July 31 Offer,

which became the First Amendment once Peerless agreed to match, had expired on August 13, 2015.  But Local Access continued to represent that the July 31 Offer was pending as of August 20, 2015.  Peerless claims it relied on these false representations when it ultimately signed the July 31 Offer on August 20, 2015, one week after the offer was expired.  Local Access disagrees and also moves for summary judgment as to Peerless's fourth affirmative defense and Counterclaim VII, which set forth additional bases for Peerless's argument that it was fraudulently induced into executing the First Amendment

As an initial matter, Local Access argues that Peerless should not be permitted to pursue its expiration date theory because it did not include the alleged misrepresentations regarding the expiration of the July 31 Offer in its pleaded factual bases.  But Peerless did plead that Local Access engaged in misrepresentations regarding the expiration date of the July 31 Offer.  (Doc. 207 at 31–33).  Thus, Peerless sufficiently pleaded the bases for its fraudulent inducement claim and will not be barred from pursuing this claim on procedural grounds.  *See Foman v. Davis*, 371 U.S. 178, 181–82 (1962).

Under Illinois law, "[f]raud in the inducement of a contract is a defect which renders the contract voidable at the election of the innocent obligor."  *Tower Invs., LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 939 (Ill. App. Ct. 2007).  To render a contract voidable as a result of fraudulent inducement, a party must prove that a misrepresentation was made that was: "(1) one of material fact; (2) made for the purpose of inducing the other party to act; (3) known to be false by the maker, or not actually believed by him on reasonable grounds to be true, but reasonably believed to be true by the other party; and (4) was relied upon by the other party to his detriment."  *Jordan v. Knafel*, 880 N.E.2d

1061, 1069 (Ill. App. Ct. 2007).  A "misrepresentation is 'material 'if the [party seeking rescission] would have acted differently had he been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 7 (Ill. App. Ct. 2001).

Here, Peerless cannot demonstrate that it relied on its mistaken belief about the pendency of the July 31 Offer when it formally signed the First Amendment on August 20, 2015, because it repeatedly affirmed its intent to match the July 31 Offer in the weeks before then.  (*See, e.g.*, Doc. 1075-3 at 446).  At the time of Local Access's alleged misrepresentations regarding the pendency of the July 31 Offer, the parties were attempting to coordinate a formal signing to memorialize the agreement made as of August 5 and thereafter on August 7, 2015.  (*Id.* at 449).  Indeed, the First Amendment itself states that the agreement to match the July 31 Offer was effective on August 5 and thereafter on August 7.  (Doc. 135-1 at 14–15); *see also Martino v. City Furniture, Inc.*, No. 05-61316-CIV, 2006 WL 8431423, at *4 (S.D. Fla. June 29, 2006) (rejecting fraudulent inducement claim where "evidence revealed that some members of the class did not receive prospectus before they purchased the notes, so necessarily could not have relied on the allegedly false advertisement" (citing *Kaser v. Swann*, 141 F.R.D. 337, 341 (M.D. Fla. 1991)))  Thus, Peerless's Motion will be denied because Peerless cannot satisfy each element of fraudulent inducement as a matter of law.

Local Access also moves for summary judgment on Peerless's Counterclaim VII and fourth affirmative defense, which include additional theories as to Local Access's purported fraudulent inducement of the First Amendment.  In Counterclaim VII, Peerless alleges Local Access misrepresented: (1) that the July 31 Offer was identical to the

Contract with two exceptions; (2) that Peerless would be the exclusive provider of Homing Tandem Services for the entire duration of the Contract and the First Amendment; and (3) that Peerless would be the exclusive provider of transit services for the entire duration of the Contract and First Amendment. (Doc. 207 at 78). Additionally, the fourth affirmative defense claims that Local Access and Inteliquent modified the terms of the July 31 Offer, which was misrepresented to Peerless. (*Id.* at 31).

Peerless's claims fail as a matter of law. There is no dispute that at all material times Peerless was in possession of the whole Contract, as well as the entire July 31 Offer. As a sophisticated party with legal counsel, Peerless was capable of assessing the veracity of Local Access's claim that they were identical to the extent stated. *See Regensburger v. China Adoption Consultants*, 138 F.3d 1201, 1207 (7th Cir. 1998); *Wasser v. Sasoni*, 652 So. 2d 411, 412 (Fla. 3d DCA 1995). Indeed, "[a]fter-the-fact disappointment with the results of a contract is not a ground for nullifying the contract's express terms." *Regensburger*, 138 F.3d at 1206. Peerless, therefore, cannot claim to have been fraudulently induced, because it negotiated at arm's length and had all the relevant information available to it at the time the First Amendment was executed. Therefore, summary judgment will be granted against Peerless on Counterclaim VII and its fourth affirmative defense.

### D.    Collected Tandem Access Revenue

The parties move for summary judgment as to whether Peerless was obligated to pay Local Access seventy-five percent of its collected tandem access revenue as set forth in the First Amendment. Because the Court determined that the First Amendment was not fraudulently induced, Peerless will be obligated to fulfill the revenue sharing

agreement.  At issue then is the scope and duration of that obligation.  Local Access argues it is owed seventy-five percent of all collected tandem access revenue generated on its traffic from August 5, 2015, until the expiration of the Contract.  Moreover, Local Access seeks to broadly define "collected tandem access revenue" as revenue collected on all long distance traffic.  In contrast, Peerless contends that its obligation to share revenue under the First Amendment was conditional on it acting as the exclusive provider of Homing Tandem Services to Local Access, which ended with the execution of the Inteliquent Agreement.  Additionally, Peerless maintains that "collected tandem access revenue" is ambiguous and, in its view, accounts only for traffic routed according to LERG designations.

