**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

LOCAL ACCESS, LLC,

        Plaintiff,

v.                                                                            Case No.: 6:17-cv-236-WWB-EJK

PEERLESS NETWORK, INC.,

        Defendant.
_____/

**ORDER**

THIS CAUSE is before the Court on Defendant's Motion to Exclude Expert David Gabel (Doc. Nos. 1052, 1080); Defendant's Motion to Exclude Expert James Smith (Doc. Nos.1053, 1073); Defendant's Motion to Exclude Expert David Malfara (Doc. Nos. 1055, 1074); Plaintiff's Motion to Exclude Expert Michael Starkey (Doc. 1058); and Plaintiff's Motion to Exclude Expert James Webber (Doc. Nos. 1059, 1082).[1]

**I.     BACKGROUND**

This dispute arises out of a 2012 agreement wherein Defendant, Peerless Network, Inc. ("**Peerless**") agreed to provide Plaintiff, Local Access, LLC ("**Local Access**") with Homing Tandem Service. (Doc. 135-1 at 2–12). The agreement, known as the Master Service Agreement ("**Contract**"), obligated Local Access to populate the Local Exchange Routing Guide ("**LERG**") with routing instructions designating Peerless as the default tandem provider for all traffic directed to Local Access within the Peerless

---

[1] With the Court's permission, the parties have submitted a number of filings under seal. However, recognizing that proceedings in the United States District Court are public and court filings are matters of public record, this Order has been filed publicly.

footprint.  (*Id.*; Doc. 1075-1 at 134:6–23; Doc. 1075-4 at 58:14–19; Doc. 1075-16 at 17:12–17).

There are many points of contention between the parties, but as relevant here, the dispute begins with § 3.3 of the Contract, which established that Local Access would be entitled to reroute traffic designated for Peerless in the event it received a competitive offer that Peerless failed to match.  (Doc. 135-1 at 4).  On July 31, 2015, Inteliquent, Inc. ("**Inteliquent**"), a non-party telecommunications company, sent Local Access a competitive offer.  (Doc. 1075-17 at 345).  This competitive offer included a revenue sharing agreement wherein Inteliquent agreed to share seventy-five percent of all "Collected Tandem Access Revenue" with Local Access.  (*Id.*).  Peerless matched the competitive offer, which became the First Amendment to the Master Service Agreement. ("**First Amendment**," Doc. 135-1 at 14–15).  Peerless has never paid Local Access any percentage of the Collected Tandem Access Revenue it obtained from Local Access's traffic.  (Doc. 1075-4 at 242:6–243:19).  In the summary judgment Order (Doc. 1201), the Court ruled that Peerless was obligated to pay seventy-five percent of its Collected Tandem Access Revenue to Local Access but found the First Amendment ambiguous as to the scope of the traffic to which the revenue sharing provision applies.  (*Id.* at 14–19).

Shortly after the execution of the First Amendment, Inteliquent presented Local Access with a second competitive offer that Peerless declined to match.  (Doc. 1075-6 489–492).  Local Access then shifted the majority of its traffic to Inteliquent, but some traffic remained with Peerless.  (Doc. 1075-3 at 269–270; Doc. 1075-17 at 365–366). Over two years later, Peerless unilaterally cancelled the Contract with Local Access, claiming that Local Access violated its right of complete exclusivity by routing traffic to

2

Inteliquent prior to its decision not to match the second competitive offer. (Doc. 1137-5 at 4). In the summary judgment Order, the Court found that the extent of Peerless's exclusivity over Local Access's traffic within the Peerless footprint was ambiguous as well. (Doc. 1201 at 12–14).

