IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LOCAL ACCESS, LLC,

      Plaintiff/Counter-Defendant,

                               CASE NO.: 6:17-cv-00236-JSS-EJK

v.

PEERLESS NETWORK, INC.,

      Defendant/Counter-Plaintiff

_____/

**LOCAL ACCESS LLC'S MOTION FOR SANCTIONS FOR FAILURE TO COMPLY WITH A DISCOVERY ORDER AND SPOLIATION OF EVIDENCE**

Local Access, LLC ("LA"), by its undersigned counsel, respectfully moves for sanctions against Peerless Network, Inc. ("PN") pursuant to the inherent authority of this Court to grant sanctions, Fed.R.Civ.P. 37(b)(2), and Fed.R.Civ.P. 37(e).

**I.      PRELIMINARY STATEMENT**

LA has alleged in this case that, among other breaches, PN failed to pay $11,000,0000 to LA for seventy-five percent (75%) of Collected Tandem Access Revenue ("CTAR") received on traffic associated with LA since August 2015. Since this lawsuit was filed in February 2017, LA has served multiple discovery requests on PN to obtain information regarding the amount of CTAR for each telephone call delivered to LA since August 2015 that was billed and collected by PN either directly, or through its third party billing vendor, CSG. PN has responded with incomplete data and carefully parsed and misleading answers or excuses as to why PN had not

provided LA with the requested information, all of which have resulted in years of time consuming and expensive discovery disputes before this Court.

On February 13, 2024, Judge Berger directed PN to provide responses to two key interrogatories (doc. 1210), which, if answered completely, would finally have provided LA with the information that it has been seeking since 2017. Magistrate Judge Kidd ordered PN to provide responses. (Doc. 1212). Rather than provide responses as directed by Judge Berger, PN objected to the interrogatories and Magistrate Kidd's order, and on March 6, 2024 provided responses to interrogatories that were not asked, indicated that years worth of revenues could not be determined because the underlying data is no longer "*accessible*" or "*reasonably available*", and then qualified its responses with disclaimers that essentially make them unusable. (**Ex. 1**).

In response, on March 24, 2024, LA's counsel emailed PN's counsel seeking clarification as to how the requested records were not "accessible" or "reasonably available to PN". PN did not respond, but shortly before 11:00 p.m. that evening, PN filed its Opposition to LA's Motion to Amend or Supplement Its Expert Reports (doc. 1241) and Declaration from Robert Sherman, PN's "Vice President Information Technology" acknowledging PN's routine destruction of billing data used to generate customer invoices reflecting amounts PN billed its customers for each call delivered to LA, the very data that LA has sought in this litigation since 2017. (Doc. 1241-2).

The magnitude of this stunning eve of trial admission cannot be understated. The purged records contain PN's billing data for ███ of the calls that are the subject

of LA's damages claim.[1] Such information is exclusively in PN's possession. LA has no other avenue to obtain exactly what PN charged its customers per-minute for each call delivered to LA. PN either violated this Court's order by not providing complete responses or it spoliated the information.  Either way, PN actions are sanctionable and the harshest sanctions should be imposed for PN's misuse of the discovery process, failure to comply with a discovery order, and spoliation of evidence.[2]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### a.    LA's Breach of Contract Damage Claims.

LA and PN entered into a Master Services Agreement effective June 1, 2012 (the "Contract"). (Doc. 1-1; 86-1, 135-2). On August 5, 2015, the parties entered into a First Amendment to Master Service Agreement (the "First Amendment") (doc. 1-2, 86-2, 135-2) wherein PN agreed to pay LA a revenue-share of 75% of its CTAR for all long distance per-minute charges associated with each call PN delivered to LA:

> A3.  PN will share 75% of Collected Tandem Access revenue it receives on traffic associated with LA. Collected Tandem Access Revenue is defined as tandem access revenue actually collected by PN, whether via tariff or contract, for the delivery of interMTA (in the case of traffic originated by wireless carriers) or interLATA (in the case of traffic originated by landline carriers) traffic to LA. Collected Tandem Access Revenue includes all per-minute charges associated with the delivery of interMTA or interLATA traffic (as the

---

[1] Curiously, Mr. Sherman did not say that the customer billing itself had been purged, only the underlying data that PN used in preparing its bills.

[2] PN and its counsel, Kelley Drye and Warren have been admonished for routinely objecting to discovery (doc. 546 at 35:19-25) and held in contempt and sanctioned for intentional misuse of LA's protected litigation materials. (Doc. 703, 738).

case may be), but excludes charges for facilities or other non per-minute charges. (Doc. 1-1, 86-2, ¶ A3).

PN promised to provide a compensation statement and payment by December 5, 2015 (doc. 1-3, 86-3, 135-3) but failed to do so. PN contends that compensable CTAR calls are limited to only the calls that PN's billing vendor, CSG, invoiced for "LERG routed" calls delivered to LA. Conversely, LA contends that it is owed 75% of CTAR on all per-minute charges for Long Distance calls, regardless of whether CSG or PN billed and/or created the invoice for each call, and regardless of how PN received the customer's call (LERG or non-LERG routed) that PN delivered to LA.