The First Amendment is devoid of conditional language and cannot support Peerless's proposed interpretation that its obligation to share revenue would terminate in the event it failed to match a competitive offer under § 3.3.  And Peerless can point to no evidence in the Contract or otherwise that the parties intended to tie the revenue sharing requirement to exclusivity.  Therefore, Peerless must pay Local Access seventy-five percent of all the collected tandem access revenue it generated on Local Access's traffic pursuant to the bargain it made in the First Amendment.

The next inquiry is what "collected tandem access revenue" entails.  Section A3 of the First Amendment states in relevant part:

> Peerless will share 75% of Collected Tandem Access [R]evenue it receives on traffic associated with Local Access.  Collected Tandem Access Revenue is defined as tandem access revenue actually collected by Peerless, whether via tariff or contract, for the delivery of interMTA . . . or interLATA . . . traffic to Local Access.  Collected Tandem Access Revenue includes all per-minute charges associated with the delivery of interMTA or interLATA traffic . . . but excludes charges for facilities or other non per-minute charges.

(Doc. 135-1 at 14).   Peerless argues that § A3 allows for the sharing of revenue for a subset of long-distance traffic—"tandem access"—, which explicitly excludes charges for facilities and other non-per minute charges.   Rather than sharing revenue on all long-distance traffic, Peerless contends that collected tandem access revenue means revenue on switched access traffic, which amounts to traffic delivered to Local Access by way of the routing instructions in the LERG.

Here again, the scope and extent of collected tandem access revenue is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression.   Thus, it is ambiguous as a matter of law and summary judgment will be denied on this issue.   See *Shields Pork Plus*, 767 N.E.2d at 949.

### E.      Fraud Regarding the Inteliquent Agreement

The parties cross move for summary judgment on Peerless's Counterclaim VIII and fifth affirmative defense regarding the rejected August 24 Offer.   Peerless formally declined to match the August 24 Offer and declared that it "no longer has the exclusive right to provide Homing Tandem Service to Local Access."   (Doc. 1075-6 489).   In the ensuing weeks, Local Access and Inteliquent continued to negotiate the terms of the August 24 Offer, which culminated in the Inteliquent Agreement.  (Doc. 1092-5 at 3–13).

Peerless alleges that, unlike the August 24 Offer, the final Inteliquent Agreement contained an explicit exclusivity provision, and that it would have matched the Inteliquent Agreement as executed if it had been given the opportunity.   Thus, Peerless characterizes the August 24 Offer as a farce.   Peerless further claims that Local Access breached § 3.3 of the Contract by failing to provide it with the terms as they existed in the final Inteliquent Agreement.   Local Access admits that after Peerless declined to match the August 24

Offer, it negotiated amendments to the agreement with Inteliquent. But Local Access maintains that the August 24 Offer was a valid competitive offer and the additional amendments made to the final Inteliquent Agreement were the result of the changing needs of the parties and not the result of fraud or conspiracy.

A plaintiff must allege four elements to establish a fraud or fraudulent misrepresentation claim: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quotation omitted).

As with the fraudulent inducement claim pertaining to the First Amendment, summary judgment will be entered against Peerless for failing to satisfy the elements of fraud. Peerless cannot demonstrate that Local Access made a false statement concerning any material fact. There is no dispute that the August 24 Offer was a genuine competitive offer and that it was presented to Peerless in its entirety. (Doc. 1075-3 at 243–244). Peerless affirmed that it would not match the August 24 Offer and was waiving its exclusivity. (Doc. 1075-6 489). Peerless baselessly speculates as to Local Access's intent with the August 24 Offer, but it undeniably declined the August 24 Offer of its own accord. Moreover, Peerless cannot point to any language in § 3.3 or elsewhere in the Contract that would require Local Access to alert Peerless as to the evolving terms of its agreements with third party carriers after Peerless grants permission to reroute traffic under § 3.3. Thus, summary judgment is appropriate on Peerless's Counterclaim VIII and fifth affirmative defense.

### F.     Local Access's Routing Instructions

Peerless moves for summary judgment on Count V, wherein Local Access alleges that Peerless violated § 5.18 of the Contract.  Section 5.18 states as follows:

> Homing Tandem Service may not be used for termination of "pass through" or transit access traffic if such use results in an arrangement that seeks to avoid the appropriate application of switched access charges.

(Doc. 135-1 at 6).

Local Access accuses Peerless of routing traffic from third party carriers to Local Access in contravention of the default routing information that Local Access uploaded into the LERG.  Peerless moves for summary judgment because it claims § 5.18 unambiguously applies to Local Access only.

The Contract is clear that Peerless is the "provider" of Homing Tandem Services, but there is no contractual evidence that Peerless's role as the provider of Homing Tandem Services necessarily excludes it from using Homing Tandem Service as contemplated by § 5.18.  Unlike many other subsections within section 5 of the Contract, § 5.18 does not reference Local Access or "customer" as the sole responsible party.  It is well-established that "when parties to the same contract use . . . different language to address parallel issues [ ], it is reasonable to infer that they intend this language to mean different things."  *Collins v. Univ. of Notre Dame Du Lac*, 929 F.3d 830, 841 (7th Cir. 2019) (quotation omitted).  Therefore, Peerless's Motion will be denied on this issue because it has not conclusively demonstrated that it is exempt from this provision.

## IV.   CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Final Judgment (Doc. Nos. 1060, 1075) is

   **GRANTED in part** as set forth herein and **DENIED** in all other respects.

2. Defendant's Motion for Summary Judgment (Doc Nos. 1057, 1092) is

   **GRANTED in part** as set forth herein and **DENIED** in all other respects.

3. Plaintiff's Requests for Oral Argument (Doc. Nos. 1062, 1066, 1086) and

   Defendant's Request for Oral Argument (Doc. 1065) are **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on December 15, 2023.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record