## II.   LEGAL STANDARD

Although opinion testimony is generally inadmissible, Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony in limited circumstances. Expert opinion testimony is admissible if: (1) "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." *Id.*

"[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). Pursuant to *Daubert*, the determination of admissibility is "uniquely entrusted to the district court," which is given "considerable leeway in the execution of its duty." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quotation omitted). However, "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has distilled the test for determining the admissibility of expert testimony under Rule 702 and *Daubert* into three basic inquiries—(1) is the expert qualified; (2) is the expert's methodology reliable; and (3) will the testimony assist the trier of fact. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

## III. DISCUSSION

The parties have retained experts who have opined as to: (1) the scope of the seventy-five percent revenue sharing provision; (2) the extent of exclusivity provided for by the Contract; (3) the composition of the traffic that Peerless sent to Local Access; and (4) damages. The parties have moved to exclude expert testimony on each of these issues. In addition, the parties seek to exclude expert testimony relating to whether the Contract allows for outbound traffic. Because the Court determined as a matter of law that Local Access cannot recover damages for its lost profits or business opportunities flowing from Peerless's failure to route its outbound traffic, this issue has become moot. (Doc. 1201 at 7–11); *see also Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (quotation omitted)). The parties' remaining arguments will be addressed in turn below.

### A. Gabel

There is no dispute that Gabel is a qualified expert in the fields of telecommunications and economics, and the Court finds that he is qualified based on the evidence before the Court. Rather, Peerless moves to strike his opinions on the basis that they are unreliable. Specifically, Peerless argues that: (1) Gabel's estimate of the traffic mix delivered to Local Access is unreliable; and (2) Gabel's chosen rate to calculate Local Access's alleged damages is unreliable.

4

### 1. Traffic Mix Estimate

Peerless challenges Gabel's opinion estimating the minutes of Long-Distance Termination traffic to which the revenue sharing provision could apply. In his May 1, 2023 report, Gabel adopted a methodology developed by Peerless's expert, James D. Webber. (Doc. 1080-11, ¶ 21; *see also* Doc. 1080-12). In Webber's November 3, 2022 report, Webber analyzed Local Access's Call Detail Records ("**CDRs**") to calculate the approximate total volume of traffic that would have traversed Peerless's network for calls destined to Local Access. (Doc. 1080-12, ¶¶ 40–41). From there, Webber used "operational and financial records provided by Peerless" to determine the ratio of Long-Distance Termination to Local Transit traffic delivered to Local Access. (*Id.* ¶ 45). Webber determined that approximately three percent of all traffic delivered over the Peerless network to Local Access related to calls for which switched access charges applied. (*Id.*). The remaining traffic delivered to Local Access was split between Long-Distance Termination and Local Transit at a three-to-one ratio. (*Id.*). The Court notes that Webber's methodology appears to be sufficient under *Daubert*, and that Gabel was entitled to rely on it in forming his own opinion. *See, e.g.*, *Christiansen v. Wright Med. Tech. Inc.* (*In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig.*), 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015) (finding that the "facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and findings").

Using Webber's calculations as to the traffic mix delivered to Local Access as a baseline, Gabel concluded that approximately 72.75% of the traffic delivered from

5

Peerless to Local Access was Long-Distance Termination traffic. (Doc. 1080-11, ¶¶ 21–22). Moreover, Gabel accepted Peerless's Minutes of Use calculations—which Local Access stipulated to—that indicate Peerless delivered approximately 3.6 billion minutes of traffic to Local Access between July 2015 and April 2018. (*Id.* ¶ 20). Taken together, Gabel concluded that Peerless delivered approximately 2.6 billion Long-Distance Termination minutes to Local Access. (*Id.* ¶ 26).

Peerless objects that Gabel misappropriated Webber's findings because Webber calculated only the minutes delivered from Inteliquent to Local Access, not from Peerless to Local Access. However, Webber's methodology appears to be designed to determine the composition of the traffic delivered to Local Access, not the composition of total traffic delivered by Inteliquent to other carriers. To the extent Peerless wishes to argue that the traffic mix Local Access received from Inteliquent would have been meaningfully different than the traffic Local Access received from Peerless, that goes to the weight of Gabel's testimony, not its admissibility. *See City of S. Mia. V. DeSantis*, No. 19-22927, 2020 WL 7074644, at *3 (S.D. Fla. Dec. 3, 2020) ("The presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility." (quotation omitted)).