In response to discovery requests, PN has only provided billing data and information related to what was invoiced by CSG and has consistently refused to provide its own direct billing data evidencing what PN itself actually billed per-minute to each customer for delivering each of their calls to LA.[3] The formula is simple for what PN billed each customer for each call: Call duration or "Minutes of Use" or "MOU" multiplied by the applicable rate. So, (MOU) x (rate) = $ billed for each call. This billing data evidence has always been solely in PN's possession.

PN was aware from the outset of this litigation of LA's need for its billing and collection data. PN's failure to make the CTAR payments was alleged in the Complaint filed February 9, 2017 (doc. 1 at ¶ 21, 32, 37), First Amended Complaint

---

[3] ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ **Ex. 2**

filed December 29, 2017 (doc. 86 at ¶ 21, 36, 41, 47), and Second Amended Complaint filed March 5, 2018 (doc. 135 at ¶ 21, 36, 41-45, 55-57, 112-115).

**b.**   **LA's Disclosures, Discovery Requests and Related Court Orders.**

Although the parties have disputed the definitions of CTAR, whether it includes all Long Distance per-minute charges associated with every call PN delivered to LA, whether it was limited to calls invoiced by CSG or included what PN itself billed, LA has consistently sought information regarding PN's own billing and collection data and its customer invoices relating to calls PN delivered to LA.   As early as June 26, 2017, in its First Request for Production of Documents, LA sought invoices and supporting billing data, accounts receivables information, and revenues billed and/or collected that were attributable to CTAR associated with calls PN delivered to LA (**Ex. 3**, Requests 3, 4, 7, 9 and 12).

Of interest, is PN's response to RFP No. 4 wherein LA was seeking the very data that PN now acknowledges was destroyed.   PN did not advise in its response that it does not keep or retain the data but, instead,   complained that "[s]uch a demand would require Peerless to compile lengthy reports which indicate every call during that timeframe amounting to hundreds of man-hours to analyze information not kept in the normal course of business   unreadable except through a separate mediation system".   **(Ex. 4)**   In this response, then, PN acknowledges that it has the data and bills, but does not object on the basis that the data is purged on regular cycles.

 When the responses were inadequate, on September 5, 2017, LA sent its Second Requests for Production of Documents seeking similar information (**Ex. 5**,

Requests 23 and 27). PN initially objected to every request, but did provide some data, but not all, of the requested information. (**Ex. 6**).

PN compounded its excuses regarding the onerous task of gathering the data and invoices as stated in its response to RPD No. 4  during a hearing before the late Magistrate Judge Smith on February 21, 2018, complaining that PN would have to undergo "extremely laborious efforts to try to match up those billions of call records " to the invoices.  (Doc.  143 at 88:3 – 90:1). However, at no time did PN advise the Court that it regularly purged the very records that it complained about having to review and produce.

LA's Amended Rule 26 Disclosures, served May 8, 2018, also detailed its discovery plan and alerted PN to the need to retain its billing data:

> " The plaintiff will seek this information through discovery, and apply the same to the following methodology:
>
> \*       \*       \*
>
> 2.  The defendant's records for calls billed as InterLATA and InterMTA from August 5, 2015 through the present (and continuing until the expiration of the First Amendment to the Master Services Agreement) will be reviewed to identify those records relating to InterMTA and InterLATA traffic delivered to LA.
>
> 3. Each record so identified will provide the minutes of use (MOU) for the call, and the identity of the entity that defendant invoiced for the billable amount per call for traffic delivered to LA.
>
> 4. The MOUs and billable amounts will be aggregated based on the entity that defendant invoiced for traffic delivered to LA.
>
> 5. The defendant's invoices or other documents obtained through discovery will identify the rate(s) per MOU the defendant charges each entity for traffic delivered to LA.

> 6. The total MOUs for each entity will be multiplied by the applicable rate that the defendant charges each entity for traffic delivered to LA. This will result in the maximum revenue that could have been collected by the defendant on the plaintiff's traffic that is covered by the First Amendment to the Master Service Agreement. This maximum revenue will be multiplied by 75% to determine the amount that the defendant should have paid the plaintiff pursuant to the First Amendment to the Master Service Agreement."

(**Ex. 7**)

All in all, throughout this litigation, LA has propounded twelve separate sets of requests for production of documents containing 128 individual requests.  Within each of the requests, LA included the following specific instruction:

> 4.   If your response to a document request is that any document, ESI or thing is not in your possession, custody, or control, describe in detail the efforts you have made to locate the document, ESI or thing and identify who has possession, custody, or control of it.  This document request requires the production of all original documents and ESI, all non-identical copies of such documents and ESI, and any preliminary drafts thereof that are within your possession, custody, or control, or within the custody or control of any of your agents, representatives, attorneys or other persons who have or are acting on your behalf."