Next, Peerless objects because, at his deposition, Gabel described Webber's methodology as "unconventional" and admitted that it made him "uncomfortable." (Doc. 1080-14 at 196:21–197:2). Gabel previously criticized Webber's report on the grounds that the total minutes used in calculating the percentages for the traffic mix is not consistent across the three categories of traffic analyzed. (Doc. 1080-9, ¶¶ 8–9). But it is well established that "[t]he identification of such flaws in generally reliable scientific

6

evidence is precisely the role of cross-examination." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003). To the extent Gabel's adoption of Webber's findings is inconsistent with his previous observation about the deficiencies in Webber's methodology, this too goes to the credibility of his testimony, not its admissibility. Likewise, the extent to which Gabel did not adequately explain his rationale for departing from the conclusions he made in his earlier February 1, 2023 report is a subject best addressed during cross-examination. *See Daubert*, 509 U.S. at 596.

        2.     *Gabel's Chosen Rate*

When calculating damages, Gabel used $0.0066 as the baseline rate that Peerless charged its customers for Long-Distance Termination traffic delivered to Local Access. (Doc. 1080-11, ¶ 23). This rate was derived by taking the "average" of the rates from "one of Peerless's rate decks" that was produced in discovery. (*Id.*). Peerless produced thousands of rate decks to Local Access, but nevertheless Gabel relied on a single one, which he testified was given to him "by Mr. Russell," a co-owner of Local Access. (Doc. 1128-2 at 274:19–275:5). Gabel further testified that he did not believe that $0.0066 was an accurate rate, admitting that it was a "placeholder" until Local Access receives additional discovery from Peerless.[2] (Doc. 1080-11, ¶ 24).

Gabel's blind acceptance and reliance on the single rate deck provided to him by Local Access, when thousands were available to analyze, renders his methodology unreliable and therefore inadmissible. *See PODS Enters., Inc. v. U-Haul Int'l, Inc.*, No.

---

[2] In the February 13, 2024 Order (Doc. 1210), the Court ordered this discovery dispute recommitted to Magistrate Judge Kidd to facilitate the production of additional discovery on this issue. Magistrate Judge Kidd ordered Peerless to supplement its responses on or before March 6, 2024. (Doc. 1212).

8:12-cv-01479-T, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014). Gabel acknowledges that the rate of $0.0066 has no basis in fact and describes it as a "placeholder" until Local Access receives additional CDRs from Peerless. But Local Access's failure to provide Gabel with the available evidence on this issue will be fatal to the admissibility of his testimony. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (rejecting expert who did not explain why he ignored certain data, accepted only testimony and data that suited his theory, and "cherry-picked" supporting facts).

    B.    **Smith**

Local Access retained James M. Smith, an attorney who practices telecommunications law, to offer opinions regarding Local Access's status under the Telecommunications Act of 1996 and whether Federal Communication Commission ("**FCC**") rules obligate Peerless to terminate Local Access's outbound traffic. Peerless moves to exclude his findings pertaining to outbound traffic. In the December 15, 2023 Order on the parties' motions summary judgment, the Court resolved this issue as a matter of law. (Doc. 1201 at 7–11). Thus, Smith's testimony is now moot, "because it is redundant of arguments previously presented to, and resolved by, this Court." *Abrams v. Ciba Specialty Chems. Corp.*, No. 08-0068, 2010 WL 1141409, at *4 (S.D. Ala. Mar. 22, 2010). Peerless's Motion will be denied as moot, and the Court will not consider Peerless's remaining objections to Smith's testimony.

    C.    **Malfara**

There is no dispute that Malfara is a qualified expert in the field of telecommunications, and the Court finds that he is qualified based on the evidence before

8

the Court. Peerless seeks to exclude portions of Malfara's May 29, 2018, January 19, 2023, and May 2, 2023 reports relating to the issue of complete exclusivity on the grounds that: (1) he offers impermissible legal conclusions; and (2) his testimony will not assist the trier of fact.