(As example, **Ex. 3**)  PN never stated in any of its responses that it was systematically destroying the evidence, billing data, and information sought by LA.

By Order dated July 19, 2018, this case was stayed while the parties litigated PN's and its attorneys' violations of the Protective Order. (Doc. S-275,  Doc. 745). Following the conclusion of the almost three year sanctions phase, on October 11, 2022, LA served its Seventh and Ninth Requests for Production of Documents (**Ex. 8 and 9**) requesting PN to (a) provide copies of contracts with customers billed by PN

services (**Ex. 8**, Req. 82), (b) documents showing the total dollar amounts billed by PN

for traffic delivered to LA  (**Ex. 9**, Req. 109), (c) documents showing the total dollar

amounts collected for any calls delivered to LA (**Ex. 9**, Req. 111 and 12).  In addition,

LA served Interrogatory No. 20 on November 20, 2022 and Interrogatory No. 22 on

November 21, 2022. (Doc. 908-1 and 908-2 respectively).  These two interrogatories,

taken together, narrowly and unambiguously seek the amounts PN itself directly billed

and collected each month from each third party customer for all calls that PN delivered

to LA.

> **INTERROGATORY 20:** For each month from August 2015 through March 2022, and for each of the following categories of traffic for each such month: interMTA calls (in the case of traffic originated by wireless carriers), interLATA calls (in the case of traffic originated by landline carriers), IntraLATA calls (in the case of traffic originated by landline carriers) and IntraMTA calls (in the case of traffic originated by wireless carriers), provide the following information for traffic PN delivered to LA: total number of calls, total minutes of use, total amount PN billed each third party (whether via tariff or contract), and total number of minutes that PN did not bill any third party

> **INTERROGATORY 22**: For each month from June 2012 through March 2022, on a monthly basis, for any and all traffic that PN received whatsoever (whether in IP or TDM format) from any third-party, including but not limited to PN's customers (whether licensed telecommunications carriers or not), to be processed, carried, switched, terminated, passed, placed, and/or delivered to LA, provide: total number of calls, total minutes of use, total amount PN billed each third-party (whether via tariff or contract), total amount PN collected on such billing, and total number of minutes that PN did not bill to any third-party.

On December 30, 2022, PN raised a number of objections and refused to answer

Interrogatories 20 and 22  (Doc. 908-3) [4].  LA moved to compel responses. (Doc. 908).

---

[4]  PN's objections to Interrogatories 20 and 22 did not state that the data was not all "reasonably available", or that most of the requested data had been purged.

On February 9, 2023, Magistrate Judge Kidd issued an Endorsed Order denying the Motion to Compel, explaining that LA could renew its motion if it was not resolved by PN's then-forthcoming production of call detail records ("CDRs"). (Doc.923).

PN's production of CDRs were missing years' worth of data and did not provide any customer billing and/or collection data whatsoever, nor provide answers to Interrogatories 20 and 22. The produced billing records did not include information as to what PN itself (rather than its vendor, CSG) billed and collected from its customers for CTAR. On May 15, 2023, LA filed a renewed motion to compel responses to Interrogatories 20 and 22. (Doc. 978), wherein LA argued that PN's CDRs were inadequate because they did not contain PN's billing or collection information. *Id.* at 2–3. Magistrate Judge Kidd denied the renewed motion.

On June 14, 2023, LA filed its Objection to Magistrate's Order (doc. 1013), and by Order dated February 13, 2024 (doc. 1210), District Judge Berger entered an Order sustaining LA's objections as they related to the necessity of compelling responses to Interrogatories 20 and 22. Judge Berger observed and ordered as follows:

> [I]f LA's interpretation of the First Amendment ultimately prevails, **it will then be entitled to damages based on the actual amounts that PN billed and collected on all long-distance traffic, not mere approximates thereof.** In light of the Court's determination regarding the First Amendment, Magistrate Judge Kidd's Order denying further discovery on this issue shall be set aside."
>
> **The Court recognizes that requiring PN to produce additional discovery is potentially burdensome, but simultaneously must acknowledge that LA is entitled to same so that it may precisely calculate its potential damages. Thus, the Court finds that PN must supplement its responses to Interrogatories 20 and 22**. Nevertheless, in the interests of a fair and expedient resolution, and noting the advanced posture of this case, the Court finds that

recommitting this matter to Magistrate Judge Kidd to facilitate the exchange of information in accordance with the considerations set forth in Federal Rule of Civil Procedure 26(b) and the findings in this Order is proper.  (Doc. 1210 at p.5, emphasis added).

In other words, LA's requests in Interrogatories 20 and 22 were seeking appropriate discoverable information, and regardless of any inconvenience or burden on PN, they must be answered. The Court ordered the matter to be recommitted to Magistrate Judge Kidd "to facilitate the exchange of information in accordance with the considerations set forth in Federal Rule of Civil Procedure 26(b) and the findings in this Order." *Id.*  On February 21, 2024, Judge Kidd ordered PN to "supplement its responses to Interrogatories 20 and 22 . . . on or before March 6, 2024".  (Doc. 1212).