The parties dispute whether the Contract, including the First Amendment, provides Peerless with the right of complete exclusivity over all Local Access traffic. After considering the Contract as a whole, the Court previously determined that the Contract is ambiguous on the issue of complete exclusivity. (Doc. 1201 at 12–14). Local Access has retained Malfara to opine on the issue. (Doc. 1074-1 at 7–20). In his report, Malfara purports to interpret section A3 of the First Amendment, which states that "consistent" with the Contract, "Peerless will be the sole provider of Homing Tandem Services . . . " (Doc. 135-1 at 14). In his May 29, 2018 report, Malfara explained as follows:

> In everyday language, "consistent" means consistent. That is: in agreement with, in accordance with; congruent with; without variance to; not contradictory to; or, *the same as*. In the case of the Agreement, *to the extent that*, is also an implied part of that meaning, since any variance from the conveyance or denial of exclusivity held within the Agreement would make A3 <u>not consistent</u> with the Agreement
>
> . . . .
>
> With that in mind, the "Current Local Access Agreement" as it is cited here, contains no language whatsoever making Peerless "the sole provider of Homing Tandem Services".
>
> . . . .
>
> Therefore, in a reasonable reading of A3 of the First Amendment, I find nothing that would change the operational exclusivity requirements of the original agreement as it pertains to Homing Tandem Service which, as explained earlier, do not exist.

(Doc. 1074-1 at 18–19).

Peerless challenges the admissibility of this testimony. As an initial matter, Peerless appears to argue that Malfara's testimony should be inadmissible because it believes that the provision in question is an unambiguous grant of complete exclusivity to Peerless, making expert testimony to the contrary inherently unhelpful to the trier of fact. But contrary to Peerless's assertions, the Contract is ambiguous on the issue. (Doc. 1201 at 12–14). Malfara's testimony will not be excluded on this basis.

Peerless also seeks to exclude Malfara's testimony on the grounds that it constitutes improper legal argument. It is well-established that "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005). Moreover, "questions of law are not subject to expert testimony." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128–29 (11th Cir. 2018). District "courts must remain vigilant against the admission of legal conclusions," and have therefore "excluded expert testimony that employs terminology with legal import." *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1325 (M.D. Fla. 2015) (quotation omitted). And, most critically here, "[i]n the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible." *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 8 (Fed. Cl. 2007)

Here, Malfara's testimony will be excluded because it is impermissible legal analysis. "Consistent" is not a technical term and does not require explanation from a telecommunications expert. As recounted in the summary judgment Order, the issue of exclusivity is ambiguous because the interaction between the Contract and the First Amendment is uncertain, not because technical language stands in the way of a plain

reading. Malfara's interpretation may be viable, and Local Access will be free to advocate for it at trial, but Malfara will not be permitted to testify on the subject.

### D. Starkey

There is no dispute that Starkey is a qualified expert in the field of telecommunications, and the Court finds that he is qualified based on the evidence before the Court. Local Access seeks to exclude several portions of Starkey's December 2, 2022 and June 1, 2023 reports on the grounds that Starkey's opinions: (1) are not relevant; and (2) are impermissible legal advocacy.

First, Local Access seeks to exclude Starkey's testimony on the issue of exclusivity. (Doc. 1081-1 at 17–22). In its Response, Peerless notes that this section of Starkey's report is largely written in response to Malfara's opinion as to the meaning of "consistent" in the First Amendment. Like Malfara's opinion, Starkey's opinions assessing the extent of exclusivity provided for by the Contract and First Amendment will be excluded, as it is impermissible legal argument.