On March 6, 2024, PN provided supplemental answers accompanied by an Exhibit purportedly detailing the information sought by LA. (**Ex. 1**). PN's supplemental answers did not answer either interrogatory as asked.  Instead, PN's accompanying Exhibit 20A contained years of billing data gaps, did not directly respond to the specific requests within the interrogatory questions, and seemingly ignored the directives of Judge Berger, as the answers did not contain the following information that was requested by the interrogatories for each third-party: (1) total calls and total MOU for non-LERG-routed long-distance traffic for the 22 months of January 2019-October 2020; (2) total amounts billed for non-LERG-routed long-distance traffic for the 41 months of August 2015-July 2016 and June 2018-October 2020; (3) total calls and total MOU for local traffic for the 39 months of January 2019-March 2022; (4) total amounts billed for local traffic for the 58 months of August 2015-

July 2016 and June 2018-March 2022; (5) total calls for LERG-routed long-distance traffic for the 39 months of January 2019-March 2022; (6) any information whatsoever for "Local Transit Actually InterLata/InterMTA" for the 39 months of January 2019-March 2022; (7) any information whatsoever for any traffic during any timeframe for total MOU PN did not bill; and (8) any information whatsoever for *any* traffic during *any* timeframe for total amounts collected by PN for LA's traffic.[5]

PN qualified its responses to the Interrogatories as "*based on data reasonably available to PN*" leading LA's counsel to send an email on March 24, 2024 to PN's counsel seeking clarification of PN's qualifications to its responses, and specifically asking as follows:

> Exhibit 20A is qualified within the March 6, 2024 Supplemental Response as being "based on data reasonably available to PN", and then vaguely suggests in the legend that for some fields "PN does not have similar data available" for certain time periods.  While Mr. Sherman declared that paragraphs 1-2 and exhibit 20A are true and correct, Mr. Sherman does not explain whether there is additional responsive billing data/information that is in PN possession or control that was not used and/or provided in preparing PN's supplemental answers and, if so, how or why that information  was not "reasonably available to PN" in the preparation of its responses.  Similarly, if the additional information that was not "reasonably available" actually exists, please identify that  information  and  advise  where  it  is  located  and  how  it  can  be

---

[5] PN has stipulated that it collected 100% of what it billed for LERG-routed traffic, but when the limitation of the stipulation was pointed out to the Court, and LA requested that the stipulation be extended to *all* long-distance traffic, PN's counsel was "not prepared to make that stipulation." *Doc.* 835 at 107:9-109:22.  In its objection/motion, "PN stipulates that it collected 100% of the amounts that it billed as reflected on Exhibit 20A" (*doc.*1220 at 9), but that is still inadequate as Exhibit 20A omits any reference to non-LERG-routed traffic (as opposed to LERG-routed traffic) and several years' worth of information (*see supra* for information PN omitted from Exhibits 20A).  PN's stipulation is meaningless relative to years of non-LERG-routed traffic PN itself billed and that PN left off Exhibit 20A.

accessed.  Conversely, if there is no additional information existing, please confirm that that is the case and correct Exhibit 20A accordingly.  (**Ex. 10**).

Late that evening, Mr. Brown responded that "[t]he issues you raise below are addressed in Mr. Sherman's declaration, which was filed along with our opposition" [to LA's motion to supplement its expert reports"]. (Id), which opposition was filed moments before Mr. Brown's response.  In his  Declaration, Mr. Sherman stated that the records sought by LA "are not stored indefinitely", "are retained for two years", "PN therefore does have not [sic] rated call detail records for long-distance termination services traffic other than from within the last two years", and "PN does not have rated call detail records for long-distance termination services traffic that PN delivered to LA".  Doc. 1241-2, ¶5.

Judge Berger specifically ordered PN to provide billing/collection information in response to Interrogatories 20 and 22 because "if LA's interpretation of the First Amendment ultimately prevails, it will then be entitled to damages based on the actual amounts that PN billed and collected on **all long-distance traffic**."  (Doc.1210  at 5 [emphasis added]).  "All long distance-traffic" includes all billing by both CSG and PN for both LERG and non-LERG-routed traffic.  The Court expressly "recognize[d] that requiring PN to produce additional discovery is potentially burdensome, but simultaneously must acknowledge that LA is entitled to same so that it may precisely calculate its potential damages." *Id.* [6]

---

[6] Curiously, while Mr. Sherman discussed the call detail records that were a portion of LA's discovery requests, he sidestepped what happened to PN's actual invoices and billing data He does not state that PN destroyed the invoices or the billing data, only

PN has provided billing data associated with calls that were LERG routed and delivered to LA and billed by PN's billing vendor, CSG.  PN has not provided LA with (a) PN's actual bills for non-LERG long distance calls delivered to LA (which PN has not said have been purged), or (b) PN's internal billing records and data PN billed itself for non-LERG calls which, it appears, is the data that was purged. Accordingly, PN has either (a) willfully disobeyed Judge Berger's Order (Doc. 1210) by not fully responding to Interrogatories 20 and 22; (b) destroyed its actual billing records; and/or (c) destroyed the information upon which the billings were based.