Next, Local Access seeks to exclude Starkey's opinions regarding how FCC regulations are implemented by telecommunications carriers, including how industry actors comply with the Northern District of Texas decision, *Sw. Bell Tel. Co. v. IDT Telecomms., Inc.*, No. 3:09-CV-01268, 2012 WL 13093941(N.D. Tex. Mar. 9, 2012) (the "**IDT decision**"). In his December 2, 2022 report, Starkey offers opinions with regard to the potential application of FCC regulations and the IDT decision to § 5.18 of the Contract, which provides that "Homing Tandem Service may not be used for termination of 'pass through' or transit access traffic if such use results in an arrangement that seeks to avoid the appropriate application of switched access charges." (Doc. 135-1 at 6). Starkey

11

provides an interpretation of several terms used in the agreement, including "pass through" and "transit," and describes a scenario involving the termination of calls to prepaid calling card companies. As part of his report, Starkey includes an analysis of the IDT decision. Local Access objects that this opinion contains improper legal analysis.

It is well-established that the interpretation of a contract is a question of law for the Court. But this portion of Starkey's report appears to offer clarification as to the meaning of technical trade terms contained in the Contract, not bare legal opinions. Starkey's opinions appear to be aimed at demonstrating how the telecommunications industry functions within the confines of the law, and he relies on his experience and training to render his opinion. Because Starkey's opinions may assist the trier of fact in understanding industry practice, the *Daubert* motion seeking to exclude his testimony will be denied.

### E. Webber

There is no dispute that Webber is a qualified expert in the field of telecommunications, and the Court finds that he is qualified based on the evidence before the Court. In his November 3, 2022, December 2, 2022, and June 1, 2023 reports, Webber estimated Peerless's alleged damages caused by Local Access improperly routing traffic to Inteliquent. This included estimating the minutes of Long-Distance traffic that Peerless delivered to Local Access. To do so, Webber identified the markets in which Peerless was capable of providing homing tandem services using information provided by Peerless. (Doc. 1114-6, ¶ 6(a)). From there, Webber analyzed Local Access's CDRs to ascertain the volume of traffic Local Access routed through Inteliquent in those markets while Peerless was capable of servicing the traffic. Webber then separated the traffic into

12

Long-Distance and Local Transit and applied a per-minutes of use rate to each traffic type to estimate the revenue Peerless would have generated had the traffic been routed to it rather than Inteliquent.[3]  (Doc. 1114-7, ¶¶ 33–35).

Local Access seeks to exclude portions of Webber's reports as unreliable under *Daubert* because it: (1) fails to account for whether Peerless had the capacity to handle Local Access traffic at the time it was allegedly improperly routed to Inteliquent; and (2) does not factor in the porting of telephone numbers in determining the composition of the traffic.

### 1. Peerless's Capacity

Local Access claims that Webber's report is unreliable because he based his damages calculations on a Peerless document containing the dates that Peerless first became capable of servicing traffic in a given market.  Local Access charges that Webber's analysis is "fatally flawed" because it takes for granted that Peerless had the capacity to handle Local Access's traffic on the dates Peerless claims it became active in those markets.  Local Access argues that this "large analytical leap" renders Webber's analysis irrelevant and therefore excludable under *Daubert*.  (Doc. 1059 at 10).

Webber's purported failure to consider Peerless's capacity to service Local Access's traffic does not render his findings deficient under *Daubert*.  Webber addresses Local Access's concern to some extent by factoring in a one-month time lag between the

---

[3] In the summary judgment Order, the Court found that the First Amendment was validly executed and that Peerless is obligated to pay Local Access seventy-five percent of its Collected Tandem Access revenue.  (Doc. 1201 at 14–17).  To the extent Webber's damages calculations assume that Peerless's obligation to pay Local Access Collected Tandem Access Revenue was excused, these opinions will be inadmissible because they are "not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (quotation omitted).