## III.   ARGUMENT

### A.   <u>This Court Should Use its Authority to Sanction PN for Its Willful Violation of Judge Berger's Discovery Order).</u>

Courts have the inherent power to police those appearing before them. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th Cir. 1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 1223. A court may exercise this power "to sanction the

---

that PN destroyed the evidence that would have allowed LA to calculate its damages, i.e. the actual per-minute rate and amount PN billed each customer for each call PN delivered to LA and were included in PN's customer invoices. The Declaration, when accompanied by the discovery responses, then, are still misleading.  If PN has invoices or data from its billing system, then the Declaration is intended to deceive. If PN does not have the billing data it used to bill each customer for each call PN delivered to LA, then PN destroyed data from its internal system(s) during this litigation to prevent LA from getting what has been asked for since 2017 to calculate its CTAR damages. PN had the information when it billed its customers because it generated the invoices.  If the billing data is no longer "reasonably available," then PN either destroyed or hid it (including 28 months of invoices that were generated during this litigation).

willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381, 133 S. Ct. 1166, 1175, 185 L. Ed. 2d 242 (2013).  In addition, Fed.R.Civ.P. 37(b) further grants the Court the authority to impose sanctions for the violation of a discovery order and provides a permissible list of sanctions.

Thus, this Court clearly has the power to sanction PN for its willful and intentional violation of this Court's order directing it to respond to  Interrogatories 20 and 22.  As set forth in detail above, PN was unambiguously ordered by Judge Berger to supplement its responses to Interrogatories 20 and 22.  (Doc. 1210).  Rather than provide answers in the manner and spirit as emphatically directed by Judge Berger, PN, as it has done throughout this litigation, objected to the information sought by LA and then provided incomplete and evasive answers.  PN never disclosed in its answers to Interrogatories 20 and 22 that it no longer had the data underlying its billing records.  That admission was made only after LA's attorney raised questions about PN's evasive answers.

PN has also been intentionally vague about whether it still has the actual billing records that were created from the purportedly missing data, or whether those were also purged.  PN either still has its actual billing records (and not the underlying data) and did not produce them, or PN purged its data and billing records knowing that the records were going to be or were already the subject of LA's discovery requests.  Either way, PN's responses to Interrogatories 20 and 22  violated Judge Berger's order and PN has acted deceptively and has concealed needed information from LA (either by

14

destruction or failure to produce). See *Taser Int'l Inc. v. Phazzer Elecs, Inc.*, Case No: 6:16-cv-366-PGB-LH, 2024 U.S. Dist. LEXIS 8158, 2024 WL 185370 (S.D. Fla. January 17, 2024)(sanctions granted because of defendant's deceptive discovery practices). As set forth above, such conduct is not an isolated instance and LA provided significant evidence of a pattern of bad faith in PN's management of its discovery strategies throughout this case. For these reasons, LA requests this Court to enter sanctions as permitted by F.R.Civ.P.37(b)(2).

**B.     PN Should Be Sanctioned for Spoliation of Its Data.**

The key to unlocking a court's inherent power is a finding of bad faith. *See Purchasing Power*, *supra* at 1223. For the reasons detailed above, PN has acted in bad faith by its spoliation of data and information sought by LA since 2017. Based on the Sherman Declaration, PN is unable to provide complete discovery responses because it no longer has the underlying data necessary to provide a complete response. Even though a finding of bad faith is not necessary in order to sanction a litigant for its failure to comply with a court order, sanctions are proper upon a finding of willfulness, bad faith, or fault on the part of the noncomplying litigant. *Alexander v. Fed. Bureau of Investigation,* 186 F.R.D. 78, 88 (D. D.C. 1998). Spoliation is certainly evidence of willfulness and bad faith and a basis for sanctions.

"Spoliation" is the intentional destruction, mutilation, alteration, or concealment of evidence. *St. Cyr v. Flying J Inc.,* 2007 U.S. Dist. LEXIS 42502 at *3, 2007 WL 1716365 (M.D. Fla. June 12, 2007). This Court may impose sanctions if electronically stored information that should have been preserved in anticipation or

conduct of the litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery. Fed.R.Civ.P. 37(e).   Spoliation of evidence is established when the prejudiced party demonstrates, first, that the missing evidence existed at one time; second, that the spoliator had a duty to preserve the evidence; and third, that the evidence was crucial to proving the movant's *prima facie* case. *Lidey v. Moser's Rides*, Case No. 8:16-cv-1241-T-17JS, 2018 U.S. Dist. LEXIS 224287 at *6-7 (M.D. Fla. September 7, 2018); *Se. Mech. Services, Inc. v. Brody*, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009).