13

time Peerless began servicing traffic in a given market and Peerless's capacity to handle Local Access's traffic in that market. (Doc. 1114-11 at 92:5–25). To the extent Local Access believes that Peerless did not have sufficient capacity to route its traffic, it will have the opportunity to prove it at trial and may cross-examine Webber on the question.[4]

### 2. Webber's Composition of Local Access's Traffic

In his June 1, 2023 report, Webber estimated that Local Access's traffic consisted of 4.58% switched access, 14.85% long-distance, and 80.56% local transit. (Doc. 1114-7, ¶ 11). Local Access argues that Webber's analysis is unreliable because he did not use an accurate statistical sample of Local Access's data. In generating his report, Webber relied on the North American Local Exchange NPA NXX Database, Wire Center Edition ("**NALENND**"). (*Id.* ¶ 17). Local Access charges that Webber's reliance on the NALENND was errant because the NALENND does not provide information on the level of an individual phone number; it provides data on blocks of 1000 telephone numbers. Local Access explains that the NALENND does not account for telephone numbers that have been ported to a new location sometime after it was originally assigned. Local Access argues that the failure to consider number porting renders Webber's estimate as to the composition of Local Access's traffic unreliable, because much traffic that is represented as Local Transit in the NALENND may have been ported to a new location and thus be, in actuality, Long-Distance traffic.

---

[4] Local Access also seeks to exclude Webber's opinions for failing to consider whether Peerless advised Local Access of its attaining capacity in a given market. To the extent Peerless was obligated to notify Local Access that it had capacity, which is uncertain, this amounts only to a dispute of fact as to when damages began accumulating and is not a reason to exclude Webber's testimony.

14

Webber testified that his analysis was at the 1000 block level only as codified in the NALENND. (Doc. 1082-3 at 40:17–41:21). Webber claims he did not undertake an analysis of any particular number in part because the overall effect on the traffic composition would have been minimal. (Doc. 1114-7, ¶ 17). Webber explains that the effect of numbers being ported to a long distance location would be counterbalanced because much of number porting would be in the form of shifts from wireline to wireless phones. (*Id.*). With potentially more wireless phones in a given 1000 block than represented in the NALENND, more traffic may have actually been local than suggested by the NALENND because MTAs, which are used for wireless phones, are often larger than the LATAs used for wireline phones. (*Id.*). Nevertheless, Local Access urges that Webber was required to undertake the analysis at the level of the individual phone number to generate a reliable report under *Daubert*.

In essence, Local Access is arguing that Webber's report should be excluded because it fails to assess whether some telephone numbers were ported. But it is well-established that the "failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Tech. DC-8*, 326 F.3d at 1346 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring)). Webber's methodology is "empirically testable," as is the effect that number porting may have had on his sample, which, as Webber recounts, could have the overall effect of increasing the composition of local traffic in the sample. *Id.* Moreover, Webber's unrebutted testimony is that the NALENND database is commonly relied on to separate local and nonlocal traffic for billing purposes. (Doc. 1114-8 at 39:5–23, 44:21–45:8). Webber's analysis appears to be the product of sound principles and methods and will thus be admissible under *Daubert*.

15

IV. **CONCLUSION**

For the reasons set forth above, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion to Exclude Expert David Gabel (Doc. Nos. 1052, 1080) is **GRANTED in part** as set forth herein and **DENIED** in all other respects.

2. Defendant's Motion to Exclude Expert James M. Smith (Doc. Nos. 1053, 1073) is **DENIED as moot**.

3. Defendant's Motion to Exclude Expert David Malfara (Doc. Nos. 1055, 1074) is **GRANTED in part** as set forth herein and **DENIED** in all other respects.

4. Plaintiff's Motion to Exclude Expert Michael Starkey (Doc. 1058) is **GRANTED in part** as set forth herein and **DENIED** in all other respects.

5. Plaintiff's Motion to Exclude Expert James Webber (Doc. Nos. 1059, 1082) is **DENIED**.

6. Local Access LLC's Request for Oral Argument Regarding Objection (Doc. 1029) is **DENIED as moot**.

**DONE AND ORDERED** in Orlando, Florida on March 4, 2024.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record