Fed.R.Civ.P. 37(e)(1) sanctions are centered on the effect of the violation, and apply only when the loss of electronic evidence causes prejudice to the other party.  In such event the court may fashion sanctions "no greater than necessary to cure the prejudice".  The spoliation of evidence rises to the level of a *sanctionable* offense under Fed.R.Civ.P. 37(e)(2) when the party seeking sanctions can show that "the party acted with the intent to deprive the other party of the information's use in the litigation", or the bad faith on the part of the spoliator, "such as where a party purposely *loses or destroys* relevant evidence." *Walter v. Carnival Corp.*, Case No. 09-20962-CIV-HOEVELER/GARBER, 2010 WL 2927962 at *2 (S.D. Fla. July 23, 2010) (citing *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)) (emphasis added).  If evidence of bad faith is unavailable, bad faith can be demonstrated through circumstantial evidence.  *Id.; Long v. Celebrity Cruises, Inc.,*  Case No. 12-22807-Civ-TORRES, 2013 U.S. Dist. LEXIS 202770 at *6; 2013 WL 12092088 (S.D. Fla. July 6, 2013)("Courts recognize that because a movant often faces a difficult burden in proving bad faith, and as direct evidence of bad faith is

16

rarely available, circumstantial evidence can be used." While bad faith must be more than mere negligence or even gross negligence, b a d faith sufficient for sanctions "is not limited to acts of malice or willful intent." *Id.* at *7. The Southern District has noted that this burden is light, otherwise "the spoliators [would] profit from the destruction of the evidence." *In re Boston Boat III*, 310 F.R.D. 510, 521 (S.D. Fla. 2015).

A finding by this Court of that "the party acted with the intent to deprive another party of the information's use in the litigation" is the equivalent to finding of bad faith. The phrase "intent to deprive" requires that the spoliator as a "purpose of hiding adverse evidence" from the other parties. *Skanska USA Civ. Se. Inc. v. Bagelheads*, Inc. 75 F. 4th 1290, 1312 (2023). Upon finding bad faith, a court has broad discretion to impose sanctions, which can include but are not limited to: dismissal of the case, entering a default judgment against a defendant, excluding expert testimony, or issuing an adverse jury instruction that raises a presumption against the spoliator. *Boston Boat*, 310 F.R.D. at 514. Although there is significant direct evidence of PN's bad faith, the circumstantial evidence is overwhelming:

### 1.   <u>The missing evidence existed at one time</u>.

There can be no dispute that the purged records existed at one time. Narrowly stated, this data was the underlying data from which PN's invoices were generated. Mr. Sherman admitted that " although PN at one time would have had call detail records that reflected a per minute rate", those records were "retained for two years" and are no longer available. Doc. 1241-2 at ¶ 5.  Mr. Sherman also admits that "PN

also billed switched access traffic by contract". Doc. 1241-2 at ¶7.   Accordingly, by

PN's admissions, the actual invoices and underlying data existed at one time and this

indicia of PN's bad faith spoliation is met.

### 2.   The purged data and information was material to LA's *prima facie* case.

Black's Law Dictionary defines a *prima facie case* as one "which has proceeded

upon sufficient proof to that stage where it will support [a] finding if evidence to [the]

contrary is disregarded." *Black's Law Dictionary 1353* (rev. 4th ed. 1968*); Moltz v. Seneca*

*Balance, Inc.*, 606 F. Supp. 612, 615-616  (S.D. Fla. 1985). According to authors

Wright and Miller, a prima facie case is one which entitles the complainant "to an

affirmative judgment against the defendant" unless the latter adduces contradictory

proof. Wright & A. Miller, Federal Practice and Procedure § 1216, at 116 n.71 (1969).

"The touchstone of both definitions is the existence of some pleadings, supported by

fact and law, that entitles the pleader to some relief unless facts or law to the contrary

is presented." *Moltz,* supra.

Under Illinois law, which governs the interpretation of the Contract, "damages

are an essential element of a breach of contract action and a claimant's failure to

prove damages entitled defendant to judgment as a matter of law".  *PSI Res., LLC v.*

*Lyster*, 2019 IL App (1st) 180025-U, 2019 Ill. App. Unpub. LEXIS 105 (citing *In re*

*Ill. Bell Tel. Link-Up II*, 2013 IL App (1st) 113349, 994 N.E.2d 553, 2013 Ill. App.

LEXIS 449, 373 Ill. Dec. 784, 2013 WL 3296617).

There can be no doubt that proof of damages is an essential component of LA's

*prima facie* case, and the amount that PN itself actually billed and collected from its customers via contract is a large part of LA's damage claim.  PN's billing records are essential to this required element of LA's proof as the information is exclusive to PN and cannot be obtained from any other source. Consequently, this indicia of PN's bad faith also satisfied.

### 3.   PN had a duty to preserve the evidence and knew of its duty when it destroyed the records.

The Eleventh Circuit has made clear that a duty to preserve evidence 'arises once litigation is pending or reasonably foreseeable" *Calhoune v. Ford Motor Co*., Case No. 17-61702-CIV-ALTONAGA/SELTZER, 2019 U.S. Dist. LEXIS 13070 at *6, 2019 WL 341 (2019) (S.D. Fla. January 28, 2019).  This duty extends broadly to all documents 'relevant' to discovery that exist at the time. . . ." *Atta v. Cisco Sys.*, CIVIL ACTION FILE NO. 1:18-cv-1558-CC-JK, 2020 U.S. Dist. LEXIS 224146 at *15, 2020 WL 7384689 (2020) (N.D. Ga. August 3, 2020).   At the latest,  the duty may arise by a properly served discovery request (after a lawsuit has already been filed). *Silhan v. Allstate Ins. Co.*, 236 F. Supp. 2d 1303, 1309 (N.D. Fla. 2002). There may be additional circumstances from which a duty may arise if a party is on notice that documents or tangible items may be relevant or discoverable in pending or imminent litigation. See *Silhan*, 236 F. Supp. 2d at 1313 n.13  The duty only attaches to information within the party's "possession, custody, or control." See *Wilson v. HH Savannah, LLC*, CV420-217, 2022 U.S. Dist. LEXIS 144965 at *8, 2022 WL 3273718 (S.D Ga. June 1, 2022) (quoting In *re Disposable Contact Lens Antitrust,* 329 F.R.D. 336, 430 (M.D. Fla. 2018)

and that cannot be restored or replaced through additional discovery. *Fed.R.Civ.P. 37(e)*, *Wilson v. HH Savannah LLC, supra*.

All PN's billing records that it has either spoliated or otherwise have refused to produce were within PN's possession, custody or control. PN was on notice from the outset of this litigation of its duty to preserve such records. LA's claim that it is entitled to its 75% share of PN's CTAR was first alleged in the original Complaint filed on February 9, 2017. (Doc. 1). Therefore PN's duty to preserve its billing and collection records arose as of the service of the Complaint back in 2017. Nevertheless, as set forth above, the allegations were repeated in amendments to the Complaint (doc. 86, 135) and PN's billing and collection records were the subject of multiple discovery requests beginning with the First Request for Production of Documents which was served on June 26, 2017. (**Ex. 3**). PN was further advised that LA intended to seek such information within the Rule 26(b) disclosures filed on May 8, 2018. (**Ex. 7**). Based on PN's admission that it retains its data for two years, then PN would still have had its 2015 data when this lawsuit was filed and LA propounded its first discovery requests, and would have had its 2016 data when LA served its Initial Disclosures. PN's duty to preserve its billing and collection records arose at the outset of this litigation and PN deliberately destroyed it records will full knowledge of its duty to preserve them. This indicia of bad faith is also satisfied.

### 4.   <u>PN cannot credibly explain how its spoliation of evidence is not sanctionable.</u>

In *Skanska, supra*, the Eleventh Circuit considered whether the District Court's

determination of bad faith was sustainable when the spoliator claimed that certain cell

phone data was destroyed as a result of their "routine" document destruction policies:

> But we review the district court's finding of bad faith for clear error. And an inference of bad faith here was not clear error. Skanska can provide no reasonable explanation for its conduct other than to plead negligence. True enough, much of the evidence was destroyed through "routine" document destruction policies. But a hands-off implementation of an ordinary corporate destruction policy is not a silver bullet. We have already explained that we would be "highly skeptical" of a claim that evidence was unintentionally destroyed "pursuant to a routine policy" after a request that the evidence be preserved. Tesoriero, 965 F.3d at 1186. We will not second guess the district court's skepticism in those very circumstances.
>
> Our conclusion is further confirmed by the advisory committee notes to Rule 37(e). The reasonableness of evidence preservation efforts depends in part on "the party's sophistication with regard to litigation in evaluating preservation efforts." 2015 Committee Notes on Rule 37(e). Skanska is a sophisticated entity—a multinational company tasked with completing a construction contract worth nearly $400 million. Skanska USA even boasts  on its website that it is "one of the largest, most financially sound construction and development companies in the U.S." Even so, Skanska did not bother to take the most fundamental of precautions—starting with backing up the custodians' cell phones and suspending its policy of wiping those phones. And the company is not being held liable for a failure of imagination—Skanska had an active litigation hold, but took no steps to implement it.
>
> Finally, Skanska argues that—as a per se rule—a finding of bad faith premised on circumstantial evidence requires an "affirmative act" by the spoliating party.19 But that argument flouts both the text of Rule 37 and our bad-faith caselaw. As we have explained, the rule provides for sanctions when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e) (emphasis added). Failure to act can thus—by definition—be a violation of Rule 37."

*Skanska, supra*,  at. p. 22

PN is a sophisticated company which, according to its internet web site, is a

"global VoIP provider" with in excess of "4,500 interconnections covering 93% of the

US population", with "9 billion monthly minutes" and service over 200 markets. (**Ex. 11**)  In July 2022, PN was acquired by Infobip, Inc.  in a sale reported to for  "around $200 million" .  "Combined, the two businesses process more than 30 billion monthly customer interactions across the full range of communications channels in 190 countries" (**Ex. 12**, from InfoBip's internet website).

   As in *Skanska*, PN is an extremely sophisticated multinational company that either intentionally deleted its data for the express purpose of depriving LA access to that data or, alternatively, "did not bother to take the most fundamental of precautions—starting with backing up" and retaining its data.  In such event, PN "had an active litigation hold, but took no steps to implement it".  Moreover, unlike in *Skanska*, PN's destruction of its records was not a one-time event since the commencement of this litigation, but it most likely occurred in some regular intervals throughout the pendency of this litigation.

## IV.   CONCLUSION

   PN must be sanctioned by this Court due to (1) its violation of Judge Berger's order by failing to fully answer and by providing intentionally evasive responses to Interrogatories 20 and 22, and/or (2) PN's spoliation of evidence.  If PN only purged its underlying billing data and not the actual invoices to its customers, then PN must be sanctioned for their continuing refusal to produce such records.  The Sherman Declaration is an admission of spoliation of the data that  LA has been requesting since

2017 and what it must have to calculate the average rate PN billed its customers for delivering their PN's customers' traffic to LA.

Without the billing data that PN admittedly destroyed, or the actual invoices for long distance traffic billed directly by PN that PN never produced, PN will continue to claim that LA cannot prove its damages.  The only invoices for long distance traffic billed directly by PN (rather than through its billing vendor, CSG) that LA has received through this litigation are the invoices that PN sent to ████, collectively attached hereto as **Ex. 13,** which demonstrate an average MOU rate of $████ per minute. See **Ex. 14** Declaration of Robert Russell calculating the per MOU rate charged by PN to ████.  As (a) LA has stipulated and agreed that PN received ████████████ of Use for which Local Access was entitled to payment [7], (b) the parties have stipulated and agreed that PN collected upon 100% of its billing for traffic destined for LA [8], and (c) the only rate billed by PN conclusively established through invoices was ████████ per MOU, then LA's damage calculation is:

████████████████████████████

This calculation is supportable by the evidence produced in this case and the stipulations of the parties.

---

[7] See Doc. 1215 at 6  wherein Judge Burger acknowledges that LA's expert, David Gable, accepted and relied on PN's expert witness' calculations of Minutes of Use in concluding that Peerless delivered approximately ████████ Long-Distance Termination Minutes to Local Access.
[8] See footnote 6 above.

For the reasons set forth above, LA moves this Honorable Court for an entry of an Order:

A.     Sanctioning PN Network, Inc. for its intentional violation of this Court's discovery order (doc. 1210) including, but not limited to, striking its Answer, Affirmative Defenses and Counterclaims;

B.     Entering a default order against PN, and entering judgment in favor of LA in the amount of $█████████;  or, in the alternative

C.     Ordering that: (i)  LA shall be entitled to a jury instruction that that the calculation of LA's damages  shall  be: ████████████████████████ █████████, and  (ii) that LA shall be entitled to an adverse inference instruction in its favor, or terms to be determined by this Court; and

D.     Awarding LA all of its attorneys' fees, costs and expenses in its needless discovery requests and disputes with PN regarding data that had been purged; and For such other and further relief as the nature of LA cause requires.

/s/ David S. Sellman
**DAVID S. SELLMAN, ESQUIRE**
(admitted pro hac vice)
Email:  dsellman@sellmanhoff.com
**TAMMY G. COHEN, ESQUIRE**
(admitted pro hac vice)
Email:  tcohen@sellmanhoff.com
SELLMAN HOFF, LLC
2201 Old Court Road, The Cooperage
Baltimore, Maryland 21208
(410) 332-4151

**ERNEST J. MYERS, ESQUIRE**
Florida Bar No.: 947350
Email: emyers@marcusmyerslaw.com
**LEE W. MARCUS, ESQUIRE**
Florida Bar No.: 967076
Email: lmarcus@marcusmyerslaw.com
MARCUS & MYERS, P.A.
6150 Metrowest Blvd., Ste 208
Orlando, Florida 32835
Tel:   407-447-2550 / Fax:      407-447-2551
Counsel for Plaintiff, LA, LLC

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 3.01(g), the undersigned certifies that, Ernest Myers, counsel for LA conducted a 3.01(g) conference with counsel for PN Network, Inc. on March 14, 2024 regarding the relief requested herein and Peerless did not consent to such relief.


Dated: March 27, 2024

/s/ David S. Sellman
David S. Sellman
Admitted Pro Hac Vice


## CERTIFICATE OF SERVICE

The undersigned certifies that this Motion was filed with the Court utilizing the Court's CM/ECF system, which will deliver a link to a true and correct copy of the same to all counsel of record.

/s/ David S. Sellman
David S. Sellman (admitted pro hac vice)